IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

RONALD PHIPPS,

                         Plaintiff,

        v.

DR. SOHAIL A. GILLANI[1] and THE STATE
OF NEW YORK,

                    Defendants.

Civil Action No.
9:10-CV-1588 (TJM/DEP)

_____

APPEARANCES:

FOR PLAINTIFF:

RONALD PHIPPS, *Pro Se*
93-A-6162
Clinton Correctional Facility
Box 2001
Dannemora, NY 12929

OF COUNSEL:

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN
Office of the Attorney General
State of New York
Department of Law
The Capitol
Albany, New York 12224

CHRISTINA ROBERTS-RYBA, ESQ.
Assistant Attorney General

WILLIAM J. McCARTHY, ESQ.
Assistant Attorney General

_____

[1]     In plaintiff's complaint the individual defendant is named as Dr. Guilani.
However, from the signature page of his affidavit as well as publicly available information,
*see* http://www.vitals.com/doctors/Dr_Sohail_Gillani (screenshot attached), it appears that
the correct name of that defendant is Dr. Sohail A. Gillani. The clerk is respectfully
directed to adjust the court's records to reflect the correct spelling of Dr. Gillani's name.

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Ronald Phipps, a New York State prison inmate, has

commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of

his civil rights.[2]  Interpreted in a light most favorable to him, plaintiff's

complaint, which is exceedingly brief, alleges that Dr. Sohail Gillani, a

psychiatrist at the prison facility in which he was housed at the relevant times,

injected him on multiple occasions with Risperdal over his objection, in

violation of his constitutional rights.

Currently pending before the court in connection with this action are two

dismissal motions.  In the first, Dr. Gillani seeks dismissal of plaintiff's claims

both for failure to state a cause of action upon which relief may be granted

---

[2]      In addition to this matter plaintiff has filed six other suits in this court, four of which were commenced prior to this action.  *See Phipps v. Senkowski,* No. 9:96-CV-0596 (RSP/RWS); *Phipps v. Cuomo,* No. 8:08-CV-1169 (GTS/RFT); *Phipps v. Attorney General's Office,* No. 9:07-CV-0132 (TJM/RWS); *Phipps v. The State of New York,* No. 9:07-CV-0372 (TJM/GJD); *Phipps v. Senkowski,* No. 9:96-CV-0596 (RSP/RWS); and *Phipps v. Superintendent,* No. 9:11-CV-0015 (DNH).  From a review of the history of the earlier actions it appears that Phipps has at least two, and possibly three, strikes within the meaning of 28 U.S.C. § 1915(g).  I have not set forth a complete analysis concerning this issue or incorporated it into my recommendation, however, in light of the fact that it appears likely plaintiff could qualify for the imminent danger exception to the three strikes provision of section 1915(g).  *See Chavis v. Chappius*, 618 F.3d 162, 169-171 (2d Cir. 2010).

and on the basis of qualified immunity.[3]  In a subsequently filed motion the

State of New York, named as a co-defendant along with Dr. Gillani, requests

dismissal of plaintiff's claims against it based upon the immunity afforded by

the Eleventh Amendment.  For the reasons set forth below I recommend that

the State's motion be granted, but that Dr. Gillani's be denied.

I.    BACKGROUND[4]

From the scant allegations set forth in his complaint, which is

comprised of one solitary paragraph, it appears that the plaintiff is a prison

inmate entrusted to the care and custody of the New York State Department

of Corrections and Community Supervision ("DOCCS"), and designated to

the Clinton Correctional Facility, located in Dannemora, New York.[5]  *See*

---

[3]      Defendant Gillani's motion also requests that the court stay discovery pending a final disposition of the dismissal motion.

[4]      In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion.  *See Erickson v. Pardus,* 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1733, 1734 (1964).

[5]      According to publicly available information, although not confirmed by any change of address notification received from the plaintiff in compliance with this court's local rules, *see* N.D.N.Y.L.R. 10.1(c)(2), Phipps was transferred from Clinton to the Central New York Psychiatric Center ("CNYPC"), a facility operated by the New York State Office of Mental Health, in or about May, 2011, and was later returned from that agency to DOCCS custody at Clinton on or about October 12, 2011. http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ3/WINQ130 (site lasted visited on January 4, 2012) (screenshot attached).

*generally* Complaint (Dkt. No. 1).  While at Clinton plaintiff claims to have

been administered in excess of 200 bi-weekly medical injections of Risperdal,

over his objection, despite the fact that a court order directing such

involuntary injections expired in October 2007.  Complaint (Dkt. No. 5).

Plaintiff asserts that the injections "have caused [him] to feel weak and dizzy

and sick."  *Id.*

II.   <u>PROCEDURAL HISTORY</u>

Plaintiff commenced this action on December 30, 2010, with the filing of

a pleading styled as an order to show cause for a temporary restraining order

and seeking preliminary injunctive relief.[6]  Dkt. No. 1.  Plaintiff's initial

pleading names Dr. Gillani and New York State as defendants and requests

an order from the court directing that the DOCCS "cease and desist" from

administering involuntary injections of Risperdal.  *Id.*

On January 12, 2011, Senior District Judge Thomas J. McAvoy issued

a decision and order directing the filing of plaintiff's original submission as a

complaint, granting plaintiff's application for *in forma pauperis* status, denying

plaintiff's motion for a temporary restraining order, and ordering a response

by the named defendants to plaintiff's request for injunctive relief.  Dkt. No. 4.

---

[6]      That filing was followed by the submission of a virtually identical document
on January 12, 2011.  Dkt. No. 5.

Thereafter, on February 16, 2011, defendants responded to plaintiff's motion for injunctive relief.  Dkt. Nos. 10, 11.  Among the materials provided in opposition to the motion for injunctive relief was an affidavit from Dr. Gillani identifying himself as a board certified psychiatrist employed by the CNYPC and assigned to treat inmates with mental health needs at Clinton.  Gillani Aff. (Dkt. No. 10-1) ¶¶ 1, 2.  In his affidavit, Dr. Gillani asserts that he has never administered any medication to the plaintiff over his objection and states further, based upon his review of plaintiff's medical records, which were also supplied, that there is no indication that any other physician at Clinton has done so.  *Id.* at ¶¶ 4-9, 11.  Plaintiff's motion for a preliminary injunction as well as a subsequent submission, construed by the court as also seeking interim injunctive relief, *see* Dkt. No. 13, were denied by order issued by Senior District Judge McAvoy on May 3, 2011.  Dkt. No. 19.

In lieu of answering, each of the two named defendants has now moved seeking dismissal of plaintiff's complaint.  The first of those motions was filed on March 28, 2011 by Dr. Gillani, requesting dismissal of plaintiff's claims against him for failure to state a cause of action and on the basis of qualified immunity.  Dkt. No. 16.  A second motion to dismiss was later filed on behalf of the State requesting dismissal of plaintiff's claims against that

defendant on the basis of the Eleventh Amendment.  Dkt. No. 23.   Plaintiff

has not responded to either of the outstanding dismissal motions, which are

now ripe for determination and have been referred to me for the issuance of a

report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and

Northern District of New York Local Rule 72.3(c).[7]  *See* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

    A.   Dismissal Motion Standard

    A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of

the Federal Rules of Civil Procedure, calls upon a court to gauge the facial

sufficiency of that pleading, utilizing as a backdrop a pleading standard

which, though unexacting in its requirements, "demands more than an

unadorned, the-defendant-unlawfully-harmed me accusation" in order to

---

[7]   Plaintiff's failure to respond to the pending motion does not preclude the court from recommending its disposition without the benefit of his submission. *See*, *e.g.*, *White v. Mitchell,* No. 99-CV-8519, 2001 WL 64756, at *1 (E.D.N.Y. Jan. 18, 2001). Such a motion to dismiss tests only the legal sufficiency of the plaintiff's complaint; accordingly, since the plaintiff has been afforded a reasonable opportunity to respond to the motion, but has failed to avail himself of that chance, the court can now determine the complaint's sufficiency as a matter of law based on its own reading of the complaint and knowledge of the case law. *McCall v. Pataki,* 232 F.3d 321, 322-23 (2d Cir. 2000).  It should be noted, however, that plaintiff's failure to respond in opposition to the pending motion is not without significance; under this court's local rules, a party's failure to respond to a properly filed motion can constitute consent to the granting of that motion, so long as the court determines that the moving party has met its burden demonstrating entitlement to the relief requested.  N.D.N.Y.L.R. 7.1(b)(3); *see also McCall*, 232 F.3d at 322-23 (holding that plaintiff's failure to respond to motion to dismiss in and of itself could not constitute basis for dismissal if plaintiff's complaint stated a claim for relief); *White,* 2001 WL 64756, at n. 2 (citing *McCall*).

withstand scrutiny.  *Ashcroft v. Iqbal*, 556 U.S. 129, ___, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555, 127 S. Ct. 1955, (2007)).  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  *Id.*  While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal,* 129 S. Ct. at 1950.

   To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face.  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).  As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).

   When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint

merits a generous construction by the court when determining whether it states a cognizable cause of action.  *Erickson*, 127 S. Ct. at 2200 ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976) (internal quotations omitted)); *Davis v. Goord*, 320 F.3d 346, 350 (2d Cir. 2003) (citation omitted); *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated.  *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party.  *Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 300 (2d Cir. 2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.).  However, the tenet that a court must accept as true all of the allegations contained in a complaint

is inapplicable to legal conclusions.  *Iqbal*, 129 S. Ct. at 1949.  In the wake of

*Twombly* and *Iqbal*, the burden undertaken by a party requesting dismissal of

a complaint under Rule 12(b)(6) remains substantial; the question presented

by such a motion is not whether the plaintiff is likely ultimately to prevail, "'but

whether the claimant is entitled to offer evidence to support the claims.'"  *Log

On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp.2d 435,

441 (S.D.N.Y. 2001) (quoting *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669,

673 (2d Cir. 1995)) (citations and quotations omitted).

      B.   New York State's Motion to Dismiss

Although its basis is not altogether clear, plaintiff has asserted a claim

in this action against the State of New York.  In its motion, the State asserts

that plaintiff's claims against it are precluded under the Eleventh Amendment.

As the State contends, the Eleventh Amendment protects a state

against suits brought in federal court by citizens of that state, regardless of

the nature of the relief sought.  *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S.

Ct. 3057, 3057-58 (1978).  This absolute immunity which states enjoy under

the Eleventh Amendment extends both to state agencies, and in favor of

state officials sued for damages in their official capacities when the essence

of the claim involved seeks recovery from the state as the real party in

interest.[8]  *Richards v. State of New York Appellate Division, Second Dep't*,

597 F. Supp. 689, 691 (E.D.N.Y. 1984) (citing *Pugh* and *Cory v. White*, 457

U.S. 85, 89-91, 102 S. Ct. 2325, 2328-29 (1982)).  That amendment bars

suits in law or equity in a federal court against the state absent either the

state's consent to be sued or a congressional abrogation of immunity.

*Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54-55, 116 S. Ct. 1114,

1122-23 (1996).  It is well established that neither the State nor the DOCCS

has consented to be sued in federal court under circumstances such as

those now presented.  *See Dube v. State University of New York,* 900 F.2d

587, 594-95 (2d Cir. 1990), *cert. denied*, 501 U.S. 1211, 222 S. Ct. 2814

(1991).  In addition, it is equally clear that in enacting section 1983 Congress

did not intend abrogate the Eleventh Amendment immunity afforded to states.

*Daisernia v. State of New York,* 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984)

(McCurn, J.);  *see also Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996).

   Based upon the foregoing, plaintiff's claims in this action against the

State of New York are plainly barred, and its motion to dismiss should

---

[8]     As the Supreme Court has reaffirmed relatively recently, the sovereign
immunity enjoyed by the states is deeply rooted, having been recognized in this country
even prior to ratification of the Constitution, and is neither dependent upon nor defined by
the Eleventh Amendment.  *Northern Ins. Co. of New York v. Chatham County*, 547 U.S.
189, 193, 126 S. Ct. 1689, 1693 (2006).

therefore be granted.

    C.    <u>Dr. Gillani's Motion to Dismiss</u>

        1.    <u>Failure to State a Claim</u>

In his motion, Dr. Gillani first argues that plaintiff has failed to state a cognizable claim against him.  In his memorandum, Dr. Gillani has devoted considerable time and effort in an attempt to show that plaintiff's Eighth Amendment rights were not violated, characterizing his challenge to being injected with Risperdal against his will as a mere disagreement over a prescribed course of treatment.  This argument, however, misses the mark. Plaintiff's claim in this case does not arise under the Eighth Amendment, but instead finds its roots in the due process clause of the Fourteen Amendment.

It is well-established that prison inmates possess "a significant liberty interest in avoiding the unwanted administration of anti-psychotic drugs under the Due Process Clause of the Fourteenth Amendment."  *Washington v. Harper,* 494 U.S. 210, 221-22, 110 S. Ct. 1028 (1990); *see also Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, 110 S. Ct. 2841 (1990) (discussing generally the right of a patient to refuse treatment under both common law under the constitution); *Roland v. Smith*, No. 10 Civ. 9218 (VM)

(KMF), 2011 WL 3449545, at *1 (S.D.N.Y. July 26, 2011).[9]  In *Harper*,

notwithstanding an inmate's liberty interest in refusing psychotropic

medication, the Supreme Court held that a state may treat an inmate against

his will if (1) "the inmate is dangerous to himself or others" and (2) "the

treatment is in the inmate's medical interest."  494 U.S. at 227, 110 S. Ct.

1039-40; *see also Roland*, 2011 WL 3449545, at * 1 (citing *Harper*, 494 U.S.

210, 110 S. Ct. 1028); *Project Release v. Prevost,* 722 F.2d 960, 971-81 (2d

Cir. 1983).  In that case, the Court also upheld a prison policy that provided

administrative procedures, including notice, a right to be present at an

adversary hearing, and to present and cross examine witnesses, prior to a

determination that inmate would be medicated over his or her objections as

comporting with the requirements of procedural due process.[10]  *Harper*, 494

U.S. at 235, 110 S. Ct. at 1044.

---

[9]      Copies of all unreported decisions cited in this document have been
appended for the convenience of the *pro se* plaintiff.

[10]      In doing so, the Court concluded that the policy at issue represented

an accommodation between an inmate's liberty interest in avoiding the
forced administration of antispsychotic drugs and the State's interests in
providing appropriate medical treatment to reduce the danger that an inmate
suffering from a serious mental disorder represents to himself or others.  The
Due Process Clause does require certain essential procedural protections,
all of which are provided by the regulation before us.

*Harper*, 494 U.S. at 236, 110 S. Ct. at 1044.

12

In *Project Release*, the Second Circuit held that "due process requires an opportunity for hearing and review of a decision to administer antipsychotic medication-but such a hearing need not be judicial in nature." *Project Release*, 722 F.2d at 981.  Moreover, due process does not require a guarantee that a physician's assessments in their commitment evaluation be correct.  *Rodriguez City of New York*, 72 F.3d 1051, 1062 (2d Cir. 1995).

New York Correction Law § 402 provides procedures whereby, upon the certification of a correctional facility physician that an inmate is mentally ill and in need of care and treatment, the superintendent of the facility may apply to a judge of a New York county court or justice of the supreme court in the county for an order committing such inmate to a hospital for the mentally ill. *See generally* N.Y. Correct. Law § 402.  The procedure outlined in section 402 expressly includes notice and opportunity to be heard to the mentally ill inmate.  *See id.* at § 402(3).  During the pendency of any section 402 proceeding, "the judge may forthwith commit such alleged mentally ill person to a hospital for the mentally ill upon petition and the affidavit of two examining physicians that the superintendent is not able to properly care for such person at the institution where he is confined and that such person is in immediate need of care and treatment."  *Id.* at § 402(8).  Additionally, section

13

402 provides that an inmate of a correctional facility may be admitted on an emergency basis to CNYPC upon certification of two examining physicians that he or she "suffers from a mental illness which is likely to result in serious harm to himself or others as defined in subdivision (a) of section 9.39 of the mental hygiene law." *Id.* at 402(9).  When an inmate is delivered to CNYPC under this emergency provision, a proceeding for an order of commitment as outlined in section 402 must be commenced immediately.  *See id.*  The procedural safeguards guaranteed under section 402 are similar to the provisions of New York Mental Health Law § 33.03, the general provision governing involuntary commitment and one which "has withstood challenges that it was facially unconstitutional."  *United States v. Waters*, 23 F.3d 29, 32 (2d Cir. 1994) (citing *Project Release*, 722 F.2d at 971-981); *see also Johnson v. Myers*, No. 10-CV-1964, 2011 WL 6131003, at *4 (E.D.N.Y. Dec. 6, 2011).

While a prisoner may, in some circumstances, refuse medical treatment, it appears that the right to do so has not been clearly defined. *Rose v. Goldman*, No. 02-CV-5370, 2011 WL 1130214, at *8 (E.D.N.Y. Mar. 24, 2011) (citing cases).  On the other hand, it seems clear that the procedural protections afforded by Correction Law § 402, if afforded plaintiff

14

in this case, "exceeded what was required by the Due Process Clause." *Gonzales v. Carpenter*, No. 9:08-CV-629, 2011 WL 768990, at *17 (Jan. 3, 2011) (Baxter, M.J.) (citing *Sheridan v. Dubow*, 92 Civ. 6024, 1993 WL 336946, at *3 (S.D.N.Y. Sep. 3, 1993)), *report and recommendation adopted*, 2011 WL 767546 (N.D.N.Y. Feb. 25, 2011) (Kahn, J.).

From plaintiff's complaint, though scant, it appears that the section 402 procedures may well have been followed in the past, resulting in the issuance of a state court order in or about 2007, authorizing such involuntary injections – an order which, according to the plaintiff, is now expired. While Dr. Gillani's affidavit submitted in opposition to plaintiff's motion for injunctive relief suggests that the facts may not ultimately bear out plaintiff's claim, his complaint, when liberally construed, suggests that Dr. Gillani involuntarily administered Risperdal over plaintiff's objection without first having satisfied the requirements of due process, and thus states a plausible due process claim.[11]  I therefore recommend that defendant Gillani's motion to dismiss for

---

[11]    It is true, as was previously noted, that Dr. Gillani has submitted an affidavit to the court in which he flatly denies having ever administered or authorized the administering of medication to the plaintiff over his objection.  That affidavit, however, is not property considered on a motion to dismiss, and I have therefore not taken into account that denial in assessing the sufficiency of plaintiff's complaint. *Gadson v. Goord*, No. 96-CV-7544, 1997 WL 714878, at *1 n.2 ("Generally a court may not look outside the pleadings when review a Rule 12(b)(6) motion to dismiss.")

failure to state a cognizable claim be denied.

      2.   <u>Qualified Immunity</u>

In addition to requesting dismissal on the merits, defendant Gillani also seeks a finding that he is entitled to qualified immunity from suit, having acted reasonably in his belief that plaintiff's rights were not being violated.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie*, 567 F.3d 54, 61 (2d Cir. 2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223,

129 S. Ct. 808, 815 (2009) .

In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson*, 555 U.S. at 232, 129 S.Ct. at 815-16. The first step requires the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[12] *Kelsey*, 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415, 430 n.9 (citing *Saucier*).[13]  Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of

---

[12]    In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.  *Saucier,* 533 U.S. at 201, 121 S. Ct. 2151.

[13]    In *Okin*, the Second Circuit clarified that the "'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful."  *Okin*, 577 F.3d at 433, n.11 (citation omitted).

decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the . . . prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[14]  *Pearson*, 555 U.S. at 236, 242, 129 S. Ct. at 818, 821.  In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so."  *Kelsey*, 567 F.3d at 61(citing *Pearson*, 129 S. Ct. at 821) (emphasis in original).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs . . . should be addressed in light of the circumstances in the particular case at hand.'"  *Okin*, 577 F.3d 430 n.9 (quoting *Pearson*).  "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do

---

[14]    Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability. . .", *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985), the Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation."  *Pearson*, 555 U.S. at 231, 129 S.Ct. at 815 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 524 (1991) (per curiam)).

not make out a constitutional violation at all.'" *Kelsey*, 567 F.3d at 61 (quoting *Pearson*, 129 S. Ct. at 818).

At this early procedural juncture, I am unable to recommend a finding that Dr. Gillani acted reasonably and is therefore entitled to qualified immunity. The principle that a prison inmate is entitled to due process before being forced to take medication over his objection was well-established at the relevant times. *See Harper*, 494 U.S. 210, 110 S. Ct. 1028. Reading plaintiff's complaint in a light most favorable to him, as the court must, and assuming that Dr. Gillani injected plaintiff with Risperdal over his objection without first having satisfied the requirements of the Fourteenth Amendment, the court is unable to conclude that such conduct was objectively reasonable. I therefore recommend denial of defendant Gillani's motion for a finding of qualified immunity, without prejudice to renewal at a later stage in the proceedings based upon a more robust record.

D.    Stay of Discovery

As was previously noted, defendant Gillani has also requested a stay of discovery pending resolution of his dismissal motion. The Federal Rules of Civil Procedure provide, in relevant part, that

> [a] party or any person from who discovery is sought
> may move for a protective order in the court where the

> action is pending. . .the Court may, for good cause,
> issue an order to protect a party or person from
> annoyance, embarrassment, oppression, or undue
> burden or expense, including one or more of the
> following:
>
> (A)    forbidding the disclosure or discovery.

Fed. R. Civ. P. 26(c)(1); *see also, Spencer Trask Software and Information Services, LLC v. RPost Intern. Ltd.*, 206 F.R.D. 367, 368 (S.D.N.Y. 2002) (granting stay of discovery pending determination of motion to dismiss where court found defendants presented "substantial arguments" for dismissal of many if not all of the claims in the lawsuit); *United States v. County of Nassau*, 188 F.R.D. 187, 188-89 (E.D.N.Y. 1999) (granting stay of discovery during the pendency of a motion to dismiss where the "interests of fairness, economy and efficiency . . . favor[ed] the issuance of a stay of discovery," and where the plaintiff failed to claim prejudice in the event of a stay.).

In this instance, I find good cause to grant a stay of discovery pending final resolution of defendants' dismissal motions.[15]

## IV.   SUMMARY AND RECOMMENDATION

Plaintiff's complaint in this action, when construed in a light most

---

[15]    I note that it appears unlikely the plaintiff will be prejudiced by such a stay of discovery.  Under the rules of this court and its established practice, no discovery in the action can occur absent court permission until an answer is filed and the court has issued its standard pretrial order pursuant to Rule 16 of the Federal Rules of Civil Procedure.

favorable to Phipps, appears to assert that defendant Dr. Gillani injected him, against his will, with Risperdal on multiple occasions while he was a prison inmate housed at Clinton.  This allegation suffices, at this early juncture, to set forth a plausible due process claim.  Plaintiff's claim against the State of New York based upon the same conduct, however, is precluded by the immunity afforded under the Eleventh Amendment.  Accordingly, it is hereby respectfully

RECOMMENDED that the motion of defendant State of New York to dismiss plaintiff's claims in this action against that defendant (Dkt. No. 23) be GRANTED, and that all claims against the State be DISMISSED; and it is further

RECOMMENDED that the motion of defendant Dr. Sohail Gillani to dismiss plaintiff's claims against him in this action (Dkt. No. 16) be DENIED, without prejudice to the defendant's right to raise a defense of qualified immunity at an appropriate juncture in the future; and it is further

ORDERED, that pending final disposition of the pending dismissal motions, the filing of an answer in the case, and the issuance of the court's Rule 16 customary pretrial order, discovery in this action be and hereby is STAYED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:      January 5, 2011
            Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

22

login: patient | physician

# vitals™
*where doctors are examined*

home    check up on your doctor    find a doctor    rate a doctor    patient guides

Advertisement

Start your year with style!
25% OFF
Photo Cards & Invitations
Ends 12/24
2011
Shop now
Kodak Gallery
Photo Books, Cards & Gifts

## Sohail A Gillani, MD
Psychiatrist
Male - 16 years experience

Patients wait...
An average of **50 minutes** for this doctor

Are you Dr. Gillani? **Edit your profile**

**Receive Alerts**
when there is new important information about this doctor.
ALERT ME

### Profile Summary
Directions
Rate this doctor
Personalize

Twee | Like

Champlain Valley Physicians Hospital Medical Ctr
75 Beekman St
Plattsburgh, NY 12901
(518) 562-7900
Map this Address

Overall Patient Rating:
★★★★
Share your opinion ▶

### More Vitals Tools
| RATE This Doctor | ASK A Dr. Now | CHEAP Insurance |
| 75% OFF Prescriptions | E-MAIL This Profile | PRINT This Profile |

### Featured Video
**Depression Videos**
How it impacts the body, the symptoms, and treatment options.
Watch Videos ▶

The Vitals website is provided for your informational use only. Nothing contained or offered by, on or through Vitals should be construed as medical advice or relied upon for medical diagnosis or treatment. Vitals does not recommend or endorse any particular healthcare provider whose information or ratings appear on this website. We encourage you to read our full terms and conditions.

### Specialty
Board Certified?

Psychiatry
Sub-specialty: Child & Adolescent Psychiatry

View ABMS® certification
✓

Vitals receives quarterly updates on board certification from ABMS®.
What's This ▲

### Patient Ratings & Comments

**Overall Patient Rating** ★★★★

Based on **2 ratings (click here)**

Read comments about Dr. Gillani
**Find out what they're saying.**
click here

| | |
|---|---|
| Ease of Appointment | 4.0 |
| Promptness | 4.0 |
| Courteous Staff | 3.0 |
| Accurate Diagnosis | 4.0 |
| Bedside Manner | 4.0 |
| Spends Time with Me | 3.0 |

**Patients Wait...**
An average wait of **50 minutes** for this doctor.

Rate This Doctor

Some ratings provided by DrScore.
What's This ▲

### Hospital Affiliation
Hospital Rating

Dr. Gillani is affiliated with **2 hospitals**.



**Champlain Valley Physicians Hospital**
100 Beekman St, Plattsburgh, NY

**Clinton Correctional Facility Hospital**
PO Box 2000, Dannemora, NY

Hospital quality is often a reflection of the doctors associated with it. Where available, hospital ranking by specialty is shown.

What's This ▲

## Education

Dr. Gillani was educated at the following institutions:

Medical School

Dow Medical College
Completed: 1991

Foreign school. Not rated.

What's This ▲

## General Information

Languages Available:
Albanian, Arabic, Armenian, Bengali, Cambodian, Cantonese, Chinese, Chinese-cantonese, Chinese-mandarin, Creole, French, German, Greek, Haitian creole, Hebrew, Hindi, Italian, Japanese, Korean, Mandarin, Polish, Portuguese, Russian, Spanish, Ukrainian, Urdu, Vietnamese, Yiddish

Personal Statement:
COMPLETED FELLOWSHIP IN CHILD AND ADOLESCENT PSYCHIATRY FROM MAINE MEDICAL CENTER BETWEEN JULY 2003 TO JUNE 2005.

## Insurance

Need health insurance? It's more affordable than you think!
Click below for an INSTANT quote!

CHEAP Insurance

What's This ▲

Have more information on this doctor?
Email us at ImproveVitals@vitals.com or **review this doctor now**.

Are you a doctor? Click here to sign in to Vitals.

**Ads by Google**    Psychiatry    Pain Management MD    Medical School    Medical Doctors

Advertisement

about us    faq    blog    contact    site map    privacy    business partners    vitals widget

Doctor Directory: A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T | U | V | W | X | Y | Z

Group Practices by State
AR | CA | CO | CT | FL | GA | IL | MA | MD | MI | MO | NC | NJ | NY | OH | PA | TN | TX | VA | WA >> See All States

Doctors by Specialist Type
Allergists and Immunologists | Anesthesiologists | Cardiologists | Critical Care Specialists | Dermatologists | Emergency Physicians | Endocrinologists | Gastroenterologists | Geriatric Specialists | Hematologists | Infectious Disease Specialists | Nephrologists | Neurologists | Oncologists | Ophthalmologists | Otolaryngologists | Pain Management Specialists | Pathologists | Physiatrists | Pulmonologists | Psychiatrists | Radiation Oncologists | Radiologists | Rheumatologists | Sleep Medicine Specialists | Sports Medicine Specialists | Urologists >> See All Specialists

Children's Doctors
Adolescent Specialists | Pediatric & Adolescent Psychiatrists | Pediatric Specialists | Pediatricians | Pediatric Surgeons

Primary Care Doctors
Family Practitioners | Internists | General Practitioners | Obstetricians & Gynecologists

Surgeons
Cardiothoracic Surgeons | Colorectal Surgeons | Neurosurgeons | Oral & Maxillofacial Surgeons | Orthopaedic Surgeons | Plastic Surgeons | Surgical Specialists

Find Doctors by Disorder | Find Leading Experts | International Doctors | Find Arthritis Doctors | Find Chronic Myeloid Leukemia Doctors

As more fully set forth in this website's **terms and conditions**, (1) nothing contained on or offered by or through this website should be construed as medical advice and should not be relied upon for medical diagnosis or treatment. MDX Medical, Inc. ("MDX"), the provider of this website, does not recommend or endorse any particular healthcare provider whose information or ratings appear on this website; and (2) MDX has granted you a limited license to access and use this website for your own noncommercial use. You are not permitted to copy, reproduce, distribute, transmit, mirror, frame, scrape, extract, wrap, create derivative works of, reverse engineer, decompile or disassemble any part or aspect of this website.

Copyright © 2006 - 2011 Vitals.com & MDx Medical, Inc. All Rights Reserved.

New York State | ≡ State Agencies | ✚ Search all of NY.gov

# Department of Corrections and Community Supervision

SKIP TO CONTENT

Google™ Custom Search

## About DOCCS
- DOCCS Home Page
- Community Supervision
- Find a Facility
- Contact DOCCS

## Inmate Info
- Inmate Lookup
- Inmate Info
- Family Guide
- Guía para la Familia
- Program Services
- PREA

## Victim Services
- Victim Services
- Servicios Victima

## News
- News Room
- Reports/Publications
- Jobs Available
- Directives
- Rules & Regulations
- Contracts

## Related Info
- Related Links
- Corcraft
- Criminal Justice



# Inmate Information

**Inmate Information Data Definitions** are provided for most of the elements listed below. When a detailed definition is available for a specific element, you may click on the element's label to view it.

| Identifying and Location Information As of 01/04/12 | |
|---|---|
| **DIN (Department Identification Number)** | 93A6162 |
| **Inmate Name** | PHIPPS, RONALD |
| **Sex** | MALE |
| **Date of Birth** | 12/31/1956 |
| **Race / Ethnicity** | BLACK |
| **Custody Status** | IN CUSTODY |
| **Housing Releasing Facility** | CLINTON |
| **Date Received (Original)** | 08/06/1993 |
| **Date Received (Current)** | 10/12/2011 |
| **Admission Type** | RETURN FROM ANOTHER AGENCY |
| **County of Commitment** | NEW YORK |
| **Latest Release Date / Type (Released Inmates Only)** | |

| Crimes of Conviction | |
|---|---|
| If all 4 crime fields contain data, there may be additional crimes not shown here. In this case, the crimes shown here are those with the longest sentences. As of 01/04/12 | |
| **Crime** | **Class** |

| ARSON 1ST | A1 |
|-----------|-----|
|           |     |
|           |     |
|           |     |

## Sentence Terms and Release Dates

Under certain circumstances, an inmate may be released prior to serving his or her minimum term and before the earliest release date shown for the inmate.

As of 01/04/12

| | |
|---|---|
| **Aggregate Minimum Sentence** | 0015 Years, 00 Months, 00 Days |
| **Aggregate Maximum Sentence** | LIFE Years, 99 Months, 99 Days |
| **Earliest Release Date** | 09/2013 |
| **Earliest Release Type** | PAROLE HEARING DATE |
| **Parole Hearing Date** | 09/2013 |
| **Parole Hearing Type** | REAPPEARANCE |
| **Parole Eligibility Date** | 02/03/2006 |
| **Conditional Release Date** | NONE |
| **Maximum Expiration Date** | LIFE |
| **Maximum Expiration Date for Parole Supervision** | |
| **Post Release Supervision Maximum Expiration Date** | |
| **Parole Board Discharge Date** | |

Home     Privacy Policy     Accessibility Information     Contact DOCCS     Disclaimer



Not Reported in F.Supp.2d, 2001 WL 64756 (E.D.N.Y.)
(Cite as: 2001 WL 64756 (E.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.
Antwon WHITE, Plaintiff,
v.
Dr. J. MITCHELL, Arthur Kill Correctional Facility
Health Services Director, Dennis Breslin, Arthur Kill
Correctional Facility Superintendent and Edward
Checkett, D.D.S., Arthur Kill Correctional Facility
Dentist, Defendants.
No. 99-CV-8519 (FB).

Jan. 18, 2001.

Antwon White, Arthur Kill Correctional Facility, Staten
Island, New York, for the Plaintiff, pro se.

Eliot Spitzer, Attorney General of the State of New York,
By: Maria Filipakis, New York, New York, for the
Defendants.

*MEMORANDUM AND ORDER*

BLOCK, J.

**\*1** Plaintiff Antwon White ("White"), a prison inmate,
brings this action *pro se* pursuant to 42 U.S.C. § 1983 and
New York law alleging that defendants were both
negligent and deliberately indifferent to his medical needs
in connection with treatment for hearing loss he suffered
following the extraction of a wisdom tooth. White pleads
that this conduct violated his rights under the Eighth
Amendment, and seeks injunctive relief as well as
compensatory and punitive damages. While White does
not make the distinction clearly, the Court construes the
complaint as naming defendants in both their individual
and official capacities.[FN1] Defendants have moved to
dismiss White's complaint pursuant to Fed.R.Civ.P.

12(b)(6) asserting that (1) the complaint fails to state a
claim under the Eighth Amendment for deliberate
indifference to his medical needs; (2) the complaint fails
to allege personal involvement by defendant Dennis
Breslin ("Breslin"), Superintendent of Arthur Kill
Correctional Facility ("Arthur Kill"); and (3) defendants
are entitled to qualified immunity. Although White has
filed no opposition to defendants' motion, the Court can
decide the motion without the benefit of a submission
from him.[FN2] For the reasons set forth below, defendants'
motion is denied.

> FN1. "[T]he plaintiff ... should not have the
> complaint automatically construed as focusing on
> one capacity to the exclusion of the other."
> *Frank v. Relin,* 1 F.3d 1317, 1326 (2d Cir.1993).

> FN2. *See McCall v. Pataki,* 232 F.3d 321, 323
> (2d Cir.2000) ("If a complaint is sufficient to
> state a claim on which relief can be granted, the
> plaintiff's failure to respond to a Rule 12(b)(6)
> motion does not warrant dismissal").

BACKGROUND

The following facts are drawn from White's complaint and
the records attached thereto, and are accepted as true for
the purposes of this motion: On August 5, 1999, while
incarcerated at Arthur Kill, White had a wisdom tooth
extracted by defendant Edward Checkett ("Checkett"), a
dentist employed at Arthur Kill. Read broadly, the
complaint seems to allege that Checkett was aware that he
negligently injured White during the extraction procedure,
but failed to provide immediate medical attention.

Soon after the extraction, White began experiencing
ringing and hearing loss in his left ear. On several
occasions, White brought these complaints to the attention
of defendant Jennifer Mitchell ("Mitchell"), Arthur Kill's
Health Services Director. However, Mitchell did not
provide White with prompt medical attention and, in
particular, failed to refer him to an ear specialist.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 64756 (E.D.N.Y.)
(Cite as: 2001 WL 64756 (E.D.N.Y.))

On November 15, 1999, White filed an administrative complaint, pursuant to the Department of Correctional Services' grievance procedures, requesting medical attention for his hearing problem and, "if necessary," a referral to an ear specialist. Inmate Grievance Complaint attached to Compl. White alleges that Breslin denied his grievance, and "failed to direct his subordinates" to provide White with prompt medical attention.[FN3]

> **FN3.** Despite White's allegation to the contrary, the Inmate Grievance Resolution Committee ("IGRC") appears to have accepted White's grievance on November 30, 1999, and directed him to "report back to sick-call." Inmate Grievance Complaint attached to Compl.

On December 9, 1999, White was seen by an audiologist who described the degree of hearing loss in his left ear as "severe-profound." NYSDOCS Request & Report of Consultation attached to Compl. The audiologist recommended further medical consultation to determine the etiology of White's hearing loss and approval for a hearing aid evaluation. *See Id.* White filed the complaint in this action on December 23, 1999.

### DISCUSSION

I. Standard on a Motion to Dismiss

**\*2** In considering a motion to dismiss, the court's task is " 'necessarily a limited one.' " *George Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 139 (2d Cir.1998) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)). "[I]n ruling on [the] defendant[s'] motion, the court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59, 63 (2d. Cir1997). The Court may consider the allegations in the complaint and "all papers and exhibits appended to the complaint, as well as any matters of which judicial notice may be taken." *Hirsch v. Arthur Anderson & Co.,* 72 F.3d 1085, 1092 (2d

Cir.1995). In addition, because White is a *pro se* plaintiff, his pleadings must be read liberally. *See Corcoran v. New York Power Auth.,* 202 F.3d 530, 536 (2d Cir.1999); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). The Court should grant such a motion only if, after viewing the plaintiff's allegations in the most favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Feder v. Frost,* 220 F.3d 29, 32 (2d Cir.2000).

II. Section 1983 Individual Capacity Claims

Defendants contend that White's complaint must be dismissed because it fails to state an Eighth Amendment violation. To state a claim under § 1983 for deprivation of medical treatment, a plaintiff must show that the defendant acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). A serious medical need exists where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997)) (internal quotation marks omitted). The Second Circuit has recently held that refusal to treat a degenerative condition that tends to have serious medical implications if left untreated is a sufficient basis to support the existence of a serious medical need. *See Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) (holding that a tooth cavity may be a serious medical condition).

To establish deliberate indifference, the plaintiff must prove that "the prison official knew of and disregarded the plaintiff's serious medical needs." *Chance,* 143 F.3d at 703 (citing *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). Deliberate indifference will exist when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer,* 511 U.S. at 847. "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). "[M]ere medical malpractice' is not tantamount to deliberate indifference," but may rise to the level of deliberate indifference when it "involves culpable

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 64756 (E.D.N.Y.)
(Cite as: 2001 WL 64756 (E.D.N.Y.))

recklessness, *i.e.,* an act or failure to act ... that evinces 'a conscious disregard of a substantial risk of harm." ' *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)) (internal quotation marks omitted)).

**\*3** White has alleged a "serious medical condition" under *Gamble.* He states that the ringing in his ear developed into a progressive loss of hearing. Indeed, the audiologist's report referred to above characterizes the degree of hearing loss in White's left ear as being "severe-profound."

*Gamble'* s "deliberate indifference" prong is satisfied in respect to each of the defendants in their individual capacities by a reasonably liberal reading of White's *pro se* complaint. With respect to Checkett, White appears to allege that the injury leading to his hearing loss occurred when Checkett negligently extracted his wisdom tooth. Dental malpractice, without more, does not state a claim cognizable under § 1983. White further alleges, however, that Checkett was deliberately indifferent to his medical condition because, once he knew that he had injured White during the extraction procedure, he failed to render timely medical treatment to abate the harm.

As for Mitchell, White alleges that she ignored his subsequent repeated requests for appropriate treatment while his condition worsened, and failed to supervise Arthur Kills's medical personnel in connection with his treatment. Mitchell, therefore, allegedly knew of White's serious medical need, and consciously failed to act to prevent further harm to White.

Finally, Breslin allegedly failed to adequately supervise White's treatment, and denied his grievance. Defendants assert that the complaint must be dismissed as to Breslin because it fails to allege his personal involvement in the Eighth Amendment violation. Because "[s]ection 1983 imposes liability only upon those who actually cause a deprivation of rights, 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." ' *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). However, "personal

involvement of a supervisory defendant may be shown by evidence that ... the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong...." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). White alleges that his grievance made Breslin aware that his medical needs were being ignored. White's further allegations that Breslin denied the grievance, and failed to take steps to provide for White's treatment are sufficient to plead Breslin's personal involvement in the violation.

III. Section 1983 Official Capacity Claims

To the extent White has asserted claims seeking damages against defendants in their official capacities, they are barred by sovereign immunity. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58 (1989). However, the complaint also seeks injunctive relief against the defendants. Injunctive relief may be obtained in a § 1983 action for deliberate indifference to a serious medical need, even absent an official's personal involvement, if the complaint alleges that the official had "responsibility to ensure that prisoners' basic needs were met, and the complaint adequately alleged deliberate indifference to a serious medical need." *Koehl v. Dalsheim,* 85 F.3d 86, 89 (2d Cir.1996); *see also New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 135 (2d Cir.1995) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 102, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)) ("the Eleventh Amendment does not bar federal courts from issuing an injunction against a state official who is acting contrary to federal law"). White alleges that defendants have denied him treatment for his progressive hearing loss. If he can prove his contentions, he may be entitled to injunctive relief.

IV. Qualified Immunity

**\*4** The defendants enjoy qualified immunity from White's suit if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Even where a prisoner's rights are clearly established, "qualified immunity is still available to an official if it was 'objectively reasonable for the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 64756 (E.D.N.Y.)
(Cite as: 2001 WL 64756 (E.D.N.Y.))

public official to believe that his acts did not violate those rights." ' *Hathaway,* 37 F.3d at 67 (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991)).

Defendants contend that their actions were objectively reasonable. (*See* Def. Mem. at 9). However, because the complaint adequately alleges a claim for deliberate indifference, defendants are not entitled to qualified immunity on their Fed.R.Civ.P. 12(b)(6) motion. *See Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (the issue when considering qualified immunity in the context of Fed.R.Civ.P. 12(b)(6) "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims"). This allegation, if proved, could constitute a violation of White's Eighth Amendment rights, and more facts are necessary to resolve the qualified immunity question.

V. State Law Claims

As referred to above, the complaint, liberally construed, also alleges dental malpractice against Checkett and negligent supervision against Breslin and Mitchell in their individual capacities. Although theses claims are not cognizable in an action under § 1983, they do allege state law claims. Defendants do not address these claims in their motion to dismiss. Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over these pendent claims. *See Shimon v. Department of Corr. Serv. for the State of N.Y.,* No. 93 Civ. 3144(DC), 1996 WL 15688, at *3 (S.D.N.Y. Jan. 17, 1996) (Section 24 of New York Correction Law does not bar federal court from hearing pendent state law medical malpractice claim asserted against New York State Department of Correctional Services employee in employee's individual capacity). However, the Eleventh Amendment bars White's claims for damages or injunctive relief against the defendants in their official capacities. *See Edelman v. Jordan,* 415 U.S. 651, 663 (1974); *Fleet Bank, Nat'l Ass'n v. Burke,* 160 F.3d 883, 891 (2d Cir.1998).

CONCLUSION

Defendants' motion to dismiss is denied.

SO ORDERED.

E.D.N.Y.,2001.
White v. Mitchell
Not Reported in F.Supp.2d, 2001 WL 64756 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 3449545 (S.D.N.Y.)

(Cite as: 2011 WL 3449545 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.
Thomas M. ROLAND III, Plaintiff,
v.
MHU Chief Susan SMITH, Superintendent James, John Doe Sargeant, John Doe Co's 4 Officers, John Doe Nurse, Dr. Donald Sawyer, John Doe Co Officers ES Block, Jane Doe Nurse Mental Health, Defendants.
No. 10 Civ. 9218(VM)(KNF).

July 26, 2011.
**MEMORANDUM and ORDER**

KEVIN NATHANIEL FOX, United States Magistrate Judge.

**\*1** Thomas M. Roland III ("Roland"), proceeding *pro se* and *in forma pauperis,* commenced this action, pursuant to 42 U.S.C. § 1983, alleging that the defendants violated his Eighth and Fourteenth Amendment rights, by forcing him to take anti-psychotic medication and, thereafter, without provocation, kicking him in the back and neck multiple times and punching his face.

Before the Court is Roland's application for the Court to seek pro bono counsel to assist him in prosecuting this action.

**DISCUSSION**

Civil litigants have no constitutional right to counsel. *See United States v. Coven,* 662 F.2d 162, 176 (2d Cir.1981). However, 28 U.S.C. § 1915(e)(1) authorizes a district court to "request an attorney to represent any person unable to afford counsel." "In deciding whether to appoint counsel, [a] district [c]ourt should first determine whether the indigent's position seems likely to be of substance." *Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986). An indigent's claim is likely to be of substance if it has merit and "appears to have some chance of success[.]" *Id.* 802 F.2d at 60–61. Pleadings drafted by a

*pro se* litigant, such as Roland, are to be construed liberally and interpreted to raise the strongest arguments they suggest. *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

Only if a plaintiff satisfies the threshold "test of likely merit," should a court consider "secondary criteria." *Cooper v.. A. Sargenti, Co. Inc.,* 77 F.2d. 170, 172–73 (2d Cir.1989). These criteria include: (1) the indigent's ability to investigate the crucial facts; (2) whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the factfinder; (3) the indigent's ability to present the case; (4) the complexity of the legal issues; and (5) any special reason why appointment of counsel would be more likely to lead to a just determination. *Hodge,* 802 F.2d at 61–62.

*Forced Administration of Medication*

A person confined to a prison has a right, under certain circumstances, to refuse anti-psychotic medication. *See Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028 (1990). In a circumstance where a prisoner has a serious mental illness, prison personnel may administer anti-psychotic medication against the person's will when the person presents as a "danger to himself or others and the treatment is in the [prisoner's] medical interest." *Id.* at 227, 110 S.Ct. at 1039–40.

In his application for court-appointed counsel, Roland reports that he suffers from mental illness. However, the severity of his mental illness is unknown to the Court. Furthermore, given the lack of information concerning (a) the severity of Roland's mental illness, (b) the danger, if any, Roland was to himself or others, and (c) whether Roland's medical interest was best served by forcibly administering anti-psychotic medication to him, the Court is unable to conclude that the instant claim has substance.

*Assault Claim*

**\*2** When a significant risk to the safety of prisoners exists, prison officials may employ force "in a good faith effort to maintain or restore discipline but they may not do so to inflict "unnecessary and wanton pain and suffering"

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3449545 (S.D.N.Y.)

(Cite as: 2011 WL 3449545 (S.D.N.Y.))

or in a malicious or sadistic manner. *See Whitley v. Albers, 475 U.S. 312, 320, 106 S.Ct. 1078, 1085 (1986).* The Eighth Amendment to the United States Constitution proscribes cruel and unusual punishment; thus, prison officials may not "use excessive physical force against prisoners." *Farmer v. Brennan, 511 U.S. 825, 832, 114S.*Ct. 1970, 1976 (1994).

Roland contends that he was the victim of an unprovoked assault perpetrated by prison personnel. An unprovoked attack, by prison officials, upon a prisoner, contravenes the Eighth Amendment, as it is not a good faith application of force to maintain or restore discipline; rather, it is an unnecessary and excessive use of force. Accordingly, Roland's assault claim appears likely to be of substance. Inasmuch as Roland's assault claim appears to be meritorious, an analysis of secondary criteria is warranted.

*Crucial Facts*

The crucial facts are set forth in Roland's complaint. He will not need counsel to undertake an investigation to uncover those facts. Therefore, this criterion militates against seeking pro bono counsel to assist Roland.
*Need for Cross–Examination*

It is likely that credibility will be a hotly contested issue at Roland's trial. Thus, skillful cross-examination will have to be employed by all parties. Nothing in the record before the Court establishes that Roland possesses cross-examination skills. Accordingly, having counsel trained in the art of cross-examination would benefit Roland greatly. This militates in favor of seeking pro bono counsel for this plaintiff.
*Presentation of the Case*

Roland's complaint demonstrates that he has a firm grasp of, and is capable of presenting, in a straight-forward manner, the facts and circumstances that are pertinent to this action. The Court can foresee no reason why he will be unable to do the same at the trial. Consequently, this factor does not support granting Roland's request that pro bono counsel be sought to assist him.
*Complexity of the Legal Issues*

The legal issues with which Roland will be confronted, as the litigation moves forward, are not complex. He has identified, already, in the complaint, the constitutional violations he contends the defendants committed, based on the facts detailed in that pleading. The connection he has made between the facts and the relevant amendments to the Constitution demonstrates his clear understanding of the legal issues that will be explored as the parties proceed to trial. Roland's understanding of these legal issues militates against searching for pro bono counsel to aid him.
*Special Reason for Pro Bono Counsel*

The Court discerns no special reason why, in this case, seeking pro bono counsel to assist Roland would more likely lead to a just determination.
**CONCLUSION**

**\*3** For the reasons set forth above, the plaintiffs request, that the Court seek pro bono counsel to assist him, Docket Entry No. 33, is denied.

SO ORDERED.

S.D.N.Y.,2011.

Roland v. Smith
Slip Copy, 2011 WL 3449545 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy, 2011 WL 6131003 (E.D.N.Y.)

(Cite as: 2011 WL 6131003 (E.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

E.D. New York.
Julia JOHNSON and DJM, Plaintiffs,
v.
Eddie James MYERS, Jr.; Donna Guarton,
Psychologist; Benjamin Malewicz; Jody
Weitzman–Fisher; P.O. Patterson, Shield No. 658, 1st
Precinct Command; Robert Barris, M.D.; Dr. G. St.
Victor; Nassau County Baldwin, U.F.S.D.; Arthur A.
Gianella, President/CEO Nassau University Medical
Center; John Ciapoli, Nassau County Attorney; Justice
Karen Murphy, Nassau County Supreme Court; Cyrus
R. Vance, Jr., New York County District Attorney,
Defendants.
No. 10–CV–1964(JS)(WDW).

Dec. 6, 2011.
Julia Johnson, Baldwin, NY, pro se.

Danielle J. Seid, Esq., Lance D. Simon, Esq., Law Offices
of Anthony A. Capetola, Williston Park, NY, for
Defendants Eddie James Myers, Jr.

Lewis R. Silverman, Esq., Christopher James Soverow,
Esq., Rutherford & Christie, LLP, New York, NY, for
Defendants Guarton and Nassau County Baldwin,
U.F.S.D.

Pablo A. Fernandez, Esq., Liora M. Ben–Sorek, Esq.,
Nassau County Attorney's Office, Mineola, NY, for
Defendants Malewicz, Weitzman–Fisher, Patterson, and
Ciapoli.

Roger B. Lawrence, Esq., Lawrence, Worden & Rainis,
P.C., Melville, NY, for Defendants Barris, St. Victor, and
Gianella.

Rebecca Rachel Hirschklau, Esq., New York City Law
Department, New York, NY, for Defendants Cyrus R.

Vance, Jr.

No appearances for Defendants Justice Karen Murphy.

*MEMORANDUM & ORDER*

SEYBERT, District Judge.

**\*1** Plaintiff Julia Johnson commenced this action *pro
se* on behalf of herself and her infant son DJM
(collectively "Plaintiffs") against DJM's father, Eddie
James Myers, Jr.; Donna Guarton and Nassau County
Baldwin U.F.S.D. (the "School District Defendants");
Benjamin Malewicz, Jody Weitzman–Fisher, Police
Officer Patterson and John Ciapoli (the "Law Enforcement
Defendants"); Dr. Robert Barris, Dr. G. St. Victor and
Arthur A. Gianella (the "NUMC Defendants"), New York
County District Attorney Cyrus R. Vance, Jr., and Nassau
County Supreme Court Justice Karen Murphy. Presently
pending before the Court is the NUMC Defendants'
motion for summary judgment. For the reasons that
follow, the NUMC Defendants' motion is GRANTED.

*BACKGROUND*

I. *Factual Background*[FN1]

> FN1. Although the NUMC Defendants provided
> Plaintiffs with the required notice to *pro se*
> litigants opposing motions for summary
> judgment, *see* Local Civil Rule 56.2, Plaintiffs
> did not serve a Local Civil Rule 56.1
> counter-statement. The Court therefore takes as
> true the facts contained in the NUMC
> Defendants' Local Rule 56.1 Statement that are
> supported by admissible evidence. *See* Local
> Civ. R. 56.1(c); *Baker v. Dorfman,* 239 F.3d
> 415, 422 (2d Cir.2000); *Marshall v. Marshall,*
> No. 08–CV–1420, 2010 WL 5477753, at *1 n. 1
> (E.D.N.Y. Dec. 7, 2010)* (Report and
> Recommendation), *adopted by 2010 WL
> 5477152 (E.D.N.Y. Dec.30, 2010).*

On or about August 20, 2008, Ms. Johnson was
admitted to Nassau University Medical Center's
("NUMC") Psychiatric Unit. She was referred for a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 6131003 (E.D.N.Y.)

(Cite as: 2011 WL 6131003 (E.D.N.Y.))

psychiatric evaluation by Child Protective Services ("CPS") and by Mr. Myers after CPS received an anonymous complaint from Brookside Elementary School concerning the possible neglect of DJM. Upon arrival at the hospital, Drs. Karine Grigoryants and Jagjeet Singh, staff psychiatrists at NUMC, examined Ms. Johnson and diagnosed her with psychosis, not otherwise specified, rule out delusional disorder and executed an application for involuntary admission pursuant to New York Mental Hygiene Law § 9.37(a).[FN2] She was deemed a danger to herself and others-she presented as extremely paranoid, guarded, anxious and suspicious, she believed that the police were monitoring her through her burglar alarm system, she reported that she locked herself and her son in her son's bedroom in the middle of the night and made him push a heavy desk against the door because she was afraid of Mr. Myers, and she had on a prior occasion attempted suicide.

> FN2. New York Mental Hygiene Law § 9.37 permits:
>
> > [t]he director of a hospital, upon application by a director of community services or an examining physician duly designated by him or her, [to] receive and care for in such hospital as a patient any person who, in the opinion of the director of community services or the director's designee, has a mental illness for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others.
>
> > Upon arrival at the hospital, the need for immediate hospitalization must be confirmed by a staff physician prior to admission. N.Y. MENTAL HYG. LAW § 9.37(a).

On August 21, 2011, Defendant Dr. St. Victor examined Ms. Johnson and diagnosed her with rule out delusional disorder and schizophrenia, paranoid type. Dr. St. Victor completed and executed a certificate stating that Ms. Johnson was in need of involuntary care pursuant to New York Mental Hygiene Law § 9.37(a).[FN3] She observed Ms. Johnson to be suspicious and paranoid, and

she exhibited poor judgment. For example, she was advised that she had a urinary tract infection but refused to take any medication to treat it and she refused to sign a release to allow NUMC to obtain information from her prior doctors regarding her psychiatric condition. Dr. St. Victor prescribed Risperdal, an antipsychotic medication, but Ms. Johnson refused to take it. She was discharged by Dr. St. Victor on September 2, 2008 because, despite a noticeable degree of suspiciousness, she was no longer believed to be a danger to herself or others. Ms. Johnson advised Dr. St. Victor that she would not pursue any mental health follow-up treatment nor was she willing to participate in her discharge planning.

> FN3. A patient may not be involuntarily retained beyond seventy-two hours unless an additional staff physician certifies the need for retention. N.Y. MENTAL HYG. LAW § 9.37(a).

On or about October 8, 2008, Ms. Johnson again was admitted involuntarily to NUMC's Psychiatric Unit after CPS expressed concern regarding her ability to care for her son. She was examined by two psychiatrists in the emergency room-Drs. Franz Hinojosa and Josephine Dellarosa-who both diagnosed her with delusional disorder and rule out psychosis. Ms. Johnson was hostile, evasive and guarded with the doctors and staff. Defendant Dr. Robert Barris examined her on October 10, 2008, but she refused to speak to him. She was extremely paranoid and refused to take the Risperdal prescribed to decrease her paranoia. Ms. Johnson continued to exhibit paranoid delusions and refused to take any antipsychotic medication, so on October 31, 2008 [FN4] NUMC filed a petition in the Supreme Court in Nassau County seeking permission to involuntarily treat Ms. Johnson with antipsychotic medication. Ms. Johnson opposed the petition at a hearing on November 6, 2008 before Defendant Justice Murphy where she was represented by counsel. That same day Justice Murphy issued an order allowing the administration of antipsychotic medications. Thereafter, Ms. Johnson began taking the prescribed medications, although on a few occasions she did not swallow the pills until she was asked to open her mouth. She was discharged on December 4, 2008 when her delusions and paranoia subsided significantly.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 6131003 (E.D.N.Y.)

(Cite as: 2011 WL 6131003 (E.D.N.Y.))

FN4. New York Mental Hygiene Law §§ 9.27, 9.39 provide that a patient can be retained involuntarily for treatment beyond fifteen days only if two physicians certify that the patient is "alleged to be mentally ill and in need of involuntary care and treatment."

II. *Procedural Background*

**\*2** Plaintiffs commenced this action *pro se* on April 23, 2010. (Docket Entry 1.) On June 29, 2010, the NUMC Defendants filed Answers to the Complaint (Docket Entries 18–20), and on August 30, 2010, the Law Enforcement Defendants filed their Answer (Docket Entry 39). The School District Defendants, Mr. Vance, and Mr. Myers all filed motions to dismiss (Docket Entries 26, 46, 64), which were granted in part and denied in part by this Court on February 23, 2011 (Docket Entry 77). All claims against the School District Defendants and Mr. Vance were dismissed with prejudice, and the only claim against Mr. Myers that survived the motion to dismiss was Plaintiffs' defamation claim. Mr. Myers filed his Answer to the remaining claim against him on June 1, 2011. (Docket Entry 96.) Justice Murphy has yet to make an appearance in this action.

Pending before the Court is the NUMC Defendants' motion for summary judgment. (Docket Entry 90.) The Court notes that no formal discovery has occurred to date.

*DISCUSSION*

I. *Ms. Johnson's Representation of DJM*

Before turning to the merits of the NUMC Defendants' summary judgment motion, the Court must first address Ms. Johnson's attempt to represent her infant son *pro se.* Although "an individual generally has the right to proceed *pro se* with respect to his own claims or claims against him personally," *Berrios v. N.Y.C. Hous. Auth.,* 564 F.3d 130, 132 (2d Cir.2009), "a person may not appear on another person's behalf in the other's cause." *Iannacone v. Law,* 142 F.3d 553, 558 (2d Cir.1998). The Second Circuit has repeatedly held that this bars parents from representing their minor children *pro se. See, e.g., Cheung v. Youth Orchestra Found. of Buffalo,* 906 F.2d 59, 61 (2d Cir.1990); *Wenger v. Canastota Cent. Sch. Dist.,* 146 F.3d 123, 125 (2d Cir.1998), *overruled on other*

grounds by *Winkelman v. Parma City Sch. Dist.,* 550 U.S. 127, 127 S.Ct. 1994, 167 L.Ed.2d 904 (2007). Accordingly, the claims of Plaintiff DJM shall be dismissed without prejudice unless counsel enters an appearance on his behalf within thirty (30) days of the date of this Order.

II. *Motion for Summary Judgment*

It is unclear what claims Plaintiffs are asserting against the NUMC Defendants or what relief Plaintiffs are seeking, as the Complaint merely narrates Plaintiffs' version of the facts. However, the Court reads the Complaint very liberally to assert claims under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments and under New York state law for assault, battery, false imprisonment, abuse of process, medical malpractice, and intentional infliction of emotional distress.

A. *Standard of Review*

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." *Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortg. Corp. (In re Blackwood Assocs., L.P.),* 153 F.3d 61, 67 (2d Cir.1998) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); FED. R. CIV. P. 56(c)); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**\*3** "The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." *McLee v. Chrysler Corp.,* 109 F.3d 130, 134 (2d Cir.1997); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *McLee,* 109 F.3d at 134.

"Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 6131003 (E.D.N.Y.)

(Cite as: 2011 WL 6131003 (E.D.N.Y.))

issue for trial.' " *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (quoting *Anderson,* 477 U.S. at 256). Where, as here, the non-moving is proceeding *pro se,* the Court should "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). "However, a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (quoting *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)); *accord Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) ("Mere conclusory allegations or denials will not suffice." (citation omitted)); *Weinstock,* 224 F.3d at 41 ("[U]nsupported allegations do not create a material issue of fact." (citing *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995))).

B. *Constitutional Claims*

Plaintiffs' § 1983 claims arise out of: (1) Ms. Johnson's involuntary commitment in NUMC's psychiatric unit from August 20 to September 3, 2008 and from October 8 to December 5, 2008 and (2) Defendants' forcibly administering antipsychotic drugs to Ms. Johnson during her second hospitalization. The Court will address the claims arising out of each incident separately.

1. *Involuntary Commitment*

With respect to the claims arising out of Ms. Johnson's involuntary commitment, Plaintiffs' Complaint, liberally construed, asserts violations of due process and the Fourth Amendment's prohibition against unreasonable seizures. The NUMC Defendants argue that they are shielded from liability by the doctrine of qualified immunity. The Court agrees.

"Under qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Faghri v. Univ. of Conn.,* 621 F.3d 92, 96 (2d Cir.2010) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "[Q]ualified immunity is available as a matter of law when the undisputed facts establish that it was objectively

reasonable for the defendants to believe that their actions did not violate clearly established rights." *Defore v. Premore,* 86 F.3d 48, 50 (2d Cir.1996).

**\*4** The NUMC Defendants do not dispute that the constitutional rights at issue here were clearly established. Rather, they argue that they are entitled to qualified immunity because it was objectively reasonable for them to believe that their decision to involuntarily commit Ms. Johnson was lawful. Therefore, the Court's analysis will focus on the objective legal reasonableness of the NUMC Defendants' actions under the due process clause and the Fourth Amendment.

a. *Due Process*

The Second Circuit has held that New York's overall statutory scheme governing involuntary commitments "meet[s] the minimum facial requirements of due process-both substantive and procedural." *Project Release v. Prevost,* 722 F.2d 960, 971 (2d Cir.1983) (construing N.Y. MENTAL HYG. LAW §§ 9. 27, 9.37, 9.39); *see also Olivier v. Robert L. Yeager Mental Health Ctr.,* 398 F.3d 183, 188 (2d Cir.2005). Additionally, the Supreme Court has held that "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving in freedom by himself or with the help of willing and responsible family members," *O'Connor v. Donaldson,* 422 U.S. 563, 576, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), and New York's Mental Hygiene Law has been interpreted to require a finding of dangerousness prior to involuntary commitment, *see Project Release,* 722 F.2d at 973–74; *see also Glass v. Mayas,* 984 F.2d 55, 57 (2d Cir.1993).

It is undisputed that the NUMC Defendants complied with the procedures set forth in the Mental Hygiene Law.[FN5] Therefore, "the availability of qualified immunity turns on whether it was objectively reasonable for the defendants to believe, at the time they examined [Ms. Johnson] and in light of the information that they possessed, that [Ms. Johnson] was dangerous." *Glass,* 984 F.2d at 57; *see also Mawhirt v. Ahmed,* 8 Fed. Appx. 125, 127 (2d Cir.2001). The Court believes that it was. With respect to the first hospitalization, the treating psychiatrists observed Ms. Johnson to be extremely paranoid and suspicious. The paranoia was affecting her

Slip Copy, 2011 WL 6131003 (E.D.N.Y.)

(Cite as: 2011 WL 6131003 (E.D.N.Y.))

son: she woke him up in the middle of the night, locked them in his bedroom, and made him move a heavy desk to block the door. They also knew that she had a history of mental illness and had attempted suicide in the past. Similarly, with respect to the second hospitalization, Ms. Johnson again showed signs of schizophrenia, including being hostile and evasive with NUMC doctors and staff. She exhibited an inability to take care of herself in that she refused treatment for a diagnosed urinary tract infection, and she expressed a total lack of understanding of CPS's concerns for DJM's safety. Accordingly, the NUMC Defendants are shielded by the doctrine of qualified immunity and are entitled to summary judgment with respect to the § 1983 claims arising out of Ms. Johnson's involuntary hospitalizations.

> FN5. Pursuant to New York Mental Hygiene Law § 9.37, upon being admitted the NUMC on each occasion, an application for involuntary admission was executed by two doctors who were in agreement that she was suffering from paranoid delusions and was deemed to be a danger to herself and her son. Also, on both occasions, a third doctor examined her within seventy-two hours of being admitted and confirmed her diagnosis and need for involuntary commitment.

b. *Fourth Amendment*

Qualified immunity also shields the NUMC Defendants from liability for violating the Fourth Amendment's prohibition against unreasonable seizures. "The Fourth Amendment requires that an involuntary hospitalization 'may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard.' " *Glass,* 984 F.2d at 58 (quoting *Villanova v. Abrams,* 972 F.2d 792, 795 (7th Cir.1993)). The Second Circuit has held that "[t]he standard for qualified immunity in the Fourth Amendment context is objective reasonableness." *Glass,* 984 F.2d at 58 (citing *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1988)); *see also Kraft v. N.Y.C.,* 696 F.Supp.2d 403, 415 (S.D.N.Y.2010) (finding that qualified immunity shielded the defendant doctors

from liability for violating the Fourth Amendment because they "had probable cause and reasonable grounds for believing that plaintiff was subject to seizure under the [Mental Hygiene Law]."). The Court has already established that the NUMC Defendants' involuntary commitment of Ms. Johnson was objectively reasonable in the due process context, it follows that their actions were also objectively reasonable in the Fourth Amendment context. Therefore, all § 1983 claims arising out of Ms. Johnson's involuntary hospitalizations are barred by the doctrine of qualified immunity.

2. *Unwanted Administration of Antipsychotic Drugs*

**\*5** The NUMC Defendants argue that Plaintiffs' § 1983 claims arising out of their involuntary administration of antipsychotic drugs are barred by the Nassau County Supreme Court's Order authorizing NUMC to administer the medication to Ms. Johnson over her objection. The Court agrees. "A valid, binding, and enforceable court order obtained and issued in accordance with the Mental Hygiene Law precludes relitigation of the issues determined therein in a later action to recover damages." *Porter v. Westchester Cnty. Med. Ctr.,* 252 A.D.2d 518, 519, 675 N.Y.S.2d 364, 365 (2d Dep't 1998) (citing *Kulak v. N.Y.C.,* 88 F.3d 63, 71–72 (2d Cir.1996)); *see also Harvey v. Sawyer,* No. 09–CV–0598, 2010 WL 3323665, at \*4–5 (N.D.N.Y. July 22, 2010). Plaintiffs do not dispute that the Order was obtained in accordance with the procedures prescribed in the Mental Hygiene Law—Ms. Johnson had the opportunity to challenge the proposed treatment at a hearing where she was represented by counsel. Plaintiffs are not permitted to relitigate the issues heard and decided by the state court in this forum. Thus, the Court grants summary judgment in favor of the NUMC Defendants.[FN6]

> FN6. The Court also finds that the NUMC Defendants are entitled to qualified immunity with respect to the claims arising out of Ms. Johnson's involuntary medication. *See Fisk v. Letterman,* 501 F.Supp.2d 505, 525 (S.D.N.Y.2007) (holding that defendant doctors were shielded from liability for claims arising out of their decision to medicate plaintiff against her will because plaintiff's right to avoid unwanted treatment is not clearly established: "[ **N]either the Supreme Court nor the Second Circuit**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 6131003 (E.D.N.Y.)

(Cite as: 2011 WL 6131003 (E.D.N.Y.))

has defined the circumstances under which forcible medication of an involuntarily committed patient is prohibited." (quoting *Graves v. MidHudson*, No. 04–CV–3957, 2006 WL 3103293, at * 6 ( E.D.N.Y. Nov. 2, 2006))).

C. *State Tort Law Claims*

The NUMC Defendants assert that Plaintiffs' state law claims must be dismissed as time-barred and for failure to serve a notice of claim under New York General Obligations Law §§ 50–i, 50–e.[FN7] The Court agrees.

> FN7. The Court notes that these sections of the General Municipal Law apply to claims against employees of NUMC pursuant to New York Public Authorities Law § 3415.

The applicable statute of limitations for tort claims against a municipality or its employees in New York is "one year and ninety days after the happening of the event upon which the claim is based." N.Y. GEN. MUN. LAW § 50–i(1)(c); *see also Bosone v. Cnty. of Suffolk,* 274 A.D.2d 532, 533, 712 N.Y.S.2d 128, 131 (2d Dep't 2000) ("Causes of action to recover damages for intentional torts committed by municipal defendants ... must be commenced within the one-year and 90–day period contained in General Municipal Law § 50–i ...."); *Castelli v. Nassau Cnty. Med. Ctr.,* 244 A.D.2d 379, 379, 664 N.Y.S.2d 94, 95 (2d Dep't 1997) (upholding dismissal of medical malpractice claim against NUMC and plaintiff's treating physician as time-barred under General Municipal Law § 50–i). Here, Plaintiffs' tort claims against the NUMC Defendants all arise out of Ms. Johnson's hospitalization in NUMC's psychiatric unit from August 20 to September 3, 2008 and from October 8 to December 5, 2008. Thus, Plaintiffs' causes of action accrued, at the latest, on December 5, 2008. Since Plaintiffs did not file their Complaint until April 23, 2010, nearly seven weeks beyond the one-year and ninety day limitations period, these claims are time-barred.

Additionally, Plaintiffs failed to comply with New York General Municipal Law § 50–e, which requires a plaintiff to file a notice of claim prior to commencing an action in tort against a municipality or one of its employees but no more than ninety days after the cause of action accrued. *See* N.Y. GEN. MUN. LAW §§ 50–e, 50–i; *cf. Warner v. Vill. of Goshen Police Dep't,* 256 F.Supp.2d 171, 175 (S.D.N.Y.2003) ("The notice of claim requirements apply equally to state tort claims brought as pendent claims in federal civil rights actions." (citation omitted)). Here, Plaintiffs never filed a notice of claim, nor did they ever request an extension of time to do so. As such, Plaintiffs' state law claims against the NUMC Defendants must be dismissed. *See Davidson v. Bronx Mun. Hosp.,* 64 N.Y.2d 59, 61–62, 484 N.Y.S.2d 533, 535, 473 N.E.2d 761, 763 (1984) ("Failure to comply with provisions requiring notice and presentment of claims prior to commencement of litigation ordinarily requires dismissal." (citation omitted)).

**\*6** Accordingly, the Court GRANTS summary judgment with respect to Plaintiffs' state law claims against the NUMC Defendants.

*CONCLUSION*

For the foregoing reasons, the NUMC Defendants' motion for summary judgment is GRANTED, and the Clerk of the Court is directed to terminate Dr. Robert Barris, Dr. G. St. Victor and Arthur A. Gianella as Defendants in this action. Additionally, unless counsel makes an appearance on behalf of DJM within thirty (30) days of the date of this Order, his claims will be dismissed by the Court *sua sponte* without prejudice.

Counsel for the NUMC Defendants is ORDERED to serve a copy of this Memorandum and Order on the *pro se* Plaintiffs and to file proof of service within seven (7) days of the date of this Order.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal. *Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

E.D.N.Y.,2011.

Johnson v. Myers

Slip Copy, 2011 WL 6131003 (E.D.N.Y.)

(Cite as: 2011 WL 6131003 (E.D.N.Y.))

Slip Copy, 2011 WL 6131003 (E.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 1130214 (E.D.N.Y.)

(Cite as: 2011 WL 1130214 (E.D.N.Y.))

Only the Westlaw citation is currently available.
United States District Court,

E.D. New York.
Wayne ROSE, Plaintiff,
v.
Robert GOLDMAN, William Ford, Jude Okora,
Colleen Walsh, Evelyn Santiago, Christopher Stanecki,
Anthony Casale, Jr., Christopher Kazlau, William Ford,
David Bethel, Sylvia Way, the City of New York, and
the State of New Jersey, Defendants.
No. 02–CV–5370 (NGG)(LB).

March 24, 2011.
Wayne Rose, Rockaway Beach, NY, pro se.

Bradford Collins Patrick, Steven Mark Silverberg, New York City Law Department, Jed Matthew Weiss, Johana Castro, Mary Theresa O'Flynn, Office of the Corporation Counsel, Erika L. Omundson, Mintzer Sarowitz Zaris Ledva & Meyers, New York, NY, Bradley J. Levien, Mintzer, Sarowitz, Zeris, Ledva & Meyers, Hicksville, NY, Joseph Ives Picillo, Raymond C. Barzey, State of New Jersey — Office of the Attorney General, Trenton, NJ, for Defendants.

### MEMORANDUM & ORDER

NICHOLAS G. GARAUFIS, District Judge.

*1 Plaintiff Wayne Rose ("Rose"), pro se, brings this action against Defendants under 42 U.S.C. §§ 1983, 1985, 1986, 1987, 1988, and 14141, and the First, Fourth, and Fourteenth Amendments to the United States Constitution. (Am. Compl. (Docket Entry # 104).) Defendants separately move for summary judgment against Rose. (N.J. Mot. (Docket Entry # 150); N.Y.C. Mot. (Docket Entry # 152); Ford Mot. (Docket Entry # 155).) On March 6, 2009, the court referred these motions for summary judgment to Magistrate Judge Lois Bloom for report and recommendation. (Docket Entry # 184.) On December 9, 2009, Judge Bloom issued a Report and Recommendation

("R & R") recommending that the court grant Defendants' motions. (R & R (Docket Entry # 189).) Rose now objects to Judge Bloom's R & R. (Pl.'s Obj. (Docket Entry # 193).) As set forth below, the court grants Defendants' motions for summary judgment in their entirety.

### I. STANDARD OF REVIEW

In reviewing the report and recommendation of a dispositive matter from a magistrate judge, the district court "may adopt those portions of the Report to which no objections have been made and which are not facially erroneous." La Torres v. Walker, 216 F.Supp.2d 157, 159 (S.D.N.Y.2000). The district court reviews de novo "those portions of the report ... to which objection is made." 28 U.S.C. § 636(b)(1). Where a plaintiff proceeds pro se, the court reads his submissions liberally and interprets them as raising the strongest arguments they suggest. See McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir.2004); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994). Even when reviewing pro se objections, a district court may adopt the recommendation of a magistrate judge for alternative reasons not set forth in the magistrate's report. See id. ("A judge of the court *may* accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.") (emphasis added); see also Johnson v. Rock, No. 08–CV–1013 (GLS)(RFT), 2010 WL 3910153, at *1 (N.D.N.Y. Sept. 30, 2010) (adopting magistrate's recommendation of dismissal of a pro se complaint for reasons other than those set out in the report).

### II. BACKGROUND

#### A. Rose's Amended Complaint

Rose's Amended Complaint centers around several incidents concerning Defendants' involvement in supervising Rose's probation in New Jersey and New York for his March 2, 1999 conviction for child abuse in New Jersey Superior Court. (See Am. Compl.; N.Y. Mot. Ex. J.) Rose brings his claims against three groups of Defendants: (1) the State of New Jersey and New Jersey Probation Officers Anthony Casale, Jr. ("Casale"), Christopher Stanecki ("Stanecki"), Colleen Walsh

Slip Copy, 2011 WL 1130214 (E.D.N.Y.)

(Cite as: 2011 WL 1130214 (E.D.N.Y.))

("Walsh"), Jude Okoro ("Okoro"), and Evelyn Santiago ("Santiago"), and New Jersey Public Defender Christopher Kazlau ("Kazlau") (collectively, "the New Jersey Defendants"); (2) the City of New York and New York City Probation Officers Robert Goldman ("Goldman"), David Bethel ("Bethel"), and Sylvia Way ("Way") (collectively, the "New York Defendants"); and (3) William Ford ("Ford"), a social worker and therapist employed by Mustard Seed Forensic Social Work Services, P.C. ("Mustard Seed"), with whom Rose engaged in one, forty-five minute session of sex counseling. (*See* Am. Compl.) Rose's probation was initially supervised in New Jersey. Shortly after his conviction, however, Rose moved from New Jersey to New York. As a consequence, the New York City Department of Probation began to supervise Rose's probation. (*See* N.Y. Mot. Ex. Q.)

**\*2** Rose's allegations focus on four events. First, Rose alleges that following his 1999 conviction, Goldman wrongly required Rose to attend a sex counseling session with Ford at Mustard Seed as part of his court ordered probation, even though his judgment of conviction did not specify that he needed mental health or sex counseling. (*See* Am. Compl. ¶ 23; N.Y. Mot. Ex. J; N.J. Mot. Ex. Q.) Second, Rose alleges that on June 19, 2000, Goldman wrongly informed Okoro that Rose had vacated his apartment without notifying Goldman, thus violating his probation. (*See* Am. Compl. ¶ 27.) Okoro then filed "violation of probation" ("VOP") proceedings against Rose ("VOP 1"). (*See* N.Y. Mot. Ex. U.) Third, Rose alleges that on March 12, 2001, Okoro wrongly filed a second VOP against Rose ("VOP 2") because Rose failed to pay court fees and attend counseling, as required under the terms of his probation. (*See* Am. Compl. ¶ 30; N.Y. Mot Ex. W.) And fourth, Rose alleges that on November 19, 2002, Bethel wrongly informed Santiago that Rose had failed to complete his mental health counseling, which led to the institution of a VOP against him ("VOP 3"). (*See* Am. Compl. ¶ 50; N.Y. Mot. Ex. Y.)

Rose claims that Defendants' supervision of his probation from 1999 until its termination in 2003 violated 42 U.S.C. §§ 1983, 1984, 1985, 1986, 1987, 1988, and 14141, and Rose's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

(*See* Am. Compl.) Rose also brings a malpractice claim against Ford. (*Id.*)

**B. Procedural History**

The procedural history in this case is complicated because Rose filed three contemporaneous actions based on the same facts in this court, the Southern District of New York, and the District of New Jersey. Rose filed his first action—this action—on October 4, 2002, against all of the same Defendants, except the City of New York, and against New Jersey Superior Court Judges Camille Kenny, Arthur D'Italia, and L. DeBello, and the State of New York. (Compl. (Docket Entry # 1).) On February 25, 2003, Rose filed a complaint in the Southern District of New York against the New York Defendants, except for Robert Goldman, and against Evelyn Santiago and Colleen Walsh, based on the same allegations contained in his Eastern District Complaint. (Compl., *Rose v. Bethel,* No. 03–cv–1241 (GBD)(HBP) (S.D.N.Y. Feb. 25, 2003) (Docket Entry # 1).) On April 16, 2003, Rose filed his third complaint on the same issues, this time in the District of New Jersey, against various defendants, including Evelyn Santiago. (Compl., *Rose v. Schultz,* No. 03–cv–1684 PMC) (MF) (D.N.J. Apr. 16, 2003) (Docket Entry # 1).)

On March 12, 2004, this court issued a Memorandum and Order dismissing Rose's claims against the New Jersey Superior Court Judge Defendants, on the basis of absolute immunity, and against the remainder of the New Jersey Defendants in their official capacities on Eleventh Amendment grounds. (*"E.D.N.Y. I"* (Docket Entry # 50) at 7–8, 23–24.) The decision also allowed Rose sixty days to amend his Complaint. (*Id.* at 24.) On September 20, 2004, following a motion to reconsider by the New Jersey Defendants, the court further concluded that the New Jersey Defendants were entitled to absolute prosecutorial immunity for initiating VOPs against Rose. (*"E.D.N.Y. II"* (Docket Entry # 64) at 5–6.)

**\*3** On June 2, 2005, after several extensions of time, Rose filed an Amended Complaint in this action, now the operative complaint. (Am.Compl.) In his Amended Complaint, Rose removed the New Jersey Superior Court Judges and the State of New York as Defendants and added the City of New York as a Defendant. (*Id.*) On

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1130214 (E.D.N.Y.)

(Cite as: 2011 WL 1130214 (E.D.N.Y.))

September 26, 2006, following discovery, all Defendants filed motions for summary judgment against Rose. (N.J. Mot.; N.Y.C. Mot.; Ford Mot.)

On April 17, 2007, pending the disposition of Defendants' motions for summary judgment in this court, the district of New Jersey issued an opinion dismissing Rose's complaint. *Rose v. Schultz ("D.N.J." ). No. 03–cv–1684 (DMC), 2007 WL 1160348, at \*1 (D.N.J. Apr. 17, 2007).* The decision barred all of Rose's claims against Santiago on the basis of claim and issue preclusion, resulting from this court's September 20, 2004 decision, *E.D.N.Y. II. Id.* at \*3–6. The decision also barred Rose's claims against the State of New Jersey on Eleventh Amendment grounds. *Id.* at \*8–9. Rose did not appeal.

On August 29, 2007, the Southern District of New York issued an opinion adopting the report and recommendation of Magistrate Judge Henry B. Pitman recommending that the district court grant summary judgment in favor of Evelyn Santiago and Colleen Walsh, also on the basis of claim and issue preclusion following this court's decisions. *Rose v. Bethel ("S.D.N.Y.I" ). No. 03–cv–1241 (GBD) (MHD), 2007 WL 2476389, at \*1 (S.D.N.Y. Aug. 29, 2007).*

On February 27, 2008, the Southern District issued a decision adopting in part additional findings and conclusions of Magistrate Judge Pitman. *Rose v. Bethel ("S.D.N.Y.II" ), No. 03–cv–1241 (GBD)(MHD), 2008 WL 563455, at \*1 (S.D.N.Y. Feb. 27, 2008).* There, the Southern District granted summary judgment for all of the defendants on all of Rose's federal claims that centered on the defendants' institution of VOP proceedings against Rose. *Id.* The Southern District also granted summary judgment in favor of all of the defendants on Rose's retaliation and discrimination claims. *Id.* at \*2. The court referred Rose's malicious prosecution claims back to Magistrate Judge Pitman. *Id.* at \*3.

On March 6, 2009, this court referred Defendants' still outstanding motions to dismiss to Magistrate Judge Lois Bloom for report and recommendation. (Docket Entry # 184.) On December 9, 2009, Judge Bloom issued an R & R recommending that the court grant Defendants' motions for summary judgment and dismiss Rose's Amended

Complaint. (R & R.)

On February 22, 2010, in the Southern District action, the court reviewed Magistrate Judge Pitman's report and recommendation concerning Rose's malicious prosecution claims. *Rose v. Bethel ("S.D.N.Y.III" ). No. 03–CV–1241 (GBD)(MHD), 2010 WL 727149, at \* 1 (S.D.N.Y. Feb. 22, 2010).* The court adopted the magistrate judge's recommendation that Rose's malicious prosecution claims should be dismissed, granted summary judgment in favor of Bethel, Way, and the City of New York, and dismissed Rose's action. *Id.* at \*2.

### III. DISCUSSION

**\*4** Rose submits a rambling, ten-page, slumgullion of objections to Judge Bloom's R & R. (Pl.'s Obj.) Construing Rose's objections liberally, as we must—and avoiding the knotty task of attempting to parse them individually—the court takes the Gordian approach by considering Rose's objections as contesting every part of Judge Bloom's R & R. Accordingly, the court reviews Judge Bloom's R & R de novo. 28 U.S.C. § 636(b)(1). On review, the court concludes that res judicata bars many of Rose's claims against Defendants, and grants summary judgment in favor of Defendants on the remainder.

**A. Res Judicata: Claim Preclusion and Issue Preclusion**

### 1. *Legal Standards*

Res judicata comes in two basic flavors: claim preclusion and issue preclusion. *Taylor v. Sturgell,* 553 U.S. 880, 892, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008) ("The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.' "). Claim preclusion forecloses "successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *Id.* (citation omitted). In other words, "the doctrine of claim preclusion ... precludes the parties or their privies from relitigating issues that were *or could have been raised* in that action." *Rivets v. Regions Bank of La.,* 522 U.S. 470, 476, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998) (internal punctuation omitted) (emphasis added). "Issue preclusion, in contrast, bars successive litigation of an issue of fact or law actually

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1130214 (E.D.N.Y.)

(Cite as: 2011 WL 1130214 (E.D.N.Y.))

litigated and resolved in a valid court determination essential to the prior judgment...." *Taylor,* 553 U.S. at 892 (citation omitted).

a. Claim Preclusion

In the Second Circuit, claim preclusion exists where there was "(1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action." *EDP Med. Computer Sys., Inc. v. United States,* 480 F.3d 621, 624 (2d Cir.2007). This four prong test is explicated below.
i. A Final Judgment on the Merits

For the purpose of claim preclusion, a "final judgment on the merits" "actually passes directly on the substance of a particular claim before the court." *Semtek Int'l. Inc. v. Lockheed Martin Corp.,* 531 U.S. 497, 501–02, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001) (internal punctuation omitted). "To be on the merits the judgment must have been based upon legal rights as distinguished from mere matters of practice, procedure, jurisdiction, or form." *McKinnon v. City of Berwyn,* 952 F.2d 1398 (Table), at *2 (7th Cir.1992) (internal quotation marks omitted).
ii. A Court of Competent Jurisdiction

A court of competent jurisdiction is that judicial body that has the legal authority to award the relief sought by the plaintiff. *See Sheffield v. Sheriff of Rockland Cnty. Sheriff Dep't,* 393 F. App'x 808, 813 (2d Cir.2010).
iii. A Case Involving the Same Parties or Their Privies

**\*5** Where the defendants seek to preclude the plaintiff from litigating his claim on res judicata grounds, "claim preclusion bars a subsequent action—involving either the same plaintiffs or parties in privity with those plaintiffs—from asserting [those] claims." *Bank of N.Y. v. First Millennium, Inc.,* 607 F.3d 905, 918 (2d Cir.2010).
iv. Involving the Same Cause of Action

Whether a claim involves "the same cause of action" as a previously litigated claim turns on "whether the two proceedings in question concern the same transaction or series of transactions, whether the same evidence is needed to support both claims, and whether facts essential to the second proceeding were present in the first." *Jones v. Dep't of Army Bd. for Corr. of Military Records,* 77 F. App'x 39, 40 (2d Cir.2003). Importantly, "it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory upon which a litigant relies." *Expert Elec., Inc. v. Levine,* 554 F.2d 1227, 1234 (2d Cir.1977). Two cases may be the "same cause of action" if it appears that the plaintiff is attempting to "relitigate [e] identical issues by merely 'switching adversaries.' " *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 329, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *see also O'Berry v. State Attorneys Office,* 241 F. App'x 654, 660 (11th Cir.2007) (upholding district court's dismissal on res judicata grounds for pro se plaintiff's second complaint alleging violations of 42 U.S.C. § 1983 after a final judgment on an earlier and substantially similar complaint where plaintiff's second complaint merely added the City of Fort Lauderdale, an individual Assistant State Attorney, and individual police officers as defendants).
b. Issue Preclusion

A party is barred from raising a previously litigated issue under the doctrine of issue preclusion when

(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.

*Purd y v. Zeldes,* 337 F.3d 253, 258 (2d Cir.2003) (citation omitted).

**2. *E.D.N. Y. II:* Claims Related to VOPs 1, 2, and 3 Against the New Jersey Defendants**

In *E.D.N.Y. II,* this court concluded that the New Jersey probation officers were absolutely immune from claims related to the institution of VOP proceedings against Rose. (*E.D.N.Y II* at 5–6 ["[W]ith respect to initiating the violation proceeding, the New Jersey probation officers' conduct in making the discretionary decision to prosecute the probation violation falls within the probation officers' absolute prosecutorial immunity."].) Rose's claims against the New Jersey probation

Slip Copy, 2011 WL 1130214 (E.D.N.Y.)

(Cite as: 2011 WL 1130214 (E.D.N.Y.))

officers—Casale, Stanecki, Walsh, Okoro, and Santiago—are therefore barred by issue preclusion under the framework described in *Purdy.* This identical issue of the New Jersey Defendants' absolute prosecutorial immunity was raised, litigated, and decided in *E.D.N.Y. II.* There, Rose had a full and fair opportunity to litigate the issue by submitting briefing on this very same point. (Docket Entry 25, 36, 37.) Finally, resolution of this issue was necessary to support the judgment in *E.D.N.Y. II* as to Rose's claims against the New Jersey probation officers. Rose may therefore no longer bring his claims against the New Jersey probation officers.

3. *D.N.J.: Claims Against the State of New Jersey*

**\*6** The New Jersey Defendants have not argued that *D.N.J.* bars Rose's claims against them on res judicata grounds. (*See* N.J. Mem. (Docket Entry # 150–4).) Typically, "res judicata ... and collateral estoppel ... are affirmative defenses that must be pleaded by the defendant." *Leather v. Eyck,* 180 F.3d 420, 424 (2d Cir.1999). But, "[t]he failure of a defendant to raise res judicata in answer does not deprive a court of the power to dismiss a claim on that ground," sua sponte. *Salahuddin v. Jones,* 992 F.2d 447, 449 (2d Cir.1993); *see also Scherer v. Equitable Life Assurance Soc'y of U.S.,* 347 F.3d 394, 398 n. 4 (2d Cir.2003). The court does so here.

In Rose's District of New Jersey action, Rose brought a Complaint against a number of defendants, including the State of New Jersey, concerning the events leading to VOPs 1, 2, and 3. *See D.N.J.,* 2007 WL 1160348, at \*1–3. In *D.N.J.,* the court determined that the Eleventh Amendment barred Rose's claims against the state. *Id.* at \*8–9. That decision was a final decision on the merits, issued by a court of competent jurisdiction, between the same parties, and arising from the same cause of action—the State's involvement in VOPs 1, 2, and 3—as the instant case. This court will not upset the District of New Jersey's decision. Claim preclusion now bars Rose's claims against the State of New Jersey.

4. *S.D.N.Y. II and III: Claims Related to VOP 3 Against the New York Defendants*

In *S.D.N.Y. II,* Judge Daniels adopted in part the report and recommendation of Magistrate Judge Pitman recommending summary judgment for Bethel, Way, and the City of New York on Rose's claims related to VOP 3, except for Rose's malicious prosecution claim. 2008 WL 563455, at \*1–3. In *S.D.N.Y. III,* Judge Daniels adopted in full Magistrate Judge Pitman's recommendation that Rose's malicious prosecution claims against the same defendants should be similarly dismissed. 2010 WL 727149, at \*1–2. Claim preclusion now estops Rose from asserting his claims against the current New York Defendants for incidents surrounding VOP 3. Both *S.D.N.Y. II* and *III* were final decisions on the merits, issued by a court of competent jurisdiction, between the same parties, and arising from the same cause of action—the New York Defendants' involvement in VOP 3—as the instant case.

**B. Rose's Remaining Claims**

After *E.D.N.Y. II, D.N.J.,* and *S.D.N.Y. II* and *III,* the only surviving claims are Rose's claims related to VOP 1 against Goldman; Rose's malpractice and federal claims against Ford; and Rose's claim against Kazlau.

1. *Qualified Immunity*

Goldman and Ford each argue that they are qualifiedly immune from Rose's claims. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity is an affirmative defense which is "an immunity from suit rather than a mere defense to liability ... [and] is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (emphasis omitted). Whether qualified immunity applies should be resolved at the earliest possible stage in litigation. *See Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). Qualified immunity "often can and should be decided on a motion for summary judgment." *Castro v. United States,* 34 F.3d 106, 112 (2d Cir.1994).

**\*7** A district court deciding a question of qualified immunity must appropriately define the constitutional right at issue. "The Supreme Court has instructed courts encountering a qualified immunity defense to claimed violations of constitutional rights to consider carefully 'the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1130214 (E.D.N.Y.)

(Cite as: 2011 WL 1130214 (E.D.N.Y.))

level of generality at which the relevant 'legal rule' is to be identified.' " *Zahrey v. Coffey,* 221 F.3d 342, 348 (2000) (quoting *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). If the right is construed too generally, e.g., "the right to due process of law," qualified immunity would be meaningless; if the right is construed too narrowly, only specific acts that have been previously declared unconstitutional would entitle a plaintiff to sue. *Id.* The touchstone for the courts' analysis should be the "context" of the alleged violation: "a potentially recurring scenario that has similar legal and factual components." *Arar v. Ashcroft,* 585 F.3d 559, 572 (2d Cir.2009).

After defining the constitutional right, the court faces two issues. One, "a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 815–16, 172 L.Ed.2d 565 (2009) (internal citations omitted). And two, "the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 816. The court may decide either of these issues first. *Id.* at 822 (abrogating *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

"In deciding whether a right was clearly established, we ask: (1) Was the law defined with reasonable clarity? (2) Had the Supreme Court or the Second Circuit affirmed the rule? and (3) Would a reasonable defendant have understood from the existing law that the conduct was unlawful?" *Taravella v. Town of Wolcott,* 599 F.3d 129, 140 (2d Cir.2010) (quoting *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998)). Like defining the constitutional right, the key to determining whether the right was clearly established is context. The question is not whether "the *very action* in question has previously been held unlawful but it is to say that *in light of the pre-existing law the unlawfulness must be apparent." Id.* at 140 n. 5 (quoting *Anderson,* 483 U.S. at 640) (internal punctuation omitted). Therefore, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Id.* (quoting *United States v. Lanier,* 520 U.S. 259, 269, 117 S.Ct. 1219, 137 L.Ed.2d 432

(1997)) (internal punctuation omitted).

c. Claims Against Goldman

Rose alleges that Goldman violated his constitutional rights by requiring him to attend sex counseling with Ford; by reporting his discontinuance of treatment with Ford to Okoro in retaliation; and by failing to provide him with medical reports indicating that he needed counseling. Appropriately abstracted to encompass "a potentially recurring factual scenario that has similar legal and factual components," *see Arar,* 585 F.3d at 572, Rose's claims against Goldman can be construed as being predicated on: (1) a due process right to be punished only according to the terms of his conviction; (2) a due process right to refuse medical treatment, i.e., therapy with Ford; and (3) a due process right to access to medical records held by the State.

v. Due Process Right to Punishment According to the Terms of Probation

**\*8** The court first considers whether Rose has made out a violation of a due process right to be punished only according to the terms of his probation. *Pearson,* 129 S.Ct. at 815–16. This claim, is based on the false assumption that the Superior Court of New Jersey did not order mental health counseling as part of Rose's probation, and that Goldman illegally modified Rose's conditions of probation. While it is true that Rose's judgment of conviction did not specify that he was required to undergo mental health counseling, the court has already determined, in *E.D.N.Y. II,* that Rose was

> required to undergo a mental health assessment as a special condition of his probation. Implicit in [the mental health assessment order] is some discretionary authority that probation should require [Rose] to receive further mental health counseling in the event that the assessment indicated that it was appropriate. [In addition], the State of New Jersey "Standard Conditions of Adult Probation" form states that probationers shall cooperate in any medical and/or psychological examinations, tests and/or counseling [the probationer's] probation officer recommends.

(*E.D.N.Y. II* at 6–7.) Goldman, therefore, did not modify Rose's terms of probation. To the contrary, it

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1130214 (E.D.N.Y.)

(Cite as: 2011 WL 1130214 (E.D.N.Y.))

appears that Goldman directed Rose to follow the terms of his probation despite the absence of such a requirement on the face of the judgment of conviction. While the Superior Court's failure to include these terms on the judgment of conviction may be sorely regrettable, Goldman's conduct in ordering Rose to receive counseling was not prohibited by law. Goldman, therefore, is qualifiedly immune from Rose's due process claim based on such conduct.

vi. Due Process Right to Refuse to Attend Therapy

Rose alleges that Goldman violated his constitutional right to due process by requiring him to undergo medical treatment, i.e., his therapy session with Ford. While a prisoner or probationer may refuse medical treatment in some circumstances, this right is by no means clearly defined. *Compare Washington v. Harper,* 494 U.S. 210, 240, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (due process right to refuse electroconvulsive therapy), *Hernandez–Carrera v. Carlson,* 547 F.3d 1237, 1254–55 (10th Cir.2008) (due process right to refuse to participate in group therapy), *Traylor v. Main,* No. 07–cv–2751 (DMC), 2007 WL 2028044, at *3 (D.N.J. July 10, 2007) (collecting cases finding constitutional right to refuse to attend therapy); *with Newman v. Beard,* 617 F.3d 775, 780–81 (3d Cir.2010) (finding no constitutional right to refuse to attend group therapy). Goldman, therefore, is qualifiedly immune from Rose's due process claim on this ground.

vii. Due Process Rights to Obtain Medical Records

Rose alleges that Goldman refused to provide him with "medical documentation verifying that [Rose] was and/or is in need of any treatment of any nature" in violation of his constitutional right to due process. (*See* Am. Compl. ¶ 22.) Rose does not point to—nor can the court find—any federal law, constitutional or otherwise, violated by the alleged conduct. Here, too, Goldman is qualifiedly immune from Rose's due process claim related to his medical records.

d. Claims Against Ford

**\*9** Ford also argues that he is qualifiedly immune from Rose's claims. Generally, qualified immunity from federal claims is afforded only to state actors. *Richardson v. McKnight,* 521 U.S. 399, 403, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997). In limited circumstances, however, private individuals may be qualifiedly immune from § 1983 claims if history reveals a "firmly rooted" tradition of immunity applicable to" that class of individuals. *Id.* at 404. Here, Ford does not dispute that he is not a state actor. (Ford. Mot. at 3.) Suffice it to say that there is not a " 'firmly rooted' tradition of immunity applicable" to clinical social workers conducting therapy pursuant to probation orders. Therefore, Ford is not entitled to qualified immunity from Rose's claims.

2. *Malpractice*

Rose claims that Ford committed malpractice by "grossly and negligently failing to properly diagnose, observe, treat and/or administer proper care to [him]." (*See* Am. Compl. ¶ 116.) As a result, Rose alleges he felt "sever [sic] physical, mental and emotional pain and suffering." (*See Id.* ¶ 115.) In New York, "[t]he essential elements of medical malpractice are (1) a deviation or departure from accepted medical practice, and (2) evidence that such departure was a proximate cause of injury." *DiMitri v. Monsouri,* 302 A.D.2d 420, 754 N.Y.S.2d 674, 675 (2d Dep't 2003). Rose has submitted no evidence, whatsoever, that Ford's treatment of Rose—at a single, forty-five minute psychotherapy session—somehow deviated or departed from an accepted medical practice. The only evidence submitted by Rose that even remotely addresses this issue is a letter from Quentin John Clough, a licensed clinical social worker, who stated that Ford's letter discontinuing his treatment of Rose "has impugned [Rose's] character and any reasonable person reading this letter will likely fall under the false assumption that Mr. Rose is [a] convicted sexual offender." (Docket Entry # 159.) This has *nothing* to do with whether Ford violated an accepted medical practice. Even given the deference afforded to Rose as a pro se litigant, Rose utterly fails to establish that Ford engaged in malpractice in any way.

3. *Federal Claims Against Ford*

In his Amended Complaint, Rose adds a number of federal claims against Ford, specifically claims under 42 U.S.C. §§ 1985, 1986, 1987, 1988, and 14141. In *E.D.N.Y. I,* however, the court dismissed Rose's §§ 1985 and 1986 claims against Ford, and only granted Rose leave to amend to add his malpractice claim against Ford.

Slip Copy, 2011 WL 1130214 (E.D.N.Y.)

(Cite as: 2011 WL 1130214 (E.D.N.Y.))

Rose's new federal claims fall outside of the court's Order in *E.D.N.Y. I,* and Rose may not now litigate these claims.

4. *Claims Against Kazlau*

Federal Rule of Civil Procedure 4(m) requires a plaintiff to serve a defendant "within 120 days after the complaint is filed." If the plaintiff fails to do so, the court may "dismiss the action without prejudice against that defendant." *Id.* Nothing in the record indicates that Kazlau was properly served with either of Rose's Complaints. Rose submits a certified mail receipt signed by a "Byrone B," and admits that he "has not received the return receipt from ... Kazlau." (Docket Entry # 7.) Because more—much more—than 120 days have passed since Rose filed either of his Complaints, and because Rose has failed to serve Kazlau, the court dismisses those claims against Kazlau without prejudice.

**IV. CONCLUSION**

**\*10** Plaintiff's suit has now spanned two states, three judicial districts, and almost nine years of litigation. Today, it finally comes to an end. The court dismisses Plaintiff's claims against Kazlau without prejudice. The court grants summary judgment in favor of all of the remaining Defendants. The Clerk of Court is directed to close this case.

SO ORDERED.

E.D.N.Y.,2011.

Rose v. Goldman
Slip Copy, 2011 WL 1130214 (E.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Raymond GONZALES, Plaintiff,
v.
Dr. Lester WRIGHT, et al.,, Defendants.
No. 9:06-CV-1424 (JMH).

Feb. 23, 2010.
West KeySummary**Civil Rights 78**  1358

78 Civil Rights

   78III Federal Remedies in General
      78k1353 Liability of Public Officials
         78k1358 k. Criminal Law Enforcement; Prisons.
Most Cited Cases
   Prison officials' motion for summary judgment was properly granted in prisoner's § 1983 action where prisoner failed to demonstrate they were involved in any alleged constitutional violation. Prisoner failed to demonstrate prison superintendent and deputy were personally involved in any alleged constitutional violation for denial of medical care and his claims against them were properly dismissed. Additionally, prisoner failed to allege any conduct by medical director or facility health director regarding his treatment, but merely named them in their official capacity and for "responsibility of medical care of inmates," but the fact that they held positions of medical director and facility health administrator was insufficient to provide requisite personal involvement to state a constitutional claim. 42 U.S.C.A. § 1983.

Raymond Gonzales, Romulus, NY, pro se.

Roger W. Kinsey, Office of Attorney General, Albany, NY, for Defendants.

**DECISION and ORDER**

HOOD, District Judge.

**\*1** Raymond Gonzales complains in this action brought pursuant to 42 U.S.C. § 1983 that, while he was incarcerated at the Upstate Correctional Facility ("Upstate"), Defendants, various New York penal officers and employees, denied him the protections of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.[FN1] The matter is before the Court on Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 81). Plaintiff having responded to the motion *sub judice* (Dkt. No. 88), it is ripe for review.

   FN1. The Eleventh Amendment recognizes the fundamental principle of sovereign immunity. Thus, the Eleventh Amendment bars any suit in federal court against a state by citizens of another state. Further, the Supreme Court has held that the amendment also bars a citizen from bringing a suit against his or her own state in federal court. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Sovereign immunity under the Eleventh Amendment protects state agencies and department sas well as the state itself. As the Supreme Court has noted: "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the Defendant is proscribed by the Eleventh Amendment.... This jurisdictional bar applies regardless of the relief sought." *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Moreover, "[o]bviously, state officials literally are persons. But a suit against a state official in his official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

   As Plaintiff is suing Defendants only in their official capacities, the action would be subject to dismissal on this ground alone. However, Plaintiff's failure to seek relief against

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

Defendants in their individual capacities could be remedied through amendment.

**Plaintiff's Allegations**

Plaintiff claims that beginning shortly after his arrival on July 3, 2006, in Building 10 SHU at Upstate Correctional Facility, some unidentified "infections harmful chemical substance" came out of the ventilation system. Although Defendants John Finazzo and Gerald Caron looked for the substance, they claimed not to see anything and mocked him. (Dkt. No. 1, ¶¶ 38, 39). In response to his ongoing complaints, Plaintiff claims that Defendants James Spinner, Sheen Pombrio, Brian Grant, Michael Riley, Scott Dumas, Jonathan Price, Jeffrey Hyde, William Brown, and Lynn Furnace looked for the substance, but claimed that they did not see nor find anything. (Dkt. No. 1, ¶¶ 41, 42).

Plaintiff also claims that all the above-named Defendants, along with Defendants Steven Salls, Jeffrey Bezio, Ricky Colton, N. Guerin, Dean Sauther, Brian Bogardus, Michael Welch, Michael Albert, and non-movant D. Ravelle [FN2], made comments and placed "infections harmful chemical substance" in the ventilation system in retaliation for filing lawsuits at other facilities and that Defendants Robert Woods and Norman Bezio directed this conspiracy. (Dkt. No. 1, ¶¶ 45-50). Defendant Bogardus is alleged to have gestured and looked with satisfaction and gladness towards the ventilation system while delivering mail. (Dkt. No. 1, ¶ 55). Plaintiff also states that the above-named Defendants tried to poison his food with an unknown "infectious chemical substance." (Dkt. No. 1, ¶¶ 108-110) [FN3].

> FN2. Although named as a Defendant, D. Ravelle has never been served with process or appeared in this action. By separate order, Plaintiff will be required to show cause why this action should not be dismissed as to this Defendant pursuant to Fed.R.Civ.P. 4(m).

> FN3. Additionally, though not in his complaint, Plaintiff also alleges that as a part of this conspiracy laser beams were shot at him through the lights in his cell. (Dkt. No. 81-3, Ex. A, 14.)

Plaintiff further alleges that the above Defendants

denied him access to the courts by denying him a pen needed to complete his 45 page, 177 paragraph complaint as well as legal work related to his other pending lawsuits. (Dkt. No. 1, ¶¶ 162-67). Plaintiff claims that he requested a pen from the correctional officers as supplies were given out and was repeatedly denied one. (Dkt. No. 1, ¶¶ 127, 129, 132, 162-67, 170-71).

Additionally, Plaintiff alleges that after his food was supposedly tainted he refused to return his food tray (Dkt. No. 1, ¶¶ 130, 168-69) which prompted a search of Plaintiffs' cell. (Dkt. No. 1, ¶¶ 126, 134-41). Plaintiff further alleges that during the cell search, the officers damaged his legal documents in retaliation for his other lawsuits against DOCS employees at other correctional facilities. (Dkt. No. 1, ¶¶ 142-43). Plaintiff further alleges that the cell search was unlawful because he said he returned all the pieces of the broken food tray. Therefore, the officers had no right to conduct the search, and did it for the sole purpose of retaliation. (Dkt. No. 1, ¶¶ 142-43).

**\*2** Plaintiff alleges that due to the "infectious harmful chemicals," his face, chest, and other body parts became infected. (Dkt. No. 1, ¶ 43). Due to Plaintiff's alleged "infections, he made several sick call requests, requesting medical attention for his "infections." (Dkt. No. 1, ¶¶ 44, 74, 85). Plaintiff also wrote letters to Facility Health Service Director Wiessman requesting medical care. (Dkt. No. 1, ¶ 74). Plaintiff also wrote Lester Wright, the Associate Commissioner of Health Services/Chief Medical Officer of New York State Department of Correctional Services at Albany, asking Wright to order Defendant Louise Tichenor to provide Plaintiff with medical care. (Dkt. No. 1, ¶ 78). Plaintiff claims that, although seen by Defendant Tichenor on July 14, 2006, he did not receive proper medical care. (Dkt. No. 1, ¶ 77). Thus, Plaintiff alleges that Defendant Evelyn Wiessman, failed to properly supervise Plaintiff's medical providers. (Dkt. No. 1, ¶ 7A).

Plaintiff also alleges that Defendant Tichenor failed to adequately examine him during his medical call out on July 14, 2006, asking with intrigue what had happened to Plaintiff's skin, but failing to properly examine Plaintiff's chest, back, shoulders, testicles and penis. (Dkt. No. 1, ¶¶ 64, 66). Plaintiff also states that Defendant Tichenor

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

prescribed him Loratadine, which Plaintiff refused to take because Plaintiff knew that he was given the medicine only to conceal and hide the evidence of the damage caused to him by the "infectious substances." (Dkt. No. 1, ¶¶ 68-69, 72). Plaintiff then states that he was given a prescription cream for his skin problem, but not enough of it. (Dkt. No. 1, ¶¶ 73, 75).

Plaintiff also alleges that Defendant Tichenor wrongfully discontinued and denied Plaintiff the nutritional supplement, Ensure, although Plaintiff acknowledges that he failed to comply with facility procedure by refusing to drink the Ensure in front of the Nurses. (Dkt. No. 1, ¶¶ 145-60).

Finally, Plaintiff alleges that nurses J. Chesbrough, R. Holmes, and Walsh failed to provide Plaintiff with non-prescription medication even though Plaintiff completed all required sick call procedures. (Dkt. No. 1, ¶¶ 85, 89-106). Plaintiff contends that all these Defendants were deliberately indifferent to his medical needs.

### Defendants' Statement of Material Facts

Defendants have provided a different view of what happened while Plaintiff was confined at Upstate, as detailed in their statement of material facts. Although quite lengthy, they are recounted in detail below to provide a better understanding of Defendants' position in the matter:

1. Plaintiff Raymond Gonzalez was seen on a nearly daily basis from his arrival at Upstate on or about July 3, 2006. Weissman Declaration, Exhibit 1.

2. On July 5, 2006, Plaintiff demanded that he be given skin cream and became very agitated when he was told that he had to wait until he was examined by the PA in order to receive the cream. Weissman Declaration, Exhibit 2.

*3 3. Plaintiff also received an orientation on sick call procedure on July 5, 2006. Weissman Declaration, Exhibit 3.

4. On July 6, 2006, Plaintiff refused to drink his Ensure in the presence of the nurse and became very vulgar and abusive. As a result, Plaintiff received a misbehavior report. Weissman Declaration, Exhibit 4.

5. On July 6, 2006, it was once again explained to Plaintiff that medical procedure required that Plaintiff consume the Ensure in view of the nurse to insure that it was properly consumed. Id.

6. Plaintiff was also informed that Ensure and skin cream would be withheld pending an examination by the PA. Id.

7. Plaintiff was again seen on July 8, 2006 and July 10, 2006 and requested skin cream and indigestion aids. Plaintiff did not exhibit any symptoms and continued to be very demanding. Weissman Declaration, Exhibit 5.

8. On July 12, 2006, Plaintiff demanded Ensure, ibuprofen and hemorrhoid cream and refused hepatitis B vaccination. Weissman Declaration, Exhibit 6.

9. On July 14, 2006, Plaintiff was examined by the PA. Weissman Declaration, Exhibit 8.

10. On July 15, 2006, Plaintiff demanded the medication ordered by the PA. Weissman Declaration, Exhibit 7.

11. On July 17, 2006, Plaintiff refused to be weighed and refused medication for allergies. Id.

12. On July 19, 20, and 21, 2006 Plaintiff refused treatment, demanded to see Dr. Weissman and was vulgar and loud indicating he did not want further treatment from the PA. Weissman Declaration, Exhibit 9.

13. On July 24, 2006, Plaintiff refused to be examined and became verbally abusive, using the vilest of language, threats and sexually explicit rants. Weissman Declaration, Exhibit 10.

14. On July 25, 2006, the refusals and tirades were repeated and Plaintiff refused treatment. Id.

15. On July 26, 2006, Plaintiff once again refused to cooperate in his examination and treatment could not be

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

provided. Once again, Plaintiff began to be verbally abusive, using the vilest of language, threats and sexually explicit rants. Weissman Declaration, Exhibit 11.

16. On July 27, 2006, Plaintiff rejected his medication by throwing it on the floor and indicating that he did not want to be examined or treated by the PA. *Id.*

17. On July 28, 2007, Plaintiff refused treatment yet again. Additionally, Plaintiff continued to express that he did not want what was being prescribed. Weissman Declaration, Exhibit 12.

18. On July 29, 2006, Plaintiff once again refused to be examined and insisted that he be given medication without examination. Plaintiff also persisted in his abusive and vulgar language until he was given a misbehavior report. Weissman Declaration, Exhibit 13.

19. On July 30, 2006, Plaintiff continued to refuse examination, making treatment impossible. Plaintiff also refused to consume Ensure as directed and treated the nurse to more vulgarity. *Id.*

20. On July 31, 2006, Plaintiff was again seen and reminded that he was required to consume the Ensure in the presence of the nurse or it would be discontinued. Examination revealed that Plaintiff's face was clear and had no redness, however, Plaintiff continued to insist that his face was real bad, dry and itching. Weissman Declaration, Exhibit 14.

**\*4** 21. On August 1, 2006, Plaintiff once again refused to consume Ensure in the presence of the nurse and was warned again that non-compliance would cause the Ensure to be stopped. Plaintiff continued to refuse to comply and the Ensure was ordered stopped. Weissman Declaration, Exhibits 15-16.

22. On August 2, 2006, Plaintiff again refused to be examined and became vulgar and abusive. An attempt to talk with Plaintiff about taking Ensure was met with more abuse and vulgarity. Plaintiff was finally given a misbehavior report when he began to threaten staff. Weissman Declaration, Exhibit 17.

23. On August 4, 2006, Plaintiff again refused to be examined and refused treatment. Once more the nurse was treated to a vulgar and threat filled tirade. *Id.*

24. On August 5, 2006, Plaintiff was non-compliant with sick call procedure. *Id.*

25. On August 6, 2006, Plaintiff again refused to be examined and refused treatment. Once more the nurse was treated to a vulgar and threat filled tirade. Weissman Declaration, Exhibit 18.

26. On August 7, 2006, Plaintiff's medicine was renewed and once again he was uncooperative and vulgar and received another misbehavior report. Weissman Declaration, Exhibit 19.

27. On August 9, 2006, the PA examined Plaintiff and Plaintiff was once more instructed that he must talk to and cooperate with the nurse in order to be treated. *Id.*

28. On August 8, 2006, Plaintiff refused to speak to the nurse and instead simply held up a piece of paper. Weissman Declaration, Exhibit 20.

29. On August 10, 2006, Plaintiff refused to speak to the nurse and instead simply held up a piece of paper. When told that he must cooperate, Plaintiff once more became enraged and vulgar and refused treatment. *Id.*

30. On August 12, 2006, Plaintiff failed to comply with sick call procedures. Weissman Declaration, Exhibit 21.

31. On August 13, 2006, Plaintiff failed to comply with sick call procedures and instead exposed himself and stood silently as the nurse tried to examine and find out symptoms. *Id.*

32. On August 14 and 16, 2006, once more Plaintiff refused to speak and held up a piece of paper when asked what he needed. The session was ended with a vulgar threat. Weissman Declaration, Exhibits 21 and 22.

33. On August 17, 2006, Plaintiff was treated for

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

indigestion and allergies. Weissman Declaration, Exhibit 22.

34. On August 18 and 19, 2006, Plaintiff refused to speak to the nurse doing sick call[,] thus, refusing to be evaluated and instead held up a piece of paper. Weissman Declaration, Exhibits 22 and 23.

35. On August 21, 2006, Plaintiff allowed an evaluation and was found to be without nasal congestion and a minor rash for which he was given medication. It was noted that his face was clear of any rash. Weissman Declaration, Exhibit 24.

36. On August 22, 2006, Plaintiff was once again noncompliant and abusive rendering any attempt to examine and treat him as impossible. *Id.*

*5 37. On August 23, 2006, Plaintiff was once again noncompliant and abusive rendering any attempt to examine and treat him as impossible. Medications were reordered in spite of Plaintiff's lack of cooperation. Weissman Declaration, Exhibit 25.

38. On August 24, 2006, Plaintiff complained of gas and a headache and allowed an evaluation and was treated for a headache and given antacid. *Id.*

39. On August 25 and 27, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Weissman Declaration, Exhibits 26 and 27.

40. On August 28, 2006, Plaintiff complained of gas and a headache and allowed an evaluation and was treated for a headache and given antacid. Weissman Declaration, Exhibit 27.

41. On August 31, 2006 and September 1, 2006, Plaintiff was once again non-compliant, vulgar and abusive rendering any attempt to examine and treat him as impossible. Weissman Declaration, Exhibits 27-28.

42. On September 4, 2006, Plaintiff complained that he had a rash on his face, chest and back. Plaintiff was examined and no rash was seen. *Id.*

43. On September 5, 2006, Plaintiff requested ibuprofen and nasal pills. Plaintiff was examined and no tenderness or redness was noted in his throat. Weissman Declaration, Exhibit 29.

44. On September 8, 2006, Plaintiff complained of gas and a rash on his testicles. Plaintiff was examined and irritation was noted and Plaintiff advised to keep clean and dry. *Id.*

45. On September 12, 2006, Plaintiff requested ibuprofen and nasal pills. Plaintiff was examined and given fluids and dispensed medications. Weissman Declaration, Exhibit 30.

46. On September 13, 2006, Plaintiff requested sinus medication and antacid. Plaintiff was examined and given antacid and sinus medication. Weissman Declaration, Exhibit 31.

47. On September 15, 2006, Plaintiff complained of a sore on his penis. Plaintiff was examined and irritation was noted but there was no evidence of a fungal infection or broken skin. Plaintiff was given bacitracin ointment to apply. *Id.*

48. On September 17, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. *Id.*

49. On September 18, 2006, Plaintiff requested ibuprofen and hemorrhoid treatment. Plaintiff was examined and give ibuprofen and hemorrhoid medication. Weissman Declaration, Exhibit 32.

50. On September 20, 2006, Plaintiff requested ibuprofen and antacid. Plaintiff was examined and treated with ibuprofen, antacid and warm compresses to his back. Weissman Declaration, Exhibit 33.

51. On September 20, 2006, Plaintiff refused to go to the infirmary for examination of possible tuberculosis infection. Plaintiff became abusive and vulgar and received a misbehavior report. *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

52. On September 21, 2006, Plaintiff again refused to be tested or evaluated. Weissman Declaration, Exhibit 34.

53. On September 28 and 30, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Weissman Declaration, Exhibit 35.

**\*6** 54. On October 3, 2006, Plaintiff complained of a headache, upset stomach and infected skin. Plaintiff was examined and given ibuprofen and antacid. Weissman Declaration, Exhibit 36.

55. On October 4, 2006, Plaintiff complained of a headache and gas. Plaintiff was examined and given ibuprofen and antacid. *Id.*

56. On October 6, 2006, Plaintiff's medications were renewed. *Id.*

57. On October 9, 2006, Plaintiff complained of a headache, cold sore and gas. Plaintiff was examined and given ibuprofen, cold sore medication and antacid. Weissman Declaration, Exhibit 37.

58. On October 10, 2006, Plaintiff complained of a headache and gas. Plaintiff was examined and given Tylenol and antacid. *Id.*

59. On October 11, 2006, Plaintiff complained of a headache, rash and gas. Plaintiff was examined and it was noted that his penis was irritated. Plaintiff was given ibuprofen, bacitracin ointment and antacid. *Id.*

60. On October 23, 2006, Plaintiff complained of infection on his back, chest and shoulders and demanded to see Dr. Weissman. Plaintiff was examined and no sores or rash was noted. The skin appeared dry and unremarkable. Plaintiff was given Tylenol and antacid. Weissman Declaration, Exhibit 38.

61. On October 24, 2006, Plaintiff complained of infection on his back, chest and shoulders and demanded to see Dr. Weissman. Plaintiff was examined and no sores or rash was noted, although a small patch of dryness was noted on Plaintiff's thigh. The skin

appeared dry and unremarkable. Plaintiff was given Tylenol and antacid. *Id.*

62. On October 25, 2006, Plaintiff complained of an infected penis. Plaintiff was examined and there was no evidence of sores or breaks in the skin. Weissman Declaration, Exhibit 39.

63. October 26, 2006, Plaintiff refused to cooperate with lab tests and with a consultation. Plaintiff also complained of an infected groin, face chest and head. Plaintiff was examined and no infection was seen. Weissman Declaration, Exhibit 40.

64. On October 30, 2006, Plaintiff once again refused laboratory tests. *Id.*

65. On November 3, 2006, Plaintiff complained of gas and a lip injury. Plaintiff was examined and give[n] antacid and antibiotic cream for his lip. *Id.*

66. On November 4, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Weissman Declaration, Exhibit 41.

67. On November 5, 2006, Plaintiff complained of gas and a split lip. Plaintiff was examined and given antacid and bacitracin for his lip. *Id.*

68. On November 6, 2006, Plaintiff complained of gas and infected skin. Plaintiff's wrist, face, head, chest and back were examined but no infection could be found. Plaintiff was given antacid for his gas. Plaintiff continued to request Ensure but it was not ordered. Weissman Declaration, Exhibit 42.

69. On November 8, 2006, Plaintiff complained of gas and a split lip. After examination Plaintiff was given triple antibiotic cream for his lip and antacid. *Id.*

**\*7** 70. On November 9, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. *Id.*

71. On November 10, 2006, Plaintiff received his quarterly review and examination. Three issues were

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

discussed. Plaintiff's lip was treated with bacitracin and antacids were given for his gas problem. It was determined that Ensure would not be restarted due to non-compliance with medical protocol. Weissman Declaration, Exhibit 43.

72. On November 11, 2006, Plaintiff reported stomach problems and requested lip cream. Following an examination it was determined that Plaintiff did not require additional lip cream and was give[n] Tylenol and antacid. Id.

73. On November 14, 2006, Plaintiff again requested antacid and lip cream. Following an examination, it was determined that Plaintiff did not require any treatment other than antacid. Weissman Declaration, Exhibit 44.

74. On November 15, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Id.

75. On November 17, 2006, Plaintiff reported stomach upset and general body aches. Following examination, Plaintiff was given antacid and analgesics for body pain. Id.

76. On November 18, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Weissman Declaration, Exhibit 45.

77. On November 19 and 21, 2006, Plaintiff requested antacids and ibuprofen. Plaintiff was examined and given antacid and Tylenol. Weissman Declaration, Exhibits 45 and 46.

78. On November 22, 2006, Plaintiff requested antacids and Tylenol. Plaintiff was examined and given antacids and Tylenol. Weissman Declaration, Exhibit 46.

79. On November 24, 2006, Plaintiff requested Ensure, lip cream and antacids. Plaintiff was examined and found to have no problems that required lip cream. Plaintiff was also informed that Ensure was suspended due to non-compliance. Tylenol and antacid was prescribed. Weissman Declaration, Exhibit 47.

80. On November 27, 2006, Plaintiff requested Ensure, lip cream and antacids. Plaintiff was examined and found to have no problems that required lip cream. Plaintiff was also informed that Ensure was suspended due to non-compliance. Tylenol and antacid was prescribed. Id.

81. On November 30, 2006, Plaintiff requested Ensure, lip cream and antacids. Plaintiff was examined and found to have no problems that required lip cream. Plaintiff was also informed that Ensure was suspended due to non-compliance. Tylenol and antacid was prescribed. Weissman Declaration, Exhibit 48.

82. Defendants Tichenor, Wash, Holmes and Chesbrough saw the Plaintiff for his sick call and also prescribed him medication which the Plaintiff refused. Complaint ¶ 72.

83. Plaintiff admits that every time he submitted a sick call, at the very least, the nurses would examine him. Dep. Pg. 30, ¶¶ 8-10.

84. Any lack of examination or treatment was due to Plaintiff's actions, either not responding to the nurse or creating a situation where evaluation and treatment was not possible. Weissman Declaration.

*8 85. While Plaintiff claimed various needs, including a rash, examination failed to confirm any medical condition existed, thus rendering treatment unnecessary. Weissman Declaration.

86. Any deprivation that Plaintiff suffered was due to his own conduct. Weissman Declaration.

87. Plaintiff was not given Ensure due to his unwillingness to consume the Ensure as directed by staff. Weissman Declaration.

88. No reasonable health care professional, on the above record, would believe that any conduct by the staff involved, violated any right enjoyed by Plaintiff. Weissman Declaration.

89. On the contrary, all personnel involved exhibited

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

extraordinary restraint and professionalism in the face of vile, uncooperative and potentially dangerous conduct by Plaintiff. Weissman Declaration.

90. Plaintiff never saw Superintendent Woods throw the chemicals on him, rather he imagined Woods did. Deposition at pg. 22, ¶¶ 14-17.

91. Plaintiff admits he did not see Deputy Superintendent Bezio ever throw any infectious chemical on him. Deposition at pg. 22, ¶¶ 18-20.

92. Plaintiff admits that he did not see Sergeant J. Bezio ever throw any infectious chemical on him. Deposition at pg. 22, ¶¶ 21-23.

93. Plaintiff admits that he did not see Sergeant Pombrio ever throw any infectious chemical on him. Deposition at pg. 22, ¶¶ 24-25; pg.23, ¶ 2.

94. Plaintiff admits that he did not see Sergeant Salls ever throw any infectious chemical on him. Deposition at pg. 23, ¶¶ 3-5.

95. Plaintiff admits that he did not see Sergeant Spinner ever throw any infectious chemical on him. Deposition at pg. 23, ¶¶ 6-8.

96. Plaintiff never saw any of the corrections staff throw any substance in his cell, rather he believes they did it through an apparatus, which he has never seen and never saw any of the defendants use. Deposition at pg. 23,¶¶ 9-17.

97. [Plaintiff] does not know who was throwing the beige substance at him but imagines it was Defendants, because they worked at Upstate. Deposition at pg. 24, ¶¶ 12-15.

98. Plaintiff has no knowledge of who was burning him with laser beams, because he had not seen the lasers or anyone use them. Deposition at pg. 24, ¶¶ 16-19.

99. Plaintiff never saw anyone throw chemical agents at him, and that he doesn't know who (if anyone) was throwing them, but that he assumes it is Defendants

because they work at the facility. Deposition at pg. 24, ¶¶ 20-25.

100. Plaintiff does not allege any conduct by Defendants Wright or Weissman regarding his treatment, but rather names them in their capacity as Defendant Weissman as Facility Health Director and Defendant Wright as Medical Director and for "responsibility of medical care of inmates". Complaint ¶¶ 4, 7A, 62; ¶¶ 78, 79; ¶¶ 82, 83.

101. Plaintiff never saw any defendant place anything in his food. Dep. Pg 34, ¶¶ 18-20; Dep. Pg. 35, ¶¶ 7-8.

102. Cell searches of Plaintiff's cell were made necessary by Plaintiff's behavior. Specifically, Plaintiff refused to return his tray after meals on several occasions and broke them into pieces. Dumas Declaration.

*9 103. The broken pieces then had to be recovered and the tray reassembled to insure that all pieces were accounted for and out of the cell. Dumas Declaration.

104. The broken pieces present a safety and security issue. Dumas Declaration.

105. At no time did the staff involved enter the cell with the purpose of destroying Plaintiff's possessions but Plaintiff's own behavior required that the searches be made. Dumas Declaration.

106. Searches of his cell, delay in getting a pen and alleged destruction of his papers delayed Plaintiff's legal work, but it had no lasting impact, because any deadlines he missed, he got extended and Plaintiff was able to submit his legal papers to the court. Dep. Pg. 46, ¶¶ 3-15.

(Dkt. No. 88-1, ¶¶ 1-106).

Although Plaintiff has contested some of the facts asserted by Defendants in the motion now before the Court (Dkt. No. 88-2), his conclusory assertions do not preclude summary judgment.[FN4] The standard for granting summary judgment is well-known.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

FN4. Had this matter been before the Court on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the teachings of *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), would guide this Court. There, the Supreme Court wrote:

> We turn to respondent's complaint. Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in *Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an u n a d o r n e d , the-defendant-unlawfully-harmed-me accusation. *Id.,* at 555, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555, 127 S.Ct. 1955, 167 L.Ed.2d 929. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.,* at 557, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929.

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.,* at 570, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely

> consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.,* at 557, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (brackets omitted).

> *Id.* at 1949.

The undersigned strongly believes that Plaintiff's complaint would not survive under this standard alone.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing a motion for summary judgment, this Court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. Furthermore, the evidence and all facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### Personal Involvement

To allege a constitutional violation under 42 U.S.C. § 1983, a pleading must state facts sufficient to support a finding that the defendant was personally involved in the alleged violation. *See Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006). For this reason, liability of a state official cannot be established under the doctrine of *respondeat superior. Iqbal,* 129 S.Ct. at 1948.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir.2001). Moreover, a plaintiff must allege personal acts of wrong on behalf of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

each Defendant he names in the complaint. *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999).

In the present complaint, Plaintiff solely brings suit against Superintendents Woods, Deputy Superintendent for Security Bezio, Facility Medical Director Weissman and Lester Wright, the Medical Director of DOCS, alleging supervisory liability. Under 42 U.S.C. § 1983 liability cannot be imposed on a supervisory official on the theory of *respondeat superior. Id.* In order for a supervisory official to be involved in a constitutional violation, he or she must have (1) directly participated in the alleged constitutional violation; (2) learned of the violation through a report or appeal and failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed the continuance of such a policy or custom; (4) been grossly negligent in supervising subordinates who committed the wrongful act; or (5) exhibited deliberate indifference to inmates' rights by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

**\*10** In the instant case, Plaintiff has merely alleged *respondeat superior* liability against Superintendents Woods, Deputy Superintendent for Security Bezio, Facility Medical Director Weissman and Lester Wright, the Medical Director of DOCS. The Superintendent's and Deputy Superintendent's delegation of medical judgment to appropriate staff was proper as the Second Circuit has cautioned that non-medical Defendants should not intercede in the medical care and treatment of an inmate. *Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir.2000) ("One can imagine the repercussions if non-medical prison officials were to attempt to dictate the specific medical treatment to be given particular prisoners...."). Concomitantly, the Second Circuit has also explicitly held the denial of a grievance on medical matter is insufficient to demonstrate personal involvement on behalf of a prison Superintendent. *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003). Similarly, the mere receipt of letters from an inmate by a facility Superintendent regarding a medical claim is insufficient to constitute personal liability. *Swindell v. Supple,* 2005 WL 267725, at \*11 (S.D.N.Y.2005); *Burgess v. Morse,* 259 F.Supp.2d 240, 250 (W.D.N.Y.2003). Therefore, Plaintiff cannot

demonstrate that Superintendent Woods and Deputy Bezio were personally involved in any alleged constitutional violation for denial of medical care and his claims against them must be dismissed.

Plaintiff also names as Defendants Dr. Evelyn Weissman, Facility Health Director and Dr. Lester Wright, the Medical Director for the Department. Once again, Plaintiff does not allege any conduct by Defendants Wright or Weissman regarding his treatment, but rather names them in their capacity as Defendant Weissman, Facility Health Director, and Defendant Wright, Medical Director, and for "responsibility of medical care of inmates." The mere fact that Defendant Dr. Wright held the position of Medical Director and Defendant Dr. Weissman the title of Facility Health Administrator is insufficient to provide the requisite personal involvement to state an Eighth Amendment claim. *Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003); *Swindell,* 2005 WL 267725, at \*9-10. Based on the above, the motion for summary judgment should be granted as to Defendants Dr. Evelyn Weissman, Dr. Lester Wright, Robert Woods, and Norman Bezio.

**Medical Indifference**

In *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Court recognized that the government has an obligation to provide medical care for those it incarcerates, because they are unable to obtain such care on their own, and held that a prisoner may have a claim for failure to do so under the Eighth Amendment. To prevail on an Eighth Amendment claim involving prison medical care, an inmate must establish that the Defendant acted with deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 294-95, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *West v. Atkins,* 487 U.S. 42, 46, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). This indifference may be manifested by prison doctors in their response to a prisoner's needs, or by officers in intentionally denying or delaying access to medical care or treatment. *Estelle,* 429 U.S. at 104. The inmate must prove both the subjective and objective elements of a claim: (1) deliberate indifference, and (2) a serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). In the instant case, Plaintiff fails to satisfy either of these elements.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

**\*11** A review of the record pertaining to Plaintiff's complaints to prison medical personnel reveals that he complained frequently of a rash or infection on various parts of his body including his face, around his testicles, and on his penis. There is nothing which would indicate that the rash was "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Throughout Plaintiff's complaint, he describes his rash, but never does he state that the rash caused him pain, much less extreme pain, that it was spreading anywhere else, besides the areas he already claimed, or that it was likely to produce death.

Even if the rash is a serious medical condition, the subjective element of the test is not met. To meet the subjective element, a prisoner must satisfy *Farmer v. Brennan's* test for deliberate indifference-the Defendant must know of and disregard an excessive risk to inmate health. A Defendant need not expressly intend to inflict pain-but Plaintiff must establish at least that a Defendant acted with the criminal recklessness discussed in *Farmer v. Brennan. See Hathaway v.Coughlin,* 99 F.3d 550, 553 (2d Cir.1996); *Morales v. Mackalm,* 278 F.3d 126, 132 (2d. Cir.2002).

Turning to the deliberate indifference element, the record is replete with evidence that Defendant medical personnel examined Plaintiff (when they were allowed to) and prescribed appropriate topical and/or allergy medicines. Although Plaintiff may have desired some other type of medicine, that desire would have, at the very best, demonstrated negligence, not deliberate indifference.

The above analysis would apply with equal force to each medical condition reported. The medical personnel treated or attempted to treat every condition despite abusive conduct on Plaintiff's part. No Eighth Amendment violation on the part of the prison medical personnel is perceived.

### Powders and Lasers

Defendants J. Finazzo and G. Caron were called and requested by the Plaintiff to look into his room for substances coming from the ventilator and the roof of his cell. Both J. Finazzo and G. Caron are accused of reacting "in the shape of mockery" and said or showed to Plaintiff that they did not see the substance. Also at Plaintiff's request, Defendants J. Spinner, S. Pombrio, B. Grant, M. Riley, S. Dumas, J. Price, J. Hyde, W. Brown, and L Furnace, looked into the cell at the ventilator and the roof and "almost made the same gesture (as J. Finazzo and G. Caron)" and told the Plaintiff they did not see any substance. Plaintiff alleges that Defendant B. Bogardus, would, while collecting or delivering the mail, looked towards the ventilator and roof of Plaintiff's cell and made a "gesturing of satisfaction and gladness." Even if true, the above allegations by Plaintiff fail to state a claim with regard to looks and smirks. Looks and smirks are not actionable.

Plaintiff alleges that Defendants S. Salls, J. Hyde, J. Bezio, S. Pombrio, J. Spinner, R. Colton, N. Guerin, D. Sauther, G. Caron, M. Riley, B. Grant, S. Dumas, B. Bogardus, M. Welch, J. Price, M. Albert, D. Ravelle, L. Furnace, J. Finazzo and W. Brown allegedly threw infectious harmful chemicals upon the Plaintiff via ventilator and the roof of his cell with a machine-like system that was allegedly placed in the room above his cell. Plaintiff alleges that all these actions were taken in retaliation for Plaintiff's other lawsuits against other DOC's employees, yet Plaintiff concedes in his deposition that he has no proof or evidence that any named Upstate employees had any knowledge of his other lawsuits. (Dkt. No. 81-3, Ex. A at 25, ¶¶ 2-10). Tellingly, all Defendants deny knowledge of any lawsuits brought by Plaintiff at other facilities.

**\*12** Equally demonstrative of the frivolous nature of the complaint, during his deposition, Plaintiff stated that he never saw Superintendent Woods throw the chemicals on him; rather he imagined Woods did. (Dkt. No. 81-3, Ex. A. at 22, ¶¶ 14-17). Additionally, Plaintiff admits he did not see Defendants Deputy Superintendent Bezio, Sergeant J. Bezio, Sergeant Pombrio, Sergeant Salls, Sergeant Spinner, ever throw any infectious chemical on him. (Dkt. No. 81-3, Ex. A at 22 ¶¶ 1-20,21-23, 24-25; 23, 2, 3-5, 6-8). In fact, Plaintiff admits that he never saw any of the corrections staff throw any substance in his cell, rather he believes they did it through an apparatus, which he has never seen and never saw any of the Defendants use. (Dkt. No. 81-3, Ex. A at 23, ¶¶ 9-17). Plaintiff further

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

admits that he does not know who was throwing the beige substance at him but imagines it was them, because they work there. (Dkt. No. 81-3, Ex. A.24, ¶¶ 12-15). Plaintiff also admitted under oath that he has no knowledge of who was burning him with laser beams, because he had not seen the lasers or anyone use them. (Dkt. No. 81-3, Ex. A.24,¶¶ 16-19). Plaintiff testified that he never saw anyone throw chemical agents at him, and that he doesn't know who was throwing them, but that he assumes it is Defendants because they work at the facility. (Dkt. No. 81-3, Ex. A.24, ¶¶ 20-25). Similarly, while Plaintiff alleges that Defendants, M. Riley and B. Grant, on August 14th, placed "a strange harmful substance" in his lunch, he stated in his deposition that he never saw either Defendant place anything in his food on the day in question or on any other day for that matter. (Dkt. No. 81-3, Ex. A. 34, ¶¶ 18-20; 35, ¶¶ 7-8).

As the Second Circuit and New York District Courts have steadily recognized, it is utterly unjust to haul people into federal court to defend against, and disprove, delusions. *See, e.g. Pillay v. INS,* 45 F.3d 14, 17 (2nd Cir.1995); *Lewis v. New York,* 547 F.2d 4, 6 (2nd Cir.1976); *Tyler v. Carter,* 151 F.R.D. 537, 540 (S.D.N.Y.1993) (*sua sponte* dismissing complaint alleging conspiracy to enslave and oppress), *aff'd* 41 F.3d 1500 (2nd Cir.1994). A victimization fantasy, with no existence beyond Plaintiff's insistence, cannot be allowed to pass review under Fed.R.Civ.P. 56(b). "Genuine issue of material fact" must mean substantially more. Plaintiff admitted under oath that he has no facts nor evidence which states the involvement of any Defendants in somehow infecting him with "infectious harmful chemicals," or laser beams. Plaintiff's complaints are mere surmise and consist of conclusory statements that contain no specific allegations of fact indicating a deprivation of rights. Accordingly, the motion for summary judgment should be granted on this issue.

**Retaliation**

Plaintiff has charged that Defendants' actions were in retaliation for him bring lawsuits against other prison employees elsewhere in the New York penal system. The use of "buzz words" such as retaliation do not cure a pleading defect such as the one herein. *See Barr v. Abrams,* 810 F.2d 358, 362 (2d Cir.1986) (the Second

Circuit has repeatedly held, "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning"); *see also, e.g., Boddiev. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) ("unsupported, speculative, and conclusory" allegations should be dismissed); *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("[c]laims by prisoners that particular administrative decisions have been made for retaliatory purposes are prone to abuse. Virtually every prisoner can assert such a claim as to every decision which he or she dislikes); *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (where allegations of retaliation and conspiracy are "wholly conclusory," the complaint "can be dismissed on the pleadings alone"); *Justice v. Coughlin,* 941 F.Supp. 1312, 1316 (N.D.N.Y.1996) ("In recognition of the reality that retaliation claims can be fabricated easily, [inmates] bear a somewhat heightened burden of proof, and dismissal can be granted if the claim appears insubstantial"). Therefore, Plaintiff's claims based on some retaliatory animus shall be dismissed. *See Iqbal,* 129 S.Ct. at 1948-49.

**Cell Search**

**\*13** Plaintiff further alleges that Defendants B. Grant, M. Riley, and M. Welch, under orders from N. Guerin, during a cell search to look for any remaining pieces of a tray broken by the Plaintiff, "did mess up, crush, spoil, destroy" legal documents and scattered shampoo on them as well. On September 8, 2006, Plaintiff alleges he asked Defendants D. Ravelle, Riley, Grant, S. Dumas and Albert for a pen throughout the day. Plaintiff alleges that no one gave Plaintiff a pen in retaliation for Plaintiff's refusal to hand in his empty food tray and, as a consequence, he broke it into pieces. Following Plaintiff's admitted refusal to give back the food tray, Defendant G. Caron and M. Albert asked Plaintiff to exit cell for a cell search. Plaintiff refused. Following his initial refusal, Defendants J. Hyde, G. Caron, S. Dumas, and M. Albert, requested that Plaintiff leave his cell for a cell search, but Plaintiff again admittedly refused. Following the second refusal to exit the cell, M. Tirone and J. Irvin came and asked Plaintiff to exit his cell for a cell search. Plaintiff agreed to do so.

During the ensuing cell search, Plaintiff alleges that Defendants G. Caron, S. Dumas, M. Albert, and an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

unknown officer, "did mess up, crush, spoil, destroy, and mix" Plaintiff's legal documents, with the consent of J. Hyde.

This aspect of the complaint has two aspects. The first, the legitimacy of the cell search, will not take long to address. Prison officials have every right to search a cell to retrieve broken pieces of a food tray, pieces which could easily be made into some form of a weapon. Plaintiff in this instance was simply removed from his cell while the search ensued.

"The Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." *Hudson v. Palmer, 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).*" No constitutional violation is perceived.

The second aspect of the cell search which must be addressed is Plaintiff's claim regarding the destruction of his legal papers. This claim will not delay the Court long either.

Although Plaintiff claims that the destruction of his papers delayed his legal work, he admits that it had no lasting impact as any deadlines he missed he was able to get extended and was able to submit his legal papers to the court. Hence, as he had no actual injury even if the events as he saw them occurred, he is not entitled to relief on this aspect either. *See Lewis v. Casey, 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).*

**Conclusion**

Accordingly,
**IT IS ORDERED** Defendants' motion for summary judgment be, and the same here by is, **GRANTED.**

This the 22nd day of February, 2010.

N.D.N.Y.,2010.

Gonzales v. Wright

Slip Copy, 2010 WL 681323 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 767546 (N.D.N.Y.)

(Cite as: 2011 WL 767546 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Raymond GONZALES, Plaintiff,
v.
D. CARPENTER, et. al, Defendants.
No. 9:08-CV-629 (LEK/ATB).

Feb. 25, 2011.
Raymond Gonzalez, Marcy, NY, pro se.

Richard Lombardo, New York State Attorney General,
Albany, NY, for Defendants.

### *DECISION and ORDER*

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on January 3, 2011 by the
Honorable Andrew T. Baxter, United States Magistrate
Judge, pursuant to 28 U.S .C. § 636(b) and L.R. 72.3 of
the Northern District of New York. Report-Rec. (Dkt. No.
132). On February 23, 2011, after receiving multiple
extensions of time by which to respond to the Report and
Recommendation, Plaintiff Raymond Gonzales filed his
objections ("Objections") to the Magistrate Judge's
findings. Dkt. No. 137.

It is the duty of this Court to "make a de novo
determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." 28 U.S.C. § 636(b). "A [district] judge ... may
accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge." *Id.*
This Court has considered the objections and has
undertaken a *de novo* review of the record and has
determined that the Report-Recommendation should be
approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt.
No. 132) is **APPROVED** and **ADOPTED** in its
**ENTIRETY;** and it is further

**ORDERED,** that Defendant's Motion to dismiss (Dkt.
No. 120) is **GRANTED** and Plaintiff's Amended
Complaint (Dkt. No. 106-1) is **DISMISSED in its
entirety;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order
on all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Gonzales v. Carpenter
Slip Copy, 2011 WL 767546 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 714878 (S.D.N.Y.)
(Cite as: 1997 WL 714878 (S.D.N.Y.))

▷

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Anthony GADSON, Plaintiff,
v.
Glenn S. GOORD, Philip Coombe, Artuz, L. Zwillinger,
D. Stevens, J. Manion, G. Schneider, D. Connelly, B.
Pease, C.O. Rassman, D. Zaken, C. Bennett,
Defendants.
**No. 96 Civ. 7544(SS).**

Nov. 17, 1997.

Anthony Gadson, pro se, Terrace Health Care Center,
Bronx, NY, for plaintiff.
Dennis C. Vacco, Attorney General of the State of New
York New York, NY, of counsel: Constantine A. Speres,
Assistant Attorney General, for defendants.

**OPINION AND ORDER**

SOTOMAYOR, J.

**\*1** *Pro se* plaintiff, Anthony Gadson, formerly
incarcerated at Green Haven Correctional Facility, brings
this 42 U.S.C. § 1983 action, alleging that defendants
violated his constitutional rights by (1) failing to provide
him with an appropriate and medically necessary
wheelchair; (2) harassing him; and (3) failing to return
plaintiff's property. The twelve named defendants are or
were Department of Correctional Services administrators
and Green Haven security or medical staff.FN1 Plaintiff
seeks an order from the Court directing defendants to: (1)
provide plaintiff with proper medical care (*e.g.,* an
appropriate wheelchair) and a proper living environment;
and (2) stop mistreating plaintiff. Additionally, plaintiff
seeks compensatory damages and punitive damages.

FN1. Defendants Goord and Coombe are named
as Department of Corrections administrators;
defendants Artuz, Schneider, Connelly, Pease,
Rassman, and Zaken are named as Green Haven
security personnel; and defendants Zwillinger,
Stevens, and Manion are named as Green Haven
medical personnel.

Defendants move to dismiss the Complaint pursuant to
Fed.R.Civ.P. 12(b)(6) for failure to state a claim. For the
reasons discussed, defendants' motion to dismiss is
**granted** in part and **denied** in part.

**BACKGROUND**FN2

FN2. The following information is set forth in
plaintiff's Complaint, accompanying exhibits and
memorandum entitled, "Opposition Against
Defendants [sic] Motion to Dismiss" ("Opp'n
Mem.") Generally, a court may not look outside
the pleadings when reviewing a Rule 12(b)(6)
motion to dismiss. However, the mandate to read
the papers of *pro se* litigants generously makes it
appropriate to consider plaintiff's additional
materials, such as his opposition memorandum.
*See* Gil v. Mooney, 824 F.2d 192, 195 (2d
Cir.1987) (in reviewing district court's dismissal
of *pro se* plaintiffs § 1983 claim, Second Circuit
considered plaintiff's affidavit submitted in
opposition to defendant's motion to dismiss);
*Donahue v. United States Dep't of Justice,* 751
F.Supp. 45, 49 (S.D.N.Y.1990) ("The policy
reasons favoring liberal construction of *pro se*
pleadings warrant the Court's consideration of
the allegations contained in plaintiffs'
memorandum of law, at least where those
allegations are consistent with the allegations in
the complaint ..."); *Lucas v. New York City,* 842
F.Supp. 101, 104 & n. 2 (S.D.N.Y.1994)
(considering *pro se* plaintiffs opposition papers).

Plaintiff is currently on parole status living at the Kings
Terrace Nursing Home in Bronx, New York. During the
events in question, plaintiff was incarcerated at Green

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 714878 (S.D.N.Y.)
(Cite as: 1997 WL 714878 (S.D.N.Y.))

Haven Correctional Facility ("Green Haven") located in Stormville, New York.

Plaintiff alleges that he is paralyzed and requires a customized "medical wheelchair." (Complaint ¶¶ 1,7.) Plaintiff claims that on January 28, 1994, prior to his transfer to Green Haven from another correctional facility, he was "medically fitted" for a wheelchair by a physical therapist at Helen Hayes Hospital. (Complaint ¶ 1; Exhibit ("Ex.") A to Complaint.)[FN3] For reasons not explained, plaintiff received a second evaluation for a wheelchair by a physical therapist employed at Green Haven on March 9, 1994. (Complaint ¶ 2.) Unlike the original wheelchair prescribed at Helen Hayes, this second wheelchair recommendation, according to plaintiff, was "not for my Physical Condition." (Complaint ¶ 2; Ex. B.)

FN3. All exhibits referenced are annexed to the Complaint.

On July 26, 1994, plaintiff claims he received a "defective wheelchair" from the Green Haven Physical Therapy Department. (Complaint ¶ 3; Ex. C-3.) He alleges that unlike the chair recommended by Helen Hayes, the delivered wheelchair was not fitted with a self-recliner nor was it suitable for plaintiff's weight or legs. (Ex. C-1; C-3.) Plaintiff maintains that he rejected the chair because it lacked these medically necessary features. (Complaint ¶ 1; Ex. C-3.)

On September 7, 1994, plaintiff filed a grievance against Green Haven personnel complaining that he was in a "great deal of pain" and seeking an "adequate heavy duty wheelchair equipped with self-recliner for his proper medical treatment." (Ex. C-1.) On December 14, 1994, the Central Office Review Committee for the State of New York Inmate Grievance Program ("C.O.R.C.") unanimously approved plaintiff's request and indicated that a new reclining wheelchair, "as prescribed," was then on order. (Ex. C-4.)

*2 Plaintiff received a second wheelchair on or about March 15, 1995. (Ex. D-1.) Plaintiff deemed this second wheelchair also "improper" and refused to accept it. Id. Specifically, plaintiff claimed the second wheelchair was

improper because: (1) the reclining handles were not within his reach; (2) the adjustable foot pieces were not accessible; (3) the leg rests were not "swing detachable;" (4) the brakes had no extensions and were hard to reach; and (5) that without a buckle, the seat belt was not strong enough. (Ex. D-1.) On March 20, 1995, Plaintiff filed a second grievance, again requesting a "proper made wheelchair" for his medical condition. (Ex. D-1.) This second grievance further requested that prison officials "stop causing me more pain and suffering by having me lie in bed for over a year." Id.

The C.O.R.C. denied plaintiff's second grievance on June 14, 1995, concluding that an "investigation reveals that the wheelchair in question was a custom made reclining wheelchair. The wheelchair was recommended and ordered by the physical therapy department and meets the medical needs of grievant per physical therapy." (Ex. D-4.) The C.O.R.C. based its determination on statements and an investigation by defendant Zwillinger, the Green Haven Regional Health Services Administrator. Id.

Plaintiff filed a third grievance requesting a wheelchair in August 1995 and again on October 18, 1995.[FN4] (Complaint ¶ 5; Ex. E-1.) Plaintiff notes that by this time he had been waiting almost two years for a special made wheelchair for my medical condition." (Complaint ¶ 5.) His grievance states that "it appears that the medical department has determine [sic] that they are not going to order me a wheelchair at all for my medical condition." (Ex. E-1 .) Eight days after filing the grievance, plaintiff was transferred to another correctional facility. (Ex. E-3.) Thereafter, on January 17, 1996, the C.O.R.C. denied plaintiff's third grievance, reiterating its previous finding that a proper wheelchair had been ordered which plaintiff had refused and suggesting that plaintiff "address the issue of his wheelchair with the health staff at his new facility." (Complaint ¶ 5; Ex. E-3.)

FN4. Apparently, plaintiff's August grievance was misplaced or not received by Green Haven personnel. By his own account, plaintiff refiled the same grievance on October 18, 1995.

Plaintiff claims that as a result of Green Haven's failure to provide him with an appropriate wheelchair, he spent two

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 714878 (S.D.N.Y.)
(Cite as: 1997 WL 714878 (S.D.N.Y.))

and a half years "bed-ridden, in constant pain, feet degenerations, and emotional distress. (Opp'n Mem. ¶ 10; Ex. D-1.) Plaintiff further claims that the Green Haven Medical Department "play[ed] word games" with his grievances and attempted to deprive him of a proper wheelchair by using the second chair recommendation which was "wrong ... from the start." (Complaint ¶ 5.) Plaintiff insists he cannot use any wheelchair other than the "self recliner" chair he requested and which the C.O.R.C. approved in response to his first grievance. (Ex. K-1.) Finally, plaintiff contends that defendants "deliberately after knowing that the first wheelchair was not for Plaintiff medical condition kept on ordering the same type of wheelchair repeatedly knowing that the Plaintiff would not accept it do [sic] to the time it takes to get a wheelchair for his medical condition." (Opp'n Mem. ¶ 10.)

### The Retaliation Claims

**\*3** Plaintiff further alleges that while waiting for a proper wheelchair, he experienced "a great deal of harassment" by Green Haven prison officials. *See* (Complaint ¶¶ 7-9.) Specifically, plaintiff alleges: (1) that defendant Connelly ordered the "illegal" search of his cell, during which time his medical and legal documents were taken from him and not returned (Complaint ¶¶ 7 & 8; Ex. G-1-G-4 & I-1-I-4); (2) that defendants Pease, Zaken, and Bennett created false misbehavior reports to keep him "on some kind of restriction" or keeplock "24 hours a day" (Complaint ¶ 7; Opp'n Mem. ¶ 17); (3) that defendant Rassman, under the direction of defendant Pease, harassed him by preventing other inmates from socializing with plaintiff while on keeplock (Complaint ¶ 9; Ex. K-2); and (4) that defendants transferred him to another correctional facility on October 26, 1995, to "further delay my getting a wheelchair ... and to prolong my stay in prison." (Complaint ¶ 10, Ex. E-2). Although plaintiff has not directly alleged that these acts of harassment were committed in retaliation for his filing of grievances, his pleadings suggest this to be his claim.[FN5]

> FN5. Any claim for retaliation plaintiff may make is based solely on a permissive reading of the pleadings, interpreting them to "raise the strongest arguments that they suggest." *See Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995).

Defendants have filed a motion to dismiss urging dismissal of the Complaint in its entirety for failure to state a claim. In particular, defendants contend that: (1) plaintiff has pled insufficient facts to support a claim of deliberate indifference to his medical needs; (2) plaintiff's claim of deprivation of property is not actionable in federal court and plaintiff does not allege any facts to demonstrate actual deprivation of access to court; (3) as against defendants Goord, Coombe, Artuz, Schneider, Zaken and Bennett, the claims must be dismissed because these defendants had no personal involvement or supervisory liability for the alleged constitutional deprivations; (4) the Eleventh Amendment protects defendants from suit in their official capacities; and (5) plaintiff's prayer for injunctive relief is moot because he is no longer incarcerated at Green Haven.

In response to defendants' motion, plaintiff provided supplemental facts addressing, *inter alia,* his claim of deliberate indifference and the personal involvement of defendant's Zaken and Bennett. For the reasons addressed in note 2, *supra,* the Court will consider these factual allegations in evaluating defendants' motion.

### DISCUSSION

### I. *Mootness*

Because plaintiff is no longer incarcerated and under the supervision of any of the named defendants, the Court rejects plaintiff's request for injunctive relief "directing defendants to provide medical care," "preventing defendants from mistreating pltf [sic]", and "directing defendant's [sic] to provide proper living environment for pltf." (Complaint at 5.) Plaintiff's claims for injunctive relief are moot and the Court lacks jurisdiction to consider them. *See Iron Arrow Honor Soc'y v. Heckler,* 464 U.S. 67, 104 S.Ct. 373, 78 L.Ed.2d 58 (1983); *see generally Courts v. Coombe,* 95 Civ. 2350(DC), 1996 WL 312357, at 2 (S.D.N.Y. June 11, 1996) (citing *Armstrong v. Ward,* 529 F.2d 1132, 1135 (2d Cir.1976)) ("The mere possibility that [plaintiff] may be returned to [the correctional facility where the incidents at issue arose] at some point in the future does not present a sufficient case

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 714878 (S.D.N.Y.)
(Cite as: 1997 WL 714878 (S.D.N.Y.))

or controversy that the court can presently adjudicate."). Accordingly, the Court reviews plaintiff's claims only to the extent they seek compensatory and punitive damages.

## II. *Motion to Dismiss Standard*

**\*4** In considering defendants' motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court must "assess the legal feasibility of the Complaint," *Smith v. O'Connor,* 901 F.Supp. 644, 646 (S.D.N.Y.1994), accepting as true the factual allegations in the Complaint and construing all reasonable inferences in plaintiff's favor. *See generally Leatherman v. Tarrant County Narcotics Intelligence & Coord. Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994). The Court may properly dismiss a claim only if, after viewing all allegations in the light most favorable to the plaintiff, it determines "beyond doubt that the plaintiff can prove no set of facts in support of [plaintiff's] claims which would entitle [plaintiff] to relief." *Hernandez,* 18 F.3d at 136 (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Moreover, where a plaintiff proceeds *pro se,* as here, the Court must " 'read his [or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest.' " *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)); *Hernandez,* 18 F.3d at 136. In so doing, the Court must hold plaintiff to a pleading standard which is "less stringent ... than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curium).

## III. *Liability Under* 42 U.S.C. § 1983

In a § 1983 action, the plaintiff must establish that a person acting under color of state law deprived him or her of a federal constitutional right. 42 U.S.C. § 1983; *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993). Section 1983 does not create any federal rights on its own, but rather enforces rights established under the Constitution, laws, or treaties of the United States. *Sykes,* 13 F.3d at 519.

Nowhere in his Complaint does plaintiff specifically allege constitutional violations, however, liberally construed, plaintiff claims that defendants denied him adequate medical care in violation of the Eighth Amendment and retaliated against him for filing grievances in violation of the First Amendment. Furthermore, plaintiff's claim that defendants deprived him of his property may be construed as alleging a violation of the Fourteenth Amendment.

## IV. *Plaintiff's Eighth Amendment Claim*

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments" on prisoners. In *Estelle v. Gamble,* the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' ... proscribed by the Eight Amendment." 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), *reh'g denied,* 429 U.S. 1066 (1977)). To state a claim of deliberate indifference, plaintiff must show that prison officials intentionally denied, delayed access to, or interfered with prescribed treatment. *Estelle,* 429 U.S. at 104-05. The inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference. *Id.* at 105.

**\*5** To sustain a claim of deliberate indifference to medical needs, plaintiff must plead facts sufficient to satisfy both the objective and subjective components of the applicable standard, *i.e.,* that the alleged deprivation was sufficiently serious and that the prison officials acted with a sufficiently culpable state of mind. *Farmer v. Brennan,* 511 U.S. 825, 834-35, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see also Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) ("Deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.' ") (citing *Estelle,* 429 U.S. at 103-104); *Wilson v. Seiter,* 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (an Eighth Amendment claim requires "inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment").

Accepting the accuracy of plaintiff's allegations for purposes of defendants' motion to dismiss, the Court can

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 714878 (S.D.N.Y.)
(Cite as: 1997 WL 714878 (S.D.N.Y.))

not conclude that plaintiff can show no set of facts sufficient to meet the deliberate indifference standard in this case. Plaintiff asserts he suffered serious injury because of the delays in his receiving a proper wheelchair, *e.g.,* that he was forced to remain bed-ridden and suffered "a great deal of pain," as well as "feet degenerations, and emotional distress" for a period of two and a half years. (Opp'n Mem. ¶ 10; Ex. D-1 & C-1.) Moreover, he alleges that defendants intentionally failed to provide him with an appropriate wheelchair despite his frequent notification to the Green Haven medical staff that he was in pain, his three grievances requesting a proper wheelchair, and the C.O.R.C.'s unanimous determination in response to his first grievance that plaintiff was entitled to a self-reclining wheelchair. Certainly, plaintiff's refusal to accept the second wheelchair offered to him, which purportedly was self-reclining, casts doubt on plaintiff's claim that defendants were purposely indifferent.[FN6] However, at this early pleading stage, without the benefit of any information on the nature of plaintiff's actual medical condition or the medical appropriateness of the wheelchairs offered to plaintiff, this Court can not conclusively say that plaintiff's Complaint fails to allege that he suffered serious injury from lack of a wheelchair. Nor can the Court, at this point, reject plaintiff's claim that defendants acted with a culpable state of mind by their intentional delay in providing him with a wheelchair customized to his particular medical needs.

FN6. Plaintiff explains his rejection of both chairs by stating that he "can not utilize any other kind of wheelchair" than the "self recliner" chair requested and approved by the C.O.R.C. (Ex. K-1.) Defendants do not dispute this allegation. While plaintiff does not explain the precise nature of his medical condition and this Court knows of no medical condition requiring use of a self-reclining wheelchair exclusively, in the absence of dispositive information to the contrary, the Court must accept these facts as true for purposes of a motion to dismiss. It is well established that claims based on a difference of opinion over matters of medical judgment do not give rise to an Eighth Amendment violation. *See Estelle,* 429 U.S. at 106-07; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("Hathaway III"). Nevertheless, given plaintiff's stated medical need for a specific type of wheelchair, without more information, the Court

can not say that his allegation is based in mere disagreement with medical opinions.

Significantly, the Second Circuit has repeatedly held that allegations of delay in providing medical treatment to a prisoner, even in the absence of physical pain, can state a claim for deliberate indifference sufficient to survive a motion to dismiss. *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) ("Hathaway II") (allegations that prison doctor delayed prisoner's surgery for over two years although he knew prisoner had two broken pins in his hip, was sufficient to meet both components of deliberate indifference claim and to withstand a motion to dismiss); *Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) (if prison officials did delay "medical aid-even for 'only' five hours-in order to make [the prisoner] suffer, surely a claim would be stated under *Estelle* "); *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996) (deprivation of prescriptive eye glasses constitutes denial of serious medical need and satisfies objective component; although deprivation did not cause pain, it prolonged plaintiffs suffering). *See also Candelaria v. Coughlin,* No. 91 Civ. 2978, 1996 WL 88555, at 7-8 (S.D.N.Y.1996) (denying cross-motions for summary judgment because the parties disputed whether plaintiffs claims of medical injury based on failure to provide proper wheelchair were "serious").

*6 Here, plaintiff alleges delay as well as pain. Plaintiff alleges he waited in bed for six and a half months before the arrival of the first "defective" wheelchair and another eight months before the delivery of the second chair. Furthermore, plaintiff contends that, after the C.O.R.C. approved the wheelchair request in his first grievance, defendants simply reordered the same chair, knowing full well that plaintiff would reject it. Defendants have not disputed these allegations and appear to agree that at least the first wheelchair was inappropriate for plaintiffs medical needs. (Ex. C-4; Def's Mot. Dismiss at 7.) Accordingly, although some question exists as to the viability of plaintiff's claim, the Court nevertheless finds that, as alleged, and in the absence of any medical documentation dispositively evincing that the second wheelchair offered to defendant was appropriate for his medical needs, plaintiff's claim is sufficient to withstand a motion to dismiss.

**V. Retaliation Claims**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 714878 (S.D.N.Y.)
(Cite as: 1997 WL 714878 (S.D.N.Y.))

Plaintiff also alleges that prison officials subjected him to a "great deal of harassment" while he waited for an appropriate wheelchair. Plaintiff insinuates that by this harassment, prison officials retaliated against him for filing grievances. Plaintiff claims this harassment to have included an illegal cell search, confiscation of legal materials he needed for court, false misbehavior reports, curtailed socializing, and a forced transfer to another correctional facility.

The Second Circuit has recognized that prison officials may not retaliate against prisoners for exercising their constitutional rights. *See Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988)). These rights include a prisoner's constitutional right to file grievances seeking administrative redress. *Franco,* 854 F.2d at 589. Nevertheless, "because we recognized ... the ease with which claims of retaliation may be fabricated, we examine prisoners claims of retaliation with care." *Colon,* 58 F.3d at 871 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)). Given the possibilities for such abuse, the Second Circuit requires a "higher level of detail in pleading [retaliation claims]." *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987).

A plaintiff alleging retaliation "bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating fact in the prison officials' decision to discipline plaintiff." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citing *In Mount Healthy Sch. Dist. V. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). In order for a plaintiff to maintain a retaliation claim, the plaintiff must prove that the alleged wrongful action would not have been taken but for the exercise of his constitutional rights. *See Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976). Action that is taken for both valid and invalid reasons will not be deemed unconstitutional if the action would have been taken in any event for the constitutionally valid reason. *See Graham,* 89 F.3d at 79.

**\*7** Where retaliation claims may have merit, the prisoner making the claim must be accorded the full procedural and

substantive safeguards available to other litigants. *See Colon,* 58 F.3d at 872. "[A] retaliation claim supported by specific and detailed factual allegations which amounts to a persuasive case ought to be pursued with full discovery. However, a Complaint which alleges retaliation in wholly conclusory terms may be safely dismissed on the pleadings alone." *Flaherty,* 713 F.2d at 13; *accord Colon,* 58 F.3d at 872.

A. *The Cell Search*

Plaintiff's cell search allegation is dismissed in its entirety because the Supreme Court has held that searches of cells implicate no protected constitutional rights, even if the search is arbitrary or retaliatory in nature. *See Hudson v. Palmer,* 468 U.S. 517, 527, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). *See also Payne v. Axelrod,* 871 F.Supp. 1551, 1555 (N.D.N.Y.1995); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.1996).

B. *Denied Access to the Courts and Deprivation of Legal Property*

Any claim plaintiff may be making for the deprivation of his legal documents and medical records must also be dismissed. A claim for deprivation of property does not lie in federal court if state courts provide an adequate remedy for the deprivation of that property. *Hudson,* 468 U.S. at 533; *Parratt v. Taylor,* 451 U.S. 527, 542-543, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds,* 474 U.S. 327, 330-331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Marino v. Ameruso,* 837 F.2d 45, 47 (2d Cir.1988). New York provides such a remedy in § 9 of the New York Court of Claims Act, which permits an inmate to pursue a claim for deprivation of property against the State of New York in the New York Court of Claims. *See Demaio,* 877 F.Supp. at 95. Therefore, plaintiff may not pursue his deprivation of property claim in this Court.

Nor has plaintiff stated a constitutional claim that confiscation of his legal materials deprived him of reasonable access to court. While confiscation of an inmate's legal materials can be actionable as a constitutional violation, *see Tyler v. "Ron" Deputy*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 714878 (S.D.N.Y.)
(Cite as: 1997 WL 714878 (S.D.N.Y.))

*Sheriff,* 574 F.2d 427,429 (8th Cir.1978) (citing *Sigafus v. Brown,* 416 F.2d 105 (7th Cir.1969)); *see also Tyler v. Woodson,* 597 F.2d 643 (8th Cir.1979), to prevail on such a claim, a plaintiff must establish actual injury. *See Monsky v. Moraghan,* 127 F.3d 243, 1997 WL 606487 (2d Cir. Oct 2, 1997) (quoting *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)) ("[A] plaintiff must demonstrate that a defendant caused 'actual injury,' i.e., took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' ").

Here, the only allegation plaintiff makes suggesting actual injury is that, following the search of his cell in 1995, he did not receive back all of his medical records and legal papers relevant to a then pending legal matter.[FN7] (Ex. G-4.) However, plaintiff has not alleged anything to indicate that the confiscation in fact interfered with his court access in that legal action. Moreover, the exhibits to plaintiff's Complaint indicate that plaintiff's property has been returned to him.[FN8] In short, these allegations are insufficient to establish any violation of a constitutional nature. At best they provide support for a claim of deprivation of personal property, which, as mentioned above, is not properly before this Court.

FN7. Apparently, plaintiff had filed or was intending to file a legal action in a different matter.

FN8. The exhibits to plaintiff's Complaint reflects that plaintiff filed a grievance with the C.O.R.C. on January 9, 1995, and again on March 17, 1995, requesting that his legal documents and other property be returned. (Ex. G-1 & I-1.) On March 22, 1995, the C.O.R.C. found that all confiscated property had been returned to the plaintiff on January 12, 1995. (Ex. G-6.) On August 30, 1995, the C.O.R.C. again determined that: (1) plaintiff's property was returned on January 12, 1995; (2) plaintiff refused to sign for his property; and (3) plaintiff's refusal to sign was noted in the hospital log book. (*See* Complaint ¶ 8; Ex. I-4.)

C. *Retaliatory False Misbehavior Reports and Curtailed Socializing*

*8 Construed liberally, plaintiff alleges that defendants fabricated false misbehavior reports against him and limited his socializing in retaliation for initiating prison grievances. Plaintiff's sole allegations in this respect are that he was "accused of sex charges that never happened" and was "constantly found guilty of charges" to keep him on "some kind of restriction ... or locked up in a room 24 hours a day." Plaintiff further alleges that defendant Rassman harassed him by preventing inmates from socializing with plaintiff.

The Second Circuit has held that " '[a]lthough the filing of unfounded charges d[oes] not give rise to a per se constitutional violation action under section 1983,' ... a § 1983 claim may stand when the false charges are allegedly brought in retaliation for an inmate's exercise of his substantive due process rights." *Rodriguez v. Phillips,* 66 F.3d 470, 477 (2d Cir.1995) (quoting *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986)). However, as noted above, claims of retaliation must be examined with skepticism and care, *Flaherty,* 713 F.2d at 13, and a "higher level of detail in pleading" is required. *Gill,* 824 F.2d at 194.

With respect to plaintiff's allegations of false misbehavior reports and curtailed socializing, the Court finds that plaintiff has failed to allege the "higher level of detail" required to sustain these claims against a motion to dismiss. *See Gill,* 824 F.2d at 194. Even viewed under liberal *pro se* pleading considerations, *Haines,* 404 U.S. at 520-21, plaintiff's allegations as to these claims are so conclusory and lacking of any detail whatsoever that the Court can not find them legally feasible. Consequently, plaintiff's claims of retaliatory false misbehavior reports and curtailed socializing are hereby dismissed.

D. *Retaliatory Transfer*

Liberally construing plaintiff's pleadings, his last claim of retaliation concerns his transfer from Green Haven to another correctional facility on October 26, 1995, eight days after plaintiff's third wheelchair grievance. Plaintiff claims he was transferred to "further delay my getting a wheelchair ... and to prolong my stay in prison."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 714878 (S.D.N.Y.)
(Cite as: 1997 WL 714878 (S.D.N.Y.))

While there is no right to be placed in a particular facility, Montanye v. Haymes, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), an inmate can not be transferred solely in retaliation for the exercise of his constitutional rights. *See Meriwether v. Coughlin,* 879 F.2d 1037, 1047 (2d Cir.1989); *see also Lowrance v. Coughlin,* 862 F.Supp. 1090, 1099 (S.D.N.Y.1994). The filing of prison grievances is a constitutionally protected right. *Franco v. Kelly,* 854 F.2d at 589.

The temporal proximity between the grievance filing and the transfer does provide circumstantial evidence suggesting that the transfer may have been in retaliation for plaintiff's grievance. Circumstantial facts in a retaliation claim can suggest an improper motive sufficient to withstand a motion to dismiss. *See Gagliardi v. Village of Pawling,* 18 F.3d 188 (2d Cir.1994) (denying motion to dismiss where retaliation claim alleged a chronology of events from which retaliatory intent could be inferred); *see also Murphy v. Lane,* 833 F.2d 106, 108-09 (7th Cir.1987) ("Chronology of events from which retaliatory animus on part of the defendants could be inferred" sufficient to overcome motion to dismiss).[FN9] Because this is a motion to dismiss and not a motion for summary judgment, the defendants properly have not provided the Court with any dispositive records or information indicating that the transfer was not retaliatory in nature. Under these circumstances, however, the Court finds that plaintiff does allege a sequence of events which may be read as providing some support for an inference of retaliation sufficient to withstand a motion to dismiss.

FN9. In contrast, circumstantial evidence of retaliatory animus is not sufficient to withstand a motion for summary judgment. *See Blue v. Koren,* 72 F.3d 1075, 1084 (2d Cir.1995) (mere temporal proximity of events may "fuel ... suspicions" but will not withstand a motion for summary judgment); *Dietz v. Damas,* 948 F.Supp. 198 (E.D.N.Y.1996).

**\*9** Nevertheless, the Court must dismiss plaintiff's retaliatory transfer claim because he has not alleged the personal involvement of any of the named defendants in the transfer decision. It is well established that as a

prerequisite to a damage award under 42 U.S.C. § 1983, a plaintiff must allege the defendant's direct or personal involvement in the alleged constitutional deprivation. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Plaintiff has not done so with respect to his transfer claim and accordingly the claim must be dismissed. The Court grants plaintiff permission, however, to amend his Complaint within thirty days of this order, reasserting claims against or adding any defendants whom he can plead with particularity had personal involvement in his retaliatory transfer claim.

**VI.** *Personal Involvement*

As stated above, plaintiff must allege a defendant's direct personal involvement in a constitutional deprivation in order to receive a damage award under § 1983. *See Wright,* 21 F.3d at 501. Because the Court has dismissed the plaintiff's retaliation claims, the retaliation claims against Schneider, Connelly, Pease, Rassman, Zaken, and Bennett are dismissed.

Concerning the plaintiff's allegation of deliberate indifference to plaintiff's medical needs against defendants Zwillinger, Stevens, and Manion, plaintiff has alleged facts of their direct involvement, knowledge, and responsibility sufficient to withstand a motion to dismiss.

Plaintiff makes no claims of direct involvement by defendants Goord (Department of Correctional Services Acting Commissioner), Coombe (Former Commissioner), and Artuz (Green Haven Superintendent) in any constitutional violation. Liability for damages in a § 1983 action may not be based in respondent superior or vicarious liability doctrines. *See Monell v. Department of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Absent allegations of personal involvement, all claims against Goord, Coombe, and Artuz are hereby dismissed.

**VII.** *Eleventh Amendment Immunity*

Finally, defendants assert that the instant Complaint is barred by the Eleventh Amendment because defendants

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 714878 (S.D.N.Y.)
(Cite as: 1997 WL 714878 (S.D.N.Y.))

were acting in their official capacities with regard to the claims alleged and thus are immune from suit. It is unclear, however, whether plaintiff is suing defendants in their official or in their individual capacities. In a case such as this, where doubt exists as to whether an official is sued in his individual or official capacity, the course of the proceedings will generally resolve the ambiguity by revealing the nature of the liability sought to be imposed. *See Kentucky v. Graham,* 473 U.S. 159, 167 n. 4, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citing *Brandon v. Holt,* 469 U.S. 464, 469, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985)). It is improper at an early stage in the proceedings automatically to construe a Complaint as focusing on one capacity and not the other. *See Frank v. Relin,* 1 F.3d 1317, 1326 (2d Cir.). Accordingly, the Court assumes for the purposes of this motion that plaintiffs claims are asserted against defendants in both their individual and their official capacities.

**\*10** To the extent that plaintiff asserts claims for monetary damages against the defendants in their official capacities, these claims must be dismissed. A claim against an employee of the New York State Department of Corrections for actions taken in his or her official capacity is, in effect, a suit against the State. Absent the State's waiver or consent, neither of which have been given here, the Eleventh Amendment bars from federal court all § 1983 suits for legal or equitable relief brought by citizens against the State and its agencies. *See Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam); *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). *See also Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (reaffirming Edelman holding that § 1983 does not override the immunity granted to States under the Eleventh Amendment). Thus, plaintiffs claims for monetary damages from defendants in their official capacities are dismissed as barred under the Eleventh Amendment. *See generally Dube v. State Univ. of New York,* 900 F.2d 587, 594-95 (2d Cir.1990). However, plaintiff may maintain his claims against defendants in their individual capacities. *See generally Hafer v. Melo,* 502 U.S. 21, 30-31, 112 S.Ct. 358, 116 L.Ed.2d 301(1991) ("[T]he Eleventh Amendment does not erect a barrier against suits to impose 'individual and personal' liability on state officials under sec.1983.") (citation omitted).

**CONCLUSION**

Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is GRANTED in part and DENIED in part. The Court denies the motions of defendants Zwillinger, Stevens, and Manion to dismiss plaintiff's claim against them of deliberate indifference to plaintiff's medical needs. The Court grants the motions of defendants Goord, Coombe, Artuz, Schneider, Connelly, Pease, Rassman, Zaken, and Bennett to dismiss the retaliation and other claims against them in their entirety. As noted herein, plaintiff has thirty days from the date of this Order to amend his Complaint to allege the personal involvement of defendants in his retaliatory transfer claim. If plaintiff adds new defendants, he must effect service upon them. **The Court schedules a conference for 1/16/98, at 2:00 pm, at which time defendants will advise the Court of the status of discovery. Attached is a Pro Se Conference notice that explains to the plaintiff how he may participate in the conference.**

**SO ORDERED**

S.D.N.Y.,1997.
Gadson v. Goord
Not Reported in F.Supp., 1997 WL 714878 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.