IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
_____

RONALD PHIPPS,

                         Plaintiff,

      v.

DR. SOHAIL A. GILLANI,

                         Defendant.
_____

Civil Action No.
9:10-CV-1588 (TJM/DEP)

APPEARANCES:

FOR PLAINTIFF:                        OF COUNSEL:

RONALD PHIPPS, *Pro Se*
93-A-6162
Clinton Correctional Facility
Box 2001
Dannemora, NY 12929

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN      KEITH A. MUSE, ESQ.
Office of the Attorney General       Assistant Attorney General
State of New York
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

*Pro se* plaintiff Ronald Phipps, a New York State prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 alleging the deprivation of his rights under the United States Constitution. Construed liberally, plaintiff's complaint alleges that defendant Dr. Sohail Gillani, a psychiatrist at the prison facility in which plaintiff was housed at the relevant times, injected him on multiple occasions with Risperdal over his objection, in violation of his constitutional rights.

Currently pending before the court is defendant Gillani's motion seeking the entry of summary judgment dismissing plaintiff's claims against him, both on the procedural basis that he failed to exhaust available administrative remedies before commencing suit, and on the merits. Because the record firmly establishes, and plaintiff has admitted, that he did not file a grievance raising the issues advanced in this action prior to its commencement, I recommend that defendant's motion be granted, and plaintiff's complaint be dismissed.

I.    BACKGROUND[1]

It appears from the scant allegations set forth in his complaint that plaintiff is a prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), and is, and was at the relevant times, confined in the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. *See generally* Complaint (Dkt. No. 5); Muse Decl. Exh. 1 (Dkt. No. 36-4); Gillani Affd. (Dkt. No. 36-10) at ¶ 6. Plaintiff alleges that, while at Clinton, defendant Dr. Sohail Gillani, a psychiatrist working at Clinton, administered to Phipps over 200 bi-weekly medical injections of Risperdal, over plaintiff's objection, despite a court order directing such involuntary injections cease in October 2007. Complaint (Dkt. No. 5) at 4. The injections have allegedly "caused [plaintiff] to feel weak and dizzy and sick." *Id.* at 2.

In response, defendant has submitted an affidavit to the effect that he "had contact with [plaintiff]" on only nine occasions beginning on June 11, 2010, and ending on December 23, 2011. Gillani Affd. (Dkt. No. 36-10) at ¶ 7. In addition, defendant Gillani states that, although he prescribed bi-weekly

_____

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

injections of Risperdal for plaintiff, he never administered the injections, nor was he aware of "any instance that [plaintiff] refused an injection during the time period in which [defendant] treated [plaintiff]." *Id.* at ¶¶ 12, 13, 15. According to defendant Gillani, "[a]t no time while [plaintiff] was under [his] direct care did [he] ever order an injection to be given to [plaintiff] over his objection or against his will." *Id.* at ¶ 17.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on December 30, 2010, with the filing of a pleading styled as an order to show cause for a temporary restraining order and seeking preliminary injunctive relief.[2] Dkt. No. 1. In that initial pleading, plaintiff named as defendants Dr. Gillani and the State of New York. *Id.* On January 12, 2011, Senior District Judge Thomas J. McAvoy issued an order directing the filing of this original submission as a complaint, granting plaintiff's application for *in forma pauperis* status, denying his motion for a temporary restraining order, and ordering a response by the named defendants to plaintiff's request for injunctive relief. Dkt. No. 4. Subsequently, following defendants' filing of response in opposition, Judge McAvoy denied plaintiff's motion for injunctive relief. Dkt. No. 19.

---

[2]     That filing was followed by the submission of a virtually identical document on January 12, 2011. Dkt. No. 5.

On March 28, 2011, defendant Gillani moved for dismissal of plaintiff's complaint against him for failure to state a claim upon which relief may be granted, and additionally on the basis of qualified immunity. Dkt. No. 16. Defendant State of New York later moved, on June 28, 2011, seeking dismissal of plaintiff's claims against that defendant upon the basis of the Eleventh Amendment. Dkt. No. 23. Those motions were addressed in a report issued by me on January 5, 2011, in which I recommended that plaintiff's claims against defendant State of New York be dismissed, but that defendant Gillani's motion to dismiss be denied. Dkt. No. 28. That report and recommendation was adopted by decision and order issued by Judge McAvoy on January 30, 2012. Dkt. No. 29.

Now that discovery in the action has closed, defendant has moved, by motion filed on October 12, 2012, for summary judgment dismissing plaintiff's claims against him. In his motion, defendant Gillani argues that (1) plaintiff has failed to exhaust his available administrative remedies, (2) no reasonable factfinder would conclude that he administered Risperdal injections to the plaintiff over his objection, and (3) in any event, he is entitled to qualified immunity from suit. Dkt. No. 36. Plaintiff has not responded in opposition to defendant's motion, which is now ripe for determination and has been

referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). Fed. R. Civ. P. 72(b).

III.   DISCUSSION

A.   Plaintiff's Failure to Oppose Defendant's Motion

The court's local rules require that a party seeking the entry of summary judgment must submit a statement of material facts that it contends are undisputed by the record evidence. N.D.N.Y. L.R. 7.1(a)(3). In opposition to that motion, the local rules instruct the non-moving party to respond to the moving party's statement of material facts by specifically admitting or denying each of the facts listed in the moving party's statement. *Id.* The purpose underlying this rule is to assist the court in framing the issues and determining whether there exist any triable issues of fact that would preclude the entry of summary judgment. *Anderson v. Dolgencorp of N.Y.*, Nos. 09-CV-0360, 09-CV-0363, 2011 WL 1770301, at *1 n.2 (N.D.N.Y. May 9, 2011) (Sharpe, J.).[3] To meaningfully fulfill this purpose, it is essential for the court to have the benefit of both the moving party's statement and an opposition statement from the non-moving party.

_____

   [3]   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

6

In this instance, defendant Gillani has complied with local rule 7.1(a)(3), providing a statement setting forth ten facts as to which, he contends, there is no genuine triable issue. Dkt. No. 36-11. Plaintiff has failed to respond to that statement. *See generally* Docket Sheet.

By its terms, local rule 7.1 provides, in part, that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this provision in cases where a non-movant fails to properly respond. *See*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Svc. Comm'n*, 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado*, No. 96-CV-0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a *pro se* litigant is not relieved of his duty to meet the

requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, C.J.).

Here, because plaintiff was warned of the consequences of failing to properly respond to defendants' rule 7.1(a)(3) statement, Dkt. No. 36-1, and he has failed to do so, I have construed defendant's facts contained therein as true to the extent they are supported by accurate record citations. *See*, *e.g.*, *Latouche*, 2011 WL 1103045, at *1; *see also Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). As to any facts not contained in defendant's rule 7.1(a)(3) statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry*, 336 F.3d at 137.

B.    Failure to Exhaust

In his motion, defendant first argues that, because plaintiff did not file a grievance addressing the issues now raised in this action before commencing suit and pursue that grievance through the administrative grievance procedure available at Clinton, he is procedurally barred from pursuing this action. Def.'s Memo of Law (Dkt. No. 36-2) at 6-9.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-

134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is . . . mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The requirement that inmates exhaust administrative remedies before filing a lawsuit, however, is not a jurisdictional requirement. *Richardson v. Goord*, 347 F.3d 431, 434 (2d Cir. 2003). Instead, failure to exhaust is an affirmative defense under the PLRA, and "inmates are not required to

specifically plead or demonstrate exhaustion in their complaints."[4] *Jones v. Bock*, 549 U.S. 199, 216 (2007). In the event a defendant establishes that the inmate-plaintiff failed to complete the administrative review process prior to commencing the action, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) (citing *Woodford*).[5]

In New York, prisons inmates are subject to a three-step Inmate Grievance Program ("IGP") established by the DOCCS and recognized as an "available" remedy for purposes of the PLRA. *Mingues v. Nelson*, No. 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing N.Y. Corrs. Law § 139 (McKinney's 2003); 7 N.Y.C.C.R. § 701.7; *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 347 (S.D.N.Y. 2002); *Mendoz v. Goord*, No. 00-CV-0146,

---

[4]    In this case, defendant Gillani raised failure to exhaust administrative remedies as a defense in his answer to plaintiff's complaint. Dkt. No. 30 at ¶ 6.

[5]    While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "'in a substantive sense,'" an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)).

2002 WL 31654855, at *2 (S.D.N.Y. Nov. 21, 2002)). First, a written

grievance is submitted to the Inmate Grievance Review Committee ("IGRC")

within twenty-one days of the incident at issue.[6] 7 N.Y.C.R.R. § 701.5(a). The

IGRC, which is comprised of inmates and facility employees, then issues a

determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal

is filed, the superintendent of the facility next reviews the IGRC's

determination and issues a decision. *Id.* § 701.5(c). The third level of the

process affords the inmate the right to appeal the superintendent's ruling to

the Central Office Review Committee ("CORC"), which makes the final

administrative decision. *Id.* § 701.5(d). Ordinarily, only upon exhaustion of

these three levels of review may a prisoner seek relief pursuant to section

1983 in a federal court. *Reyes v. Punzal*, 206 F. Supp. 2d 431, 432

(W.D.N.Y. 2002) (citing, *inter alia*, *Sulton v. Greiner*, No. 00-CV-0727, 2000

WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

Defendant's rule 7.1(a)(3) statement asserts, and by his failure to

respond, plaintiff admits, that plaintiff "never filed a grievance at Clinton

Correctional Facility alleging that Dr. Gillani was prescribing medication that

was being administered over his objection," and that he "never filed an

---

[6]     The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances."  7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

appeal to the [CORC] involving the injections of medications being administered by Dr. Gillani or his staff over his objection." Def.'s L.R. 7.1(a)(3) Statement (Dkt. No. 36-11) at ¶¶ 1, 2. These assertions are supported by record evidence including an affidavit from Christine Gregory, the IGP Supervisor at Clinton, and Karen R. Bellamy, the Director of the DOCCS IGP. Gregory Affd. (Dkt. No. 36-8) at ¶¶ 5-8; Bellamy Affd. (Dkt. No. 36-9) at ¶¶ 6-7; Bellamy Affd. Exh. A (Dkt. No. 36-9) at 3-4. In addition, at his deposition plaintiff acknowledged his failure to exhaust during the following exchange:

> Q. When you were receiving the shots from 2007 until 2010, did you ever go through the grievance process?
>
> A. No; I'm not a firm believer in the grievance process, no.
>
> Q. You never field any grievances about the shots and you didn't want to take them or you were receiving them involuntarily?
>
> A. No, I filed the lawsuit.
>
> Q. So besides filing the lawsuit, have you filed anything else in the State prison system regarding either Dr. Gillani or the shots.
>
> A. No.

Muse Decl. Exh. 4 (Dkt. No. 36-7) at 33.

Although it is clear from the record that plaintiff failed to avail himself of the administrative remedies available to him through the IGP, his failure to do so does not warrant dismissal of plaintiff's complaint without further inquiry. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See*, *e.g.*, *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir. 2004); *see also Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id*. In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the

13

applicable administrative procedure requirements. *Id*.

In this instance, there is no record evidence to suggest that the IGP was not fully available to the plaintiff in this matter. In addition, plaintiff admitted at his deposition that the failure to exhaust remedies was his decision, and not the product of any interference or special circumstances that would justify excusing him from the PLRA's exhaustion requirement. *See* Muse Decl. Exh. 4 (Dkt. No. 36-7) at 33 (testifying that he did not use the grievance procedure to complain about receiving shots between 2007 and 2010 because he is "not a firm believer in the grievance process"). Based upon this evidence, which Phipps has not disputed, I conclude that this action is subject to dismissal based on plaintiff's failure to exhaust his available administrative remedies before commencing this suit.

IV.    SUMMARY AND RECOMMENDATION

Plaintiff's complaint in this action alleges that defendant Gillani, the sole remaining defendant in the action, involuntarily subjected him to injections of Risperdal in violation of his substantive due process rights under the Fourteenth Amendment. The record firmly discloses, however, that the plaintiff did not file a grievance and pursue that grievance to completion, pursuant to the established DOCCS IGP prior to commencing this action, as

14

required under 42 U.S.C. § 1997e(a). Accordingly, it is hereby respectfully

RECOMMENDED that defendant's motion for summary judgment (Dkt. No. 36) be GRANTED, and that plaintiff's complaint in this action be DISMISSED for failure to exhaust available administrative remedies before commencing suit.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:  July 23, 2013
        Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

15

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Janet ANDERSON, Plaintiff,
v.
DOLGENCORP OF NEW YORK, INC., Defendant.
Betty Pulver, Plaintiff,
v.
Dolgencorp of New York, Inc., Defendant.
Nos. 1:09–cv–360 (GLS\RFT), 1:09–cv–363
(GLS\RFT).

May 9, 2011.

Beasley, Allen Law Firm, Roman A. Shaul, Esq., Elizabeth A. Cordello, Esq., of Counsel, Montgomery, AL, for the Plaintiffs.

Hinman, Howard Law Firm, James S. Gleason, Esq., Dawn J. Lanouette, Esq., of Counsel, Binghamton, NY, for the Defendant.

Morgan, Lewis Law Firm, Joel S. Allen, Esq., Ronald. E. Manthey, Esq., of Counsel, Dallas, TX.

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, District Judge.

### I. *Introduction*

**\*1** In this consolidated action, plaintiffs Janet Anderson and Betty Pulver allege that their former employer, defendant Dolgencorp of New York, Inc. (Dollar General) deprived them of lawful overtime wages in violation of the Fair Labor Standards Act (FLSA).[FN1] (*See* No. 09–cv–360, 2d Am. Compl., Dkt. No. 4; No. 09–cv–363, 2d Am. Compl., Dkt. No. 4.) Pending are Dollar General's motions for summary judgment as against each plaintiff and to strike certain evidence offered by plaintiffs in opposition to the summary judgment motions. (*See* No. 09–cv–360, Dkt. Nos. 38, 50; No. 09–cv–363, Dkt. No. 27.) For the reasons that follow, the motions are denied.

FN1. 29 U.S.C. § 201, *et seq.*

### II. *Background*[FN2]

FN2. Unless otherwise noted, the facts are derived directly from Dollar General's various Statements of Material Facts (SMF) and plaintiffs' responses thereto. (*See* No. 09–cv–360, Def. SMF (Anderson), Dkt. No. 38:1; No. 09–cv–360, Def. Common SMF, Dkt. No. 39; No. 09–cv–360, Pls. Common SMF Resp., Dkt. No. 44:1; No. 09–cv–360, Anderson SMF Response, Dkt. No. 46:1; No. 09–cv–363, Pulver SMF Resp., Dkt. No. 27:1; No. 09–cv–363, Def SMF (Pulver), Dkt. No. 29:1.) In that regard, the court notes that plaintiffs have failed in most instances to specifically admit or deny Dollar General's factual assertions as required by Local Rule 7.1(a)(3), instead choosing—in a somewhat boilerplate fashion—to "object" to the "implications" of those assertions or to assert additional facts that do not directly or necessarily contradict them. (*See generally, e.g.,* Anderson SMF Resp., Dkt. No. 46:1; *see also* N .D.N.Y. L.R. 7.1(a)(3) (requiring a "non-movant's response [to] mirror the movant's Statement of Material Facts by *admitting and/or denying each of the movant's assertions* in matching numbered paragraphs" (emphasis added)).) As plaintiffs' counsel is likely aware, however, the purpose of the Rule 7.1(a)(3) response requirement is not to highlight and broadly contradict intended "implications" of a movant's factual assertions, or to imply the inaccuracy of those assertions; it is to aid the court in isolating the relevant facts so that it may discern whether and to what extent disputes relating to those facts exist. Thus, a non-movant's failure to tailor her responsive SMFs in accordance with the Local Rules significantly impedes the court's ability to effectively and efficiently resolve these critical inquiries.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

Accordingly, to the extent plaintiffs have failed to properly respond to Dollar General's statements of fact, the court will, where it deems appropriate, treat those statements as admitted for purposes of this motion. *Id.* ("The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.").

## A. *Dollar General*

Defendant Dollar General is a retailer of basic consumable goods, such as cleaning supplies, health and beauty aids, foods and snacks, housewares, toys, and basic apparel. (*See* No. 09–cv–360, Def. Common SMF ¶ 1, Dkt. No. 39.) As of 2005, Dollar General operated approximately 7,500 stand-alone Dollar General Stores in thirty states, with an average sales volume of over $1 million per store. (*See id.* at ¶ 2.) Each Dollar General store is staffed by a Store Manager, an Assistant Manager (ASM), a Lead Clerk, and multiple store clerks. (*See id.* at ¶ 3.) Of these employees, Store Managers occupy the highest level of supervisory authority and are the only employees paid on a salaried basis. (*See id.*) Each Store Manager reports to a District Manager (DM), each of whom oversees from fifteen to twenty-five stores. (*See id.* at ¶ 4.)

During the relevant times, Dollar General described a Store Manager's general responsibilities as "the management of all employees in the effective planning and implementation of all store processes, including ordering, receiving, stocking, presentation, selling, staffing and support." (No. 09–cv–360, Shaul Aff., Ex. 11, Store Manager Job Description, Dkt. No. 45:11 (filed under seal) .) Encompassed within these broadly-defined responsibilities are the specific, "essential" duties to:

• Recruit, select and retain qualified employees according to federal and state labor laws and company policies; ensure store is properly staffed;

• Provide proper training for employees; conduct performance evaluations; identify gaps for appropriate solutions and/or counseling, up to and including termination;

• Make recommendations regarding employee pay rate and advancement;

• Communicate performance, conduct and safety expectations regularly; coordinate meetings and events to encourage safety, security and policies;

• Ensure that the store is appropriately staffed and effectively opened and closed each day;

• Evaluate operating statements to identify business trends (including sales, profitability, and turn), expense control opportunities, potential shrink, and errors;

• Ensure that all merchandise is presented according to established practices; utilize merchandise fixtures properly including presentation, product pricing and signage;

**\*2** • Maintain accurate inventory levels by controlling damages, markdowns, scanning, paperwork, and facility controls;

• Ensure the financial integrity of the store through strict cashier accountability, key control, and adherence to stated company security practices and cash control procedures;

• Provide superior customer service leadership;

• Maintain a clean, well-organized store; facilitate a safe and secure working and shopping environment;

• Ensure that store is adequately equipped with tools necessary to perform required tasks; and

• Complete all paperwork and documentation according to guidelines and deadlines.

(*Id.*)

The job description further outlines certain "Working Conditions and Physical Requirements" associated with the Store Manager position. (*See id.*) These include: "[f]requent walking and standing"; "[f]requent bending, stooping and kneeling to run check out station, stock merchandise, and unload trucks"; "occasional climbing";

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

and "frequent and proper lifting of up to 40 pounds [, and] occasional lifting of up to 65 pounds." (*Id.*)

With respect to compensation, in addition to their weekly salaries, Store Managers are generally eligible for certain bonuses, such as annual "Teamshare" bonuses and quarterly "in stock" bonuses. (*See* No. 09–cv–360, Def. Common SMF ¶ 13, Dkt. No. 39 .) Teamshare bonuses are tied to the financial performance of the Store Manager's individual store and the manager's individual performance as a manager. (*See id.*) To the extent that Assistant Managers have also been eligible for Teamshare bonuses, it appears that their eligibility never exceeded 30% of what a Store Manager could earn. (*See id.* at ¶ 14.) As to in-stock bonuses, they were awarded in the amount of $250 per quarter if certain in-stock goals were met, and only to Store Managers. (*See id.* at ¶¶ 13, 14.)

In assessing the financial performance of a Store Manager's individual store, Dollar General considers whether and to what extent the store is meeting its quarterly and annual sales goals, minimizing inventory shrink and controllable expense, and maximizing profit. (*See* No. 09–cv–360, Allen Aff., Ex. 3, Store Manager Performance Evaluation Form, Dkt. No. 41:3 (filed under seal). Relatedly, in evaluating a Store Manger's managerial and leadership skills, Dollar General examines the manager's performance in seven focus areas: sales volume, controllable expense, inventory shrink, merchandising/in stock, training and development, customer satisfaction, and safety awareness. (*See id.*)

## B. *Janet Anderson*

In February 2002, plaintiff Janet Anderson was hired by Dollar General as an ASM for Store No. 8576 in Burnt Hills, New York. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 1, Dkt. No. 38:1.) In April 2002, Anderson was promoted to the position of Store Manager, which she held until her resignation in November 2002. (*See id.* at ¶ 2.) According to Anderson, other than the on-the-job training she received as an ASM, she did not receive any training when she was promoted to Store Manager. (*See* No. 09–cv–360, Anderson SMF Resp., Additional Facts ¶ 20, Dkt. No. 46:1.)

**\*3** As a Store Manager, Anderson was paid a fixed weekly salary of $425.00, was eligible for the performance-based bonuses discussed above, and worked an average of fifty hours per week. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶¶ 6, 8, 25, Dkt. No. 38:1.) According to Anderson, she understood when she took the Store Manager position that she would be working more than forty hours per week, and that her salary was to compensate her for all hours worked since she would not be paid for overtime. (*See id.* at ¶¶ 6, 7; No. 09–cv–360, Anderson SMF Resp. ¶ 7, Dkt. No. 46:1.) During Anderson's tenure as Store Manager, the next highest paid employee, an ASM, earned $7.00 per hour and worked an average of thirty-one hours per week. (*See id.*)

With respect to her job functions, Anderson acknowledged in deposition that she performed all of the duties outlined in the Store Manager job description, and agreed that the description provides an accurate general summary of her position as Store Manager. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 15, Dkt. No. 38:1.) In line with that testimony, Anderson explained that she was responsible for supervising the other store employees, including an ASM, a "Third–Key" or Lead Clerk, and the other store clerks, and for performing other managerial duties. (*See id.* at ¶ 3.)

As part of her supervisory duties, Anderson testified that she trained employees on store policy and other related issues; directed, supervised, and evaluated employees' work; coached, disciplined, and counseled employees where necessary; recommended employee pay raises and promotions to her DM (recommendations that were always accepted); and scheduled employees' hours. (*See id.* at ¶¶ 14, 16.) With respect to scheduling, Anderson managed approximately 168 to 212 labor hours per week, meaning that she allocated Dollar General's labor hour allotment amongst the employees she supervised. (*See id.* at ¶ 4.)

In addition to these supervisory tasks, Anderson also performed other duties, including interviewing and hiring employees; monitoring and evaluating weekly sales reports and store operating reports; ensuring that cash registers "balanced"; completing daily paperwork, such as payroll and bank deposits; managing inventory levels; ensuring that merchandise was properly staged and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

stocked, largely in accordance with Dollar General "Plan–O–Grams"[FN3]; leading team meetings; and ensuring that the store was properly open and closed. (*See id.* at ¶¶ 14, 16.)

> FN3. "Plan–O–Grams" are store diagrams that direct the placement of products in a store. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 23, Dkt. No. 38:1.) According to Anderson, however, because her store did not comport with the standard Plan–O–Gram layout, she relied largely on her own discretion to merchandise approximately fifteen of the store shelves. (*See id.*)

Anderson also performed non-managerial tasks in her role as Store Manager. Specifically, she testified to running the cash register, stocking shelves, facing products on the shelves, helping unload delivery trucks, and cleaning the store.[FN4] (*See* No. 09–cv–360, Anderson SMF Resp., Additional Facts ¶¶ 4, 6, 7, Dkt. No. 46:1.) With respect to the division of her time, Anderson testified to spending at least half of her time on managerial duties. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 26, Dkt. No. 38:1.) Anderson agreed, however, that when she was performing non-managerial tasks, she would continue to monitor and manage the operation of the store. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 27, Dkt. No. 38:1.) Anderson further testified that if Dollar General would have allotted larger labor hour budgets, she would have been able to focus more time on her managerial duties and less on non-managerial tasks. (*See* No. 09–cv–360, Anderson Dep. at 237:11–16, Dkt. No. 38:4.) According to Anderson, the labor budget was allocated such that only two employees, including herself, could typically be working at one time. (*See* No. 09–cv–360, Anderson SMF Resp., Additional Facts ¶¶ 5–7, Dkt. No. 46:1.) Often, then, as Anderson testified, she would stock the shelves, unload a delivery truck, or clean the store while the only other employee working would run the cash register. (*See id.*)

> FN4. In addition to her routine duties, Anderson was also sent to two other Dollar General stores for two days each to set up the stores by setting up shelving and stocking merchandise. (*See* No.

09–cv–360, Anderson SMF Resp., Additional Facts ¶ 19, Dkt. No. 46:1.)

**\*4** In performing her duties as Store Manager, managerial or otherwise, Anderson was expected to act in accordance with Dollar General's standard policies and procedures. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 19, Dkt. No. 38:1.) Those policies and procedures, which were contained in the company's Standard Operating Procedures Manual (SOP), provided direction in how to perform certain store operations. (*See id.*) According to Anderson, however, while the SOP provided general guidance and direction, it did not cover every issue that would arise in the store on a daily basis. (*See id.*)

During her tenure as Store Manager, Anderson reported to DM Bob Seaman. (*See id.* at ¶ 12.) Mr. Seaman, unlike Anderson, did not have an office in or a key to Anderson's store, but would visit the store on a periodic basis. (*See id.*) According to Anderson, Mr. Seaman visited her store approximately once every five to six weeks. (*See id.*) During those visits, which typically lasted one hour, Mr. Seaman would walk through the store with Anderson and provide her with ideas and recommendations for improving the store. (*See id.*) Anderson testified that implementation of these ideas and recommendations was not mandatory, explaining that she used some of Mr. Seaman's suggestions but not others. (*See id.*) Apart from these store visits, it appears from Anderson's testimony that her communications with Mr. Seaman were relatively infrequent. According to Anderson, she spoke with Mr. Seaman on the telephone approximately six times—about once per month—and received a voice mail message from him every four or five weeks. (*See id.*) And with respect to those voice mail messages, Anderson testified that they were typically "district wide" and not specific to Anderson or her store. (*See id.*) Overall, despite Mr. Seaman's oversight, Anderson felt that she was "in charge" of her store, and further testified that Mr. Seaman did not interfere with the performance of her managerial duties. (*See id.* at ¶¶ 13, 17.)

Ultimately, as noted above, Anderson resigned from her employment with Dollar General in November 2002. (*See id.* at ¶ 2.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

### C. *Betty Pulver*

Plaintiff Betty Pulver was hired as a Store Manager for Dollar General in April 2002. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 1, Dkt. No. 27:1.) At the time of her hiring, Pulver understood that she would be responsible for opening and managing a new store in Hudson, New York. (*See id.;* No. 09–cv–363, Pulver Dep. at 45–46, Dkt. No. 27:4.) Prior to opening the Hudson store, however, and for approximately one month after being hired, Pulver worked at the Broadway store in Schenectady, New York, apparently for training purposes. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 2, Dkt. No. 29:1.) Pulver testified, however, that while at the Broadway store, the only training she received related to loading and unloading delivery trucks and stocking shelves. (*See* No. 09–cv–363, Pulver SMF Resp., Additional Facts ¶ 10, Dkt. No. 29:1.) According to Pulver, she received no instruction with respect to following Plan–O–Grams or completing paperwork, and was given no experience running a cash register, making a schedule, or opening or closing the store. (*See id.*) Pulver testified that the Store Manager who was supposed to train her went on vacation a week after she started, leaving no training instructions with the ASM who was left in charge of the store. (*See* No. 09–cv–363, Pulver Dep. at 50–51, Dkt. No. 27:4.)

**\*5** In May 2002, with the opening of the Hudson store behind schedule, Pulver was transferred to open a different store, the State Street store. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 2, Dkt. No. 27:1.) According to Pulver, it wasn't until this transfer that she received training on completing paperwork, scheduling, Plan–O–Grams, etc. (*See* No. 09–cv–363, Pulver Dep. at 53–54, Dkt. No. 27:4.) Anderson testified that this training, which was conducted over the telephone, occurred over the course of one month, but did not specify the frequency or duration of each session. (*See id.*) Ultimately, in July 2002, Pulver was transferred to open the Hudson store, where she remained as Store Manager until her resignation in July 2003. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 2, Dkt. No. 27:1.)

In "opening" the Hudson and State Street stores, Pulver supervised crews of twenty-five employees hired on a temporary basis to assist in setting up the stores. (*See id.* at ¶ 3.) Once the Hudson store was set up and ready to be opened, Pulver made recommendations as to which of the temporary employees should be hired on a permanent basis to staff the store's ASM and "Third Key Clerk" positions. (*See id.*) After the necessary hiring decisions were made and the Hudson Store was opened, Pulver began performing the duties and responsibilities associated with the day-to-day operations of the store. (*See, e.g., id.* at ¶¶ 4, 5, 12.)

Like Anderson, Pulver agreed in deposition that the duties she regularly performed as Store Manager matched those recited in Dollar General's description of the Store Manager position. (*See id.* at ¶ 14.) Those duties, as with Anderson, included managing the Hudson store's labor budget of 160 to 240 labor hours per week; directing and supervising the work of the ASM, Third Key Clerk, and store clerks Pulver supervised; ordering store merchandise; ensuring that merchandise was properly staged and stocked; interviewing and hiring employees; scheduling employees; ensuring the store was appropriately staffed and properly opened and closed each day; ensuring the safety and security of the store and employees; ensuring that all store paperwork was properly completed and forwarded to the Dollar General corporate office; recommending employees for promotion (recommendations that were always accepted); implementing Dollar General directives regarding, among other things, new store policies and procedures, product recalls, and compliance with state and local laws; and training, disciplining, counseling, and, under certain circumstances, firing employees.[FN5] (*See id.* at ¶¶ 4, 5, 12, 13, 15, 21.)

> **FN5.** Pulver had the authority to terminate employees for certain types of misconduct, such as failing to report to work or cash register shortages, without District Manager approval. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 13, Dkt. No. 29:1.) In other situations, however, such as those involving employee performance issues, Pulver was required to seek her District Manager's approval before she could terminate an employee. (*See id.*) According to Pulver, her termination recommendations were always

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

followed. (*See id.*)

In addition to these and similar duties, Pulver testified to also performing non-managerial duties, such as stocking shelves, running the cash register, cleaning the store, and unloading delivery trucks. (*See* No. 09–cv–363, Pulver SMF Resp., Additional Facts ¶ 2, Dkt. No. 29:1.) Like Anderson, Pulver testified to spending at least half of her time on managerial duties. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 26, Dkt. No. 27:1.) She further agreed in deposition that when she was performing nonmanagerial tasks, she was simultaneously managing the store, evaluating employees, and ensuring proper customer service. (*See id.*) And like Anderson, Pulver agreed that Dollar General's limited labor hour budget required her to spend more time on non-managerial tasks than she otherwise would have. (*See* No. 09–cv–363, Pulver Dep. at 287:12–16, Dkt. No. 27:4.)

**\*6** Also like Anderson, Pulver was required to comply with Dollar General SOP, and to follow Dollar General Plan–O–Grams in merchandising her store. (*See id.* at ¶¶ 22, 23.) But also similar to Anderson, Pulver testified that the SOP did not address every situation that could arise in the store on a daily basis, requiring her to exercise discretion in those situations. (*See id.* at ¶ 22.) As to Plan–O–Grams, Pulver testified that because her store did not always comport with the Plan–O–Gram layout, she would exercise discretion in deciding what products to place on approximately ten to twenty percent of the store shelves. (*See id .* at ¶ 23.)

As with all Dollar General Store Managers, Pulver reported to a DM. (*See id.* at ¶ 10.) Similar to Anderson's experience in that regard, Pulver's DM would visit the Hudson store for between one and two hours to review store paperwork and discuss employee performance and ways to improve the store's overall performance. (*See id.*) Pulver recalls only five of these visits occurring during her tenure as Store Manager of the Hudson store, and testified that she rarely spoke to her DM on the telephone and that she could not recall receiving any voice mail messages from him. (*See id.*) Rather, Pulver was responsible for leaving weekly voicemail reports for her DM regarding her store's sales performance. (*See id.*) Like Anderson, Pulver testified that her DM did not interfere with the performance of her managerial duties. (*See id.* at ¶ 16.)

With respect to compensation, Pulver was hired at a salary of $423.00 per week. (*See id.* at ¶ 6.) Beginning in July 2002, however, and continuing until the end of her employment in July 2003, Pulver's weekly salary was $480.00. (*See id.*) Like Anderson, Pulver testified that she understood when she was hired that this weekly salary was to compensate her for all hours worked since she would not be paid for overtime. (*See id.* at ¶ 7.) Pulver testified to working between sixty and seventy hours per week as Store Manager of the Hudson store. (*See* No. 09–cv–363, Pulver SMF Response, Additional Facts, ¶ 1, Dkt. No. 29:1.) During that time, the next highest paid employee in the Hudson store, an ASM, earned $7.00 per hour and worked an average of thirty to thirty-five hours per week. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 8, Dkt. No. 27:1.) In Pulver's view, she was "worth more" than the other store employees because she had more responsibilities, including hiring, firing, interviewing, scheduling, assigning, disciplining, and training employees in her store. (*See id.* at ¶ 9.) According to Pulver, she was "in charge" of her store. (*See id.* at ¶ 11.)

### D. *Procedural Background*

On March 21 and 29, 2004, Pulver and Anderson consented to join numerous other plaintiffs in this collective FLSA action against Dollar General, alleging that Dollar General improperly classified them as exempt from the FLSA's overtime compensation requirement. (*See* No. 09–cv–363, Ex. B, Pulver Consent, Dkt. No. 27:11; No. 09–cv–360, Ex. B, Anderson Consent, Dkt. No. 38:10; No. 09–cv–363, 2d Am. Compl., Dkt. No. 4; No. 09–cv–360, 2d Am. Compl., Dkt. No. 4.) While the collective action was originally filed in the Northern District of Alabama, Pulver and Anderson's claims, among others, were transferred to this court, where jurisdiction and venue is proper. (*See* No. 09–cv–360, Dkt. No. 1; No 09–cv–363, Dkt. No. 1 .)

**\*7** On May 11, 2009, Magistrate Judge Randolph F. Treece consolidated Anderson and Pulver's cases for discovery, pretrial proceedings, and the filing of common summary judgment briefing. In addition, Judge Treece designated Anderson's case, No. 09–cv–360, as the lead case, directing all filings to be made to that docket. (No.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

09–cv–363, Dkt. No. 25.)

Now pending are Dollar General's motions for summary judgment as against each plaintiff and to strike certain evidence offered by plaintiffs in opposition to the summary judgment motions. (*See* No. 09–cv–360, Dkt. Nos. 38, 50; No. 09–cv–363, Dkt. No. 27.)

### III. *Standard of Review*

The standard for the grant of summary judgment is well established and will not be repeated here. For a full discussion of the standard, the court refers the parties to its previous opinion in *Bain v. Town of Argyle,* 499 F.Supp.2d 192, 194–95 (N.D.N.Y.2007).

### IV. *Discussion*

**A.** *Motion to Strike*

Defendants have moved to strike certain evidence offered by plaintiffs in opposition to the current motions. (*See* No. 1:09–cv–360, Dkt. No. 50.) That evidence includes documents relating to a 2004 Dollar General Survey, articles about Dollar General, Dollar General Story Newsletters, and numerous other Dollar General internal documents. Because the court has not relied on this evidence in rendering its decision, Dollar General's motion to strike is denied as moot. And to the extent the motion seeks to preclude this evidence at trial, it is denied as premature.

**B.** *The FLSA Overtime Compensation Requirement*

As noted above, plaintiffs allege that Dollar General deprived them of overtime wages in violation of FLSA's overtime compensation requirement. Dollar General responds that plaintiffs, as Store Managers, were properly classified as "executive" employees and are therefore exempt from the FLSA overtime requirement.

Under the FLSA, an employer must pay overtime to employees working more than forty hours per week. 29 U.S.C. § 207(a)(1). However, individuals "employed in a bona fide executive ... capacity" are exempt from the FLSA's overtime requirements. 29 U.S.C. § 213(a)(1). Congress has not defined what it means to be a "bona fide executive employee," instead delegating that responsibility to the Department of Labor (DOL), which has promulgated a body of clarifying regulations. *See* 29 U.S.C. § 213(a)(7); 29 C.F.R. § 541, *et seq.* Under the

pre–2004 regulations,[FN6] whether an employee qualifies for the executive exemption is a question of law, and is determined based on "different legal tests according to salary level." *Donovan v. Burger King Corp.,* 675 F.2d 516, 518 (2d Cir.1982) (citation omitted). Salaried employees earning more than $250 per week, like plaintiffs here, must satisfy the so-called "short test" to qualify for the exemption. *Id.* (citing 29 C.F.R. § 541.1(f)). To satisfy this test, the employee must be one who regularly directs the work of two or more other employees, and whose "primary duty" is management. *Id.*

> FN6. Effective August 23, 2004, the DOL regulations defining the executive exemption were amended. *See* 69 Fed.Reg. 22,122 (Apr. 23, 2004). Because the relevant employment of each plaintiff in this case terminated before the effective date of these amendments, the court agrees with Dollar General—and plaintiffs do not appear to dispute—that the pre–2004 regulations should be applied to plaintiffs' claims. *See, e.g., Clougher v. Home Depot U.S.A., Inc.,* 696 F.Supp.2d 285, 290 n. 6 (E.D.N.Y.2010) (applying pre–2004 regulations to pay periods predating amendment and amended regulations to pay periods postdating amendment); *Baden–Winterwood v. Life Time Fitness, Inc.* 566 F.3d 618, 629 (6th Cir.2009) (same); *Slusser v. Vantage Builders, Inc.,* 576 F.Supp.2d 1207, 1215 n. 4 (D.N.M.2008) ("The revised FLSA regulations adopted ... in August of 2004 do not apply retroactively.").

**\*8** In this case, there is no dispute that Anderson and Pulver regularly directed the work of two or more employees. (*See* No. 09–cv–360, Allen Aff., Ex. 1, Joint Stipulations of Fact ¶ 4, Dkt. No. 41:1; No. 09–cv–360, Pls. Common Response Br., Dkt. No. 44 (focusing solely on issue of primary duty).) Rather, the only issue in dispute is whether Anderson and Pulver's primary duty as Dollar General Store Managers was management.

Whether an employee's primary duty is management under the regulations is determined based on the following five factors:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

(1) time spent in the performance of managerial duties; (2) relative importance of managerial and non-managerial duties; (3) the frequency with which the employee exercises discretionary powers; (4) the employee's relative freedom from supervision; and (5) the relationship between the employee's salary and the wages paid employees doing similar non-exempt work.

*Donovan,* 675 F.2d at 521 (citing 29 C.F.R. § 541.103). Thus, the primary duty inquiry is "necessarily fact-intensive." *Rodriguez v. Farm Stores Grocery, Inc.,* 518 F.3d 1259, 1264 (11th Cir.2008); *see* 29 C.F.R. § 541.103 (2002) ("[The] determination of whether an employee has management as his primary duty must be based on all the facts in a particular case."). And given this "deeply factual ... inquiry ... courts are often reluctant to grant summary judgment based on the executive exemption ." *Indergit v. Rite Aid Corp.,* Nos. 08 Civ. 9361 & 08 Civ. 11364, 2010 WL 1327242, at *7 (S.D.N.Y. Mar. 31, 2010). Further, in examining the primary duty factors, courts must be mindful that "[the executive] exemption must be narrowly construed," and that "[t]he employer has the burden of proving that the employee clearly falls within [its] terms." *Young v. Cooper Cameron Corp.,* 586 F.3d 201, 204 (2d Cir.2009) (citations and internal quotation marks omitted).

**1. Time Spent on Managerial Activities**

As to the first factor, the court must consider the amount of time Anderson and Pulver spent on managerial duties. " 'In the ordinary case[,] it may be taken as a good rule of thumb that ... an employee who spends over 50 percent of [her] time in management would have management as [her] primary duty.' " *Donovan,* 675 F.2d at 520 n. 5 (quoting 29 C.F.R. § 541.03). " 'Time alone, however, is not the sole test.' " *Id.* (quoting 29 C.F.R. § 541.03). Where an employee " 'does not spend over 50 percent of [her] time in managerial duties, [she] might nevertheless have management as [her] primary duty if the other pertinent [factors] support such a conclusion.' " *Id.* (quoting 29 C.F.R. § 541.03). In general, however, how an employee spends her time working is a question of fact for a jury. *Icicle Seafoods, Inc. v.. Worthington,* 475 U.S. 709, 714 (1986).

Here, Dollar General argues that plaintiffs' deposition testimony should "end the legal analysis in its favor"

because it conclusively demonstrates that plaintiffs' spent more than half of their time on managerial activities. The court disagrees. As to Anderson, Dollar General points to the following exchange:

**\*9** Q: .... When you're just performing management type duties, would you say that would be half of the time?

A: At least.

Q: Okay. So over half?

A: Yes

(No. 09–cv–360, Anderson Dep. at 211:7–12, Dkt. No. 38:4.) However, when later asked how much time she spent on non-managerial duties, Anderson responded, "[e]asily half the day," arguably implying that she may have spent more than half the day on those duties. (*Id.* at 242:5–12.) Following this response, the following exchange ensued:

Q: You're not changing your testimony that you spent more time performing managerial duties than you did nonmanagerial duties, are you?
A: No, I don't think so.

(*Id.* at 242:22–25.) Pointing to this latter exchange, Dollar General dismisses Anderson's contention that she spent "half of her day" on managerial duties, arguing that Anderson's "testimony is unequivocal that she spent more time performing managerial duties than non-managerial duties." (No. 09–cv–360, Def.Resp.(Anderson), at 4–5; Dkt. No. 52.)

Having reviewed the deposition transcript, and construing all reasonable inferences in Anderson's favor, the court is not persuaded that Anderson's testimony compels summary judgment. Specifically, given Anderson's arguably inconsistent responses, her less than definitive "clarification" of those responses, and the fact that her testimony was based upon what appear to be rough estimations of the time she spent on certain duties, the court is not satisfied that Anderson's testimony is conclusively unequivocal.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

The same is true with respect to Pulver. As to her testimony, Dollar General points to the following exchange as unequivocal proof that she spent more than half her time on managerial activities:

Q: ... So you spent more than 50 percent of your time on managerial work before you even think about what you did when you were doing the nonmanagerial work and you were still supervising and operating the store, but just out and out managerial work, you spent more than have your time on it didn't you?

A: Sitting down and thinking about it all, yes, maybe at the time I didn't feel like I was doing, you know. But sitting down here and talking and thinking about it, yes.

(No. 09–cv–363, Pulver Dep. at 252:24–25, 253:2–10, Dkt. No. 27:4.) As with Anderson's testimony, however, additional portions of Pulver's testimony weigh against characterizing this exchange as an unequivocal admission. For example, when the "time spent" issue first arose, Pulver testified as follows:

Q: And if we were trying to get a handle on how much time you spent on the non-managerial duties, stocking, cleaning, waiting on customers, running a cash register, cleaning up, those would be less than half of the time?
A: I wanna say no because a lot of paperwork I took home and did on my own time. The scheduling did home, on my own time. I did a lot of stocking and—

Q: I'm not saying you didn't do a lot of stocking.

**\*10** A: But I spent as much time—I want to say as much time doing both. I mean, I was constantly on the floor helping and stocking.

Q: So you would say about 50/50 doing management/nonmanagement?

A: Yes.

(*Id.* at 247:13–25, 248:2–5.) Again, having construed all reasonable inferences in Pulver's favor in light of this arguably inconsistent testimony, the court disagrees with Dollar General that it is entitled to summary judgment on the time spent issue with respect to Pulver. Accordingly, Dollar General's motions for summary judgement as to both Anderson and Pulver are denied insofar as they seek dismissal based on the time spent issue.

**2. Relative Importance of Managerial and Non–Managerial Duties**

This finding, however, does not end the primary duty inquiry. As noted above, "time alone is not the sole test," and the court must proceed to an examination of the second factor—the relative importance of managerial and non-managerial duties. This factor evaluates which of plaintiffs' duties—managerial or non-managerial—were more important to the employer. *See Donovan,* 675 F.2d at 521. In gauging this relative importance, "many courts look to[, among other things,] a manager's training, evaluation, and factors affecting eligibility for bonuses and pay raises." *Mayne–Harrison v. Dolgencorp, Inc.,* No. 1:09–CV–42, 2010 WL 3717604, at \*20 (N.D.W.Va. Sept. 17, 2010) (citing examples). As many courts have recognized, however, resolving this "difficult and intensive factual inquiry" is generally "inappropriate at summary judgment." *Indergit,* 2010 WL 1327242, at \*6 (collecting cases).

Here, in arguing that plaintiffs' managerial duties were most important to it, Dollar General points primarily to the Store Manager job description, which lists the variety of essential job functions that are managerial in nature; plaintiffs' compensation structure, which provides for higher weekly earnings and store-performance-based bonuses; and the fact that Store Managers were evaluated on the basis of management-focused criteria.

In response, plaintiffs point to, among other things, the fact that the Store Manager job description explicitly contemplates the frequent performance of manual labor; that plaintiffs' received very little training in preparation for their role as Store Manager; that plaintiffs' weekly pay, when accounting for the number of hours worked, was comparable to other employees; and that Dollar General's restrictive labor budget forced plaintiffs to perform more non-managerial tasks than they otherwise would have. Based primarily on these facts, plaintiffs argue that a reasonable jury could find that their non-managerial duties were more important to Dollar General than their managerial duties.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

Undoubtedly, each of the facts cited by Dollar General offers support for the conclusion that it placed significant value on the plaintiffs' performance of managerial duties. Moreover, the court is not persuaded based on plaintiffs' submissions that the second factor should conclusively weigh in their favor. Nonetheless, the court does agree with plaintiffs that summary judgment on this issue, as in most cases, is not warranted here.

**\*11** As to training, for example, plaintiffs' testimony calls into question the nature and amount of critical management training plaintiffs actually received. As other courts have recognized, the extent to which an employer trains its managers is relevant in determining the value that employer places on managerial duties. *See, e.g., In re Dollar General Stores FLSA Litigation,* Nos. 5:09–MD–1500–JG, 4:09–CV–57–BR, 4:09–CV–58–BR, 2011 WL 197804, at \*10 (E.D.N.C. Jan. 19, 2011) (finding that plaintiff's "value to Dollar General [was] shown by the fact that, unlike the other employees in her store, she went through four weeks of training before she was assigned her own store"). In this case, Anderson testified to receiving no additional training when promoted to Store Manager, and Pulver testified that the brunt of her managerial training occurred over the phone. When viewed in a light most favorable to plaintiffs, these facts cut against a finding in favor of Dollar General.

Similarly, with respect to the Store Manager job description, while Dollar General is correct that it lists numerous managerial functions as "essential," the accuracy of that label is at least somewhat lessened in light of both the limited managerial training plaintiffs appear to have received and the fact that the job description also explicitly contemplates the frequent performance of manual labor.

And most significantly in the court's view is the restrictiveness with which Dollar General appears to allot its labor budget. As noted above, both plaintiffs testified that Dollar General's limited labor budget forced them to spend more time on non-managerial duties than they otherwise would have. (*See* No. 09–cv–360, Anderson Dep. at 237:11–16, Dkt. No. 38:4; No. 09–cv–363, Pulver Dep. at 287:12–16, Dkt. No. 27:4.) As Anderson

explained, the labor budget operated such that she could typically only schedule herself and one additional employee to be in the store at one time, often requiring her to perform non-managerial tasks such as stocking and cleaning. (No. 09–cv–360, Anderson Dep. at 236–37, 238–40, Dkt. No. 38:4.) Pulver testified to operating under similar constraints, explaining that "[w]e all complained about not getting enough hours, every store manager did." (No. 09–cv–363, Pulver Dep. at 161, Dkt. No. 27:4.) Pulver further testified that she "wasn't getting the help she needed" with, among other things, "[h]iring certain employees for key positions," which "put more pressure on [her] to open and close stores everyday, rearrange [her] schedule to open and leave and then come back and leave." (*Id.* at 160–61.) Given this testimony, the court is unable to definitively conclude, especially in light of other record evidence, that no reasonable jury could find that Dollar General more highly valued plaintiffs' non-managerial duties. *See, e.g., Pierce v. Dolgencorp, Inc.,* Nos. 3:09cv079 & 4:09cv097, 2011 WL 398366, at \*9 (M.D.Pa. Feb. 3, 2011) (denying summary judgment and holding that a reasonable jury could plausibly conclude that plaintiff's managerial duties were less highly valued where employer limited employee's ability to perform managerial tasks by failing to allot more labor hours); *Plaunt v. Dolgencorp, Inc.,* Nos. 3:09cv079 & 1:09cv084, 2010 WL 5158620, at \*8 (M.D.Pa. Dec. 14, 2010) (same).

**\*12** On balance, then, having considered the parties' competing arguments and reviewed the record evidence in a light most favorable to plaintiffs, the court is not convinced that Dollar General has conclusively demonstrated an entitlement to summary judgement with respect to the second factor.

### 3. Relationship Between Salary and Other Employee Wages[FN7]

> FN7. Ordinarily, the court would next turn to an examination of the third and fourth factors—the frequency with which discretion was exercised and freedom from supervision. In this case, however, because the court discerns questions of fact with respect to the fifth factor—the relationship between plaintiffs' salary and other employees' wages—the court need not do so, for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

even if the third and fourth factors were found to decidedly weigh in Dollar General's favor, Dollar General's failure to conclusively establish the fifth, in light of the court's findings above, weighs heavily against summary judgment.

The fifth factor in the primary duty analysis compares an employee's salary to the wages of non-exempt employees performing similar work. In this case, the parties agree that the relevant comparison is between plaintiffs and their respective ASMs, each of whom, at all relevant times, earned $7.00 per hour.

Dollar General argues that this factor weighs conclusively in its favor because plaintiffs earned significantly more than their ASMs. In drawing that conclusion, Dollar General compares plaintiffs' weekly salaries with the weekly earning potential of their respective ASMs. With respect to Anderson, for example, Dollar General compares her $425.00 weekly salary to her ASM's potential weekly earnings of $280.00, and concludes that "Anderson's weekly salary was at least 151 % of the weekly earnings of her next highest paid employee." (No. 1:09–cv–360, Def. Mem. of Law (Anderson) at 14, Dkt. No. 38:2.) Dollar General also highlights the fact that "Anderson was eligible for up to $10,000 per year in bonuses based upon her store's performance, where her ASM was eligible only for up to $3,000 in bonuses." (Id.)

As to Pulver, Dollar General relies on the same calculation, comparing Pulver's weekly salary—which ranged from $423.00 to $480.00—to her ASM's potential weekly earnings of $280.00, and finding Pulver's salary to be 151% to 171% of those earnings. (No. 1:09–cv–363, Def. Mem. of Law (Pulver) at 13, Dkt. No. 27:2.)

Plaintiffs counter that their salaries were not significantly higher than their ASMs' potential wages when considering the amount of hours they worked. As to Anderson, for instance, she testified to working an average of fifty hours per week as a Store Manager. When dividing her $425.00 weekly salary, she contends, her effective hourly rate would have been $8.50 an hour, only $1.50 more per hour than her ASM. (See No. 1:09–cv–360, Anderson Mem. of Law at 11, Dkt. No. 46.)

Converting Pulver's weekly salary to an hourly rate produces similar results. As noted above, Pulver earned $425.00 per week in the beginning of her employment, and later earned $480.00 per week. Thus, when considering Pulver's testimony that she worked an average of sixty to sixty-five hours a week, her effective hourly rate was between $6.51 and $7.08 initially, and between $7.38 and $8 .00 once her salary increased. (See No. 1:09–cv–363, Pulver Mem. of Law at 11, Dkt. No. 29.) Based on these figures, Pulver argues, the gap in earnings between her and her ASM is not so significant as to compel summary judgment on this issue. (Id. at 11–12.)

As the parties' submissions reflect, there is some divergence of opinion with respect to which of these methods of calculation and comparison is the "correct" one. Compare, e.g., Moore v. Tractor Supply Co., 352 F.Supp.2d 1268, 1279 (S.D.Fla.2004) (declining to reduce salary to hourly rate), with Johnson v. Big Lots Stores, Inc., 604 F.Supp.2d 903, 918 (E.D.La.2009) (finding hourly rate analysis both relevant and appropriate to proper executive exemption determination). To the limited extent that courts in this Circuit have addressed the issue, however, they have not foreclosed use of the method espoused by plaintiffs, suggesting that the hours worked by an employee can be taken into account. See Donovan, 675 F.2d at 522 (finding that "[a]ssistant [m]anagers earning $250 or more were paid substantially higher wages even taking their longer hours into account" (emphasis added)); Clougher v. Home Depot U.S.A., Inc., 696 F.Supp.2d 285, 293 (E . D.N.Y.2010) (2010) ("[T]here is nothing in the record to render [plaintiff's] counter-argument implausible; namely, that his hourly pay rate, where properly calculated, is substantially less than comparable hourly-wage supervisors.... Given the potential import of an hourly-wage analysis, this Court is compelled to reject [defendant's] all too pat concern for the burdens of engaging in such 'mathematical gymnastics.' " (citations omitted)).

**\*13** This court likewise declines to reject plaintiffs' hourly rate conversion. In the court's view, converting plaintiffs' weekly salary into an approximate hourly wage is an appropriate way of finding a common basis with which to compare the wages paid to others. As one court

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

reasoned, "[t]o ignore the fact that [a plaintiff] worked more than forty hours per week would largely frustrate the purpose of this inquiry: to determine whether the employer sought to subvert the FLSA by attaching an overtime exemption to an employee who otherwise performs the same non-exempt tasks as hourly employees." *Plaint,* 2010 WL 5158620, at *13 ("Without some standard unit, there can be no useful comparison in this already-amorphous inquiry."). The persuasiveness of this reasoning is enhanced, in the court's view, when considering the overarching principle that "[e]xemptions from the FLSA are to be narrowly construed against the employer, and [it is] the employer [that] has the burden of establishing an exemption." *Pignataro v. Port Auth. of N.Y. & N.J.,* 593 F.3d 265, 268 (3d Cir.2010); *Young,* 586 F.3d at 204.

Thus, in viewing the wage and salary evidence in a light most favorable to plaintiffs—i.e., in accordance with the hourly-rate conversion—the court finds that the question of whether the difference in plaintiffs' salary was so significant as to justify their exemption is one more properly left to a jury. *See Morgan v. Family Dollar Stores, Inc.,* 551 F.3d 1233, 1271 (11th Cir.2008) (finding that "[g]iven the relatively small difference between the store managers' and assistant managers' hourly rates[—two or three dollars—] it was within the jury's province to conclude that this factor either did not weigh in [defendant's] favor or at least did not outweigh the other factors in Plaintiffs' favor").

And finally, with respect to Anderson, while having considered that she was, in addition to her salary, eligible for a larger bonus than was her ASM, the court is not convinced that that fact compels a contrary result. While a jury could find that this eligibility differential, in light of Anderson's higher salary, renders her compensation significant enough to justify the exemption, it could similarly find that her compensation, including the bonus eligibility, fails to meet that threshold. *See Clougher,* 696 F.Supp.2d at 293 ("[D]isparate compensation, even where it includes performance bonuses, stock options, and other tokens of executive employment, has never been held strictly dispositive." (citing, inter alia, *Johnson,* 604 F.Supp.2d at 904 (finding fact that bonuses paid to exempt workers is not strictly dispositve)).) Thus, Anderson's

bonus eligibility, while relevant, does not, in the court's view, conclusively tip the scales in favor of summary judgment.

Accordingly, having failed to demonstrate that the fifth factor weighs definitively in its favor, and in light of the court's findings with respect to the first and second factors, Dollar General's motions for summary judgment as to the primary duty issue are denied.

**C.** *Liquidated Damages*

**\*14** Finally, Dollar General claims it is entitled to summary judgment on plaintiffs' claims for liquidated damages because it acted in good faith in classifying plaintiffs as exempt employees. (*See* No. 09–cv–360, Def. Common Br., at 26, Dkt. No. 40.) At this juncture, the court declines to rule on this issue and denies Dollar General's motion with leave to renew at a later stage of the litigation.

**V.** *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Dollar General's motion to strike certain evidence (No. 09–cv–360, Dkt. No. 50) is **DENIED;** and it is further

**ORDERED** that Dollar General's motions for summary judgment as against Janet Anderson (No. 09–cv–360, Dkt. No. 38) and Betty Pulver (No. 09–cv–363, Dkt. No. 27) are **DENIED;** and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Anderson v. Dolgencorp of New York, Inc.
Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

*1 Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681 *et seq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See, e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL 903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,* 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

## BACKGROUND

**\*2** Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. [FN2] The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

**\*3** Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.](#) Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See *Torres v. Pisano,* 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see *Norton v. Sam's Club,* 145 F.3d 114, 117-20 (2d Cir.), *cert. denied,* 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer,* 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing *Cannon v. University of Chicago,* 441 U .S. 677 (1979) and *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See *Davis,* 119 S.Ct. at 1675 (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986), a Title VII case). *Accord* *Kracunas v. Iona College,* 119 F.3d 80, 87 (2d Cir.1997); *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by *Gebser,* 118 S.Ct. at 1999.

FN5. In *Gebser,* 118 S.Ct. at 1999, and *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See,e.g., *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional teasing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.AccordKotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. See*Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. See*Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' " are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. See*Davis,* 119 S.Ct. at 1671;*Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation." Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murrel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and

refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Anthony ROBINSON, Plaintiff,

v.

Jane DELGADO, Hearing Officer and Lieutenant; and Donald Selsky, Director of Inmate Special Housing Program, Defendants.

No. 96-CV-169 (RSP/DNH).

May 22, 1998.

Anthony Robinson, Veterans Shelter, Brooklyn, for Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Attorney for Defendants, Albany, Ellen Lacy Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

**\*1** Anthony Robinson, a former inmate incarcerated by the New York State Department of Corrections ("DOCS"), sued two DOCS employees, alleging that they violated his right to due process in the course of a disciplinary proceeding and subsequent appeal. On September 9, 1997, defendants moved for summary judgment. Defendants argued that plaintiff failed to demonstrate that the fifty days of keeplock confinement that he received as a result of the hearing deprived him of a liberty interest within the meaning of the Due Process Clause. Plaintiff did not oppose the summary judgment motion, and Magistrate Judge David N. Hurd recommended that I grant it in a report-recommendation filed April 16, 1998. Plaintiff did not file objections.

Because plaintiff did not file objections, I "need only satisfy [myself] that there is no clear error on the face of the record in order to accept the recommendation." Fed.R.Civ.P. 72(b) advisory committee's note. After reviewing the record, I conclude that there is no clear error on the face of the record. After being warned by defendants' motion that he must offer proof in admissible form that his disciplinary confinement imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," Robinson failed to offer any such proof. *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995). Consequently, he cannot maintain a due process challenge. *Id.* Therefore, it is

ORDERED that the report-recommendation is approved; and it is further

ORDERED that defendants' motion for summary judgment is granted and the complaint dismissed; and it is further

ORDERED that the Clerk of the Court serve a copy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

of this order on the parties by ordinary mail.

HURD, Magistrate J.

REPORT-RECOMMENDATION

The above civil rights action has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, pursuant to the local rules of the Northern District of New York. The plaintiff commenced the above action pursuant to 42 U.S.C. § 1983 claiming that the defendants violated his Fifth, Eighth, and Fourteenth Amendment rights under the United States Constitution. The plaintiff seeks compensatory and punitive damages.

Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. However:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

*2 The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))


N.D.N.Y.,1998.

Robinson v. Delgado

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)


END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Valery LATOUCHE, Plaintiff,
v.
Michael C. TOMPKINS, C.O., Clinton Correctional
Facility; Dean E. Laclair, C.O., Clinton Correctional
Facility; Jeffrey R. Ludwig, C.O ., Clinton Correctional
Facility; Michael B. King, Sgt., Clinton Correctional
Facility; D. Mason, C.O., Clinton Correctional Facility;
B. Malark, C.O., Clinton Correctional Facility; John
Reyell, C.O., Clinton Correctional Facility; Bob
Fitzgerald, R.N., Clinton Correctional Facility; John
Doe, C.O. (C.O. Gallery Officer Company Upper F–6);
John Doe, C.O. (Mess Hall Supervising C.O.),
Defendants.
No. 9:09–CV–308 (NAM/RFT).

March 23, 2011.
Valery LaTouche, Ossining, NY, pro se.

Eric T. Schneiderman, Attorney General for the State of
New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

NORMAN A. MORDUE, Chief Judge.

**INTRODUCTION**

**\*1** In this *pro se* action under 42 U.S.C. § 1983,
plaintiff, an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), claims
that defendants violated his Eighth Amendment rights as
a result of a physical altercation. Defendants moved for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure (Dkt. No. 46) and plaintiff
opposed the motion. (Dkt. No. 53). The motions were
referred to United States District Magistrate Judge Randolph F.
Treece for a Report and Recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

Magistrate Judge Treece issued a Report and
Recommendation (Dkt. No. 60) recommending that
defendants' motion be granted in part and denied in part.
Specifically, Magistrate Judge Treece recommended
awarding summary judgment dismissing the following: (1)
plaintiff's claims for monetary relief against all defendants
in their official capacity; (2) plaintiff's claims of medical
indifference against defendant Fitzgerald; and (3)
plaintiff's allegations of verbal harassment by defendant
Mason. Magistrate Judge Treece also recommended
denying defendants' motion for summary judgment on
plaintiff's excessive force claims against defendants
Tompkins, LaClair, Mason, Malark and Reyell and
plaintiff's failure to protect claims against defendants
Ludwig and King.

Defendants filed specific objections to portions of the
Report and Recommendation arguing: (1) that the
Magistrate Judge erred in "overlooking" plaintiff's failure
to comply with Local Rule 7.1(a) (3); (2) that the
Magistrate Judge erred when he failed to apply the
*Jeffreys* exception as plaintiff's testimony was incredible
as a matter of law; and (3) plaintiff's excessive force
claims against defendant Reyell are subject to dismissal
for lack of personal involvement. (Dkt. No. 61). Plaintiff
does not object to the Report and Recommendation. (Dkt.
No. 62).

In view of defendants' objections, pursuant to 28
U.S.C. § 636(b) (1)(c), this Court conducts a *de novo*
review of these issues. The Court reviews the remaining
portions of the Report–Recommendation for clear error or
manifest injustice. *See Brown v. Peters,* 1997 WL 599355,
*2–3 (N.D.N.Y.),* af'd without op., 175 F.3d 1007 (2d
Cir.1999); *see also Batista v. Walker,* 1995 WL 453299,
at *1 (S.D.N.Y.1995) (when a party makes no objection to
a portion of the report-recommendation, the Court reviews
that portion for clear error or manifest injustice). Failure
to object to any portion of a report and recommendation
waives further judicial review of the matters therein. *See
Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

**DISCUSSION**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

## I. Local Rule 7.1(a)(3)

The submissions of *pro se* litigants are to be liberally construed. *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579, 583 (S.D.N.Y.2008). However, a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment. *Id.* (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)). [FN1]

> FN1. Local Rule 7.1(a)(3) provides:
>
> Summary Judgment Motions
>
> Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*
>
> The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.
>
> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*
>
> Local Rule 7.1(a)(3) (emphasis in original).

**\*2** The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for summary judgment. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

Q. ... Have you read the complaint?

A. Yes, ma'am.

Q. So, you are aware of its contents?

A. Yes, ma'am.

Q. Did anyone help you prepare the complaint?

A. No, ma'am.

Q. Are there any statements contained in the complaint that you now wish to change or modify?

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

A. I'm not sure.

Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a summary judgment motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint as an affidavit. *See Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local Rule 7.1(a)(3), his opposition to defendants' motion contains sworn testimony. In light of his *pro se* status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See Mack v. U.S.,* 814 F.2d 120, 124 (2d Cir.1987); *see also Liggins v. Parker,* 2007 WL 2815630, at *8 (N.D.N.Y.2007) (citing *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)). The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties.[FN2]

> FN2. While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

## II. *Jeffreys* Exception

Defendants argue that the Court should apply *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) and award summary judgment dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

**\*3** "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment' ". *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for summary judgment")). A narrow exception to this general rule was created by the Second Circuit in *Jeffreys:*

> While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

> *Id.* at 554 (internal citations and citations omitted).

Here, while plaintiff relies exclusively on his own testimony, for *Jeffreys* to apply, the testimony must also be "contradictory and incomplete". In this regard, defendants argue that plaintiff's allegations are contradicted by his prior accounts of the incident. Defendants cite to the record and argue that plaintiff told Fitzgerald that, "I hit the officer first" and that "I was hurt when I was subdued". Moreover, defendants point out that these statements were documented in an Inmate Injury Report executed by plaintiff.

Plaintiff does not deny making the aforementioned statements. However, in his deposition, plaintiff explained

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

those discrepancies and testified:

Q. —did Nurse Fitzgerald ask you any questions while he was examining you?

A. I think he asked me how am I feeling, how did this happen?

Q. And what did you say?

A. I told him I was nervous and that [sic] whatever officer D. Mason told me to tell him.

Q. What did you say?

A. I told him I was nervous and whatever officer D. Mason told me to tell him, which was that I got hurt being subdued—

Q. Which was—

A. —and that I started this.

Q. And is that the truth?

A. No.

Q. Why did you tell the nurse that?

A. Because I was being forced to.

Q. Forced to how?

A. By the officers that [sic] was there.

Q. Did you sign a form admitting that you hit the officer first and you were hurt when you were subdued?

A. Yes, ma'am.

Q. Why did you do that?

A. Because the [sic] officer D. Mason kept smacking me for me to do that.

Transcript of Plaintiff's Deposition at 53–54.

*4 In the Report and Recommendation, Magistrate Judge Treece concluded that plaintiff's "fear of retribution" was a plausible explanation for the discrepancies in his testimony. This Court agrees and adopts the Magistrate Judge's conclusions. *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112–13 (2d Cir.1998); *see also Cruz v. Church,* 2008 WL 4891165, at *5 (N.D.N.Y.2008) ("[t]he Court notes that ... it would be have difficulty concluding that [the][p]laintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which individuals participated in the attack; that plaintiff's injuries are consistent with the brief use of force as described by defendants to subdue plaintiff; and that plaintiff's version is contradicted by defendants' affidavits. Magistrate Judge Treece found that plaintiff was able to identify some individuals involved in the assault which, "stands in stark contrast to the plaintiff in *Jeffreys* who was unable to identify any of the officers involved in the alleged assault". Upon review of the record, as it presently exists, the Court agrees and finds that plaintiff's testimony is not wholly conclusory or entirely inconsistent to warrant application of the *Jeffreys* exception. *See Percinthe v. Julien,* 2009 WL 2223070, at *7 (S.D.N.Y.2009) (the court rejected the defendants' argument that the plaintiff's claims were subject to dismissal for implausibility as his injuries did not reflect the attack that he described and his description of the incident changed over time holding that the plaintiff's testimony, "[did] not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of the record and applicable law and found that the evidence did not support deviating from the established rule that issues of credibility are not resolved on summary judgment. On review, the Court agrees with the Magistrate's recommendations and concludes that the *Jeffreys* exception does not apply. Accordingly, the Court accepts and adopts the Report and Recommendation on this issue.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

### III. Reyell's Personal Involvement

Defendants argue that the Magistrate Judge erred when he failed to dismiss the complaint against Reyell on the grounds that he was not personally involved in the attack. Defendants claim that the "RRO erroneously cites plaintiff's declaration as stating that 'it was defendant Reyell and another officer who removed the shirt' ". Defendants claim that the declaration and complaint clearly state that, "Officer Rock orchestrated the removal of plaintiff's shirt".[FN3] Defendants argue that the assertions in plaintiff's declaration (submitted in response to the motion for summary judgment) and complaint are contradicted by plaintiff's deposition testimony. Defendants claim that plaintiff testified that Reyell tried to cover up the incident by removing the shirt he was wearing.

> FN3. Officer Rock is not a defendant herein.

**\*5** The Court has reviewed plaintiff's complaint, declaration and deposition transcript and finds defendants' summary of plaintiff's assertions to be inaccurate. In plaintiff's complaint, on page 8, plaintiff alleges:

> Feeling extremely weak the claimant responded with a shake of his head. Once this performance was over with Correctional Officer R. Rock, the individual who held on to the photograph camera and who is responsible for capturing the claimant's injuries [sic] photos pointed to the claimant's bloodly [sic] stain kitchen white colored uniform [ ] as co-workers....

> Correctional Officer D. Mason then roughly removed the article of clothing and with the help of on[e] other they discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

> Officer Rock, the individual who held the photograph camera and was responsible for capturing LaTouche injuries pointed to LaTouche [sic] bloody kitchen white colored uniform to his coworker asking them to remove the article of clothing before he take [sic] any pictures. Mason then roughly removed the clothing and with the help of an other [sic] officer they discarded the items of

clothing.

In his deposition, plaintiff testified:

Q. What about Defendant Reyell, why are you suing Reyell?

A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.

Q. How so?

A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.

\* \* \*

Q. Reyell and another officer took your shirt off?

A. Yes, ma'am.

Q. Do you remember the other officer's name?

A. No, ma'am.

Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

> [T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

**\*6** Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may ultimately lead a jury to reject his testimony, they are not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of summary judgment. Accordingly, the Court adopts the Magistrate's recommendation and denies summary judgment on this issue.

## CONCLUSION

It is therefore

**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for summary judgment is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Latouche v. Tompkins
Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

C  Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,<sup>FN1</sup> Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff <sup>FN2</sup> as
defendants.<sup>FN3</sup> On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski,* 430 F.3d 560, 562 (2d
Cir.2005)(deeming *pro* se prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

### (3)

### NCCF's Inmate Grievance Procedure

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

*3 The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

> **FN7.** The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

> **FN8.** Hargrove has not argued that he was unaware of this five-day deadline.

> **FN9.** There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

(4)

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest argument, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth*, 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford*, 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero*, 467 F.3d at 176 (citing *Woodford*, 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock*, 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero*, 467 F.3d at 176 (quoting *Woodford*, 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero*, 467 F.3d at 176 (citing *Woodford*, 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams*, 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca*, No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

**\*7** Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero*, 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford*, 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams,* 418 F.Supp.2d at 101 (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

*\*8* Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at *8-11;Sloane,* 2006 WL 3096031, at *4;Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, see *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14] *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs'. Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

### c. Special circumstances

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " _Hemphill,_ 380 F.3d at 688 (quoting _Giano,_ 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." _Giano,_ 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. _See Sloane,_ 2006 WL 3096031, at *8; _Freeman v. Goord,_ No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

### (5)

### Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." _Woodford,_ 126 S.Ct. at 2385. _See also Ruggiero,_ 467 F.3d at 178 (citing _Porter,_ 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. _Berry v. Kerik,_ 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." _Berry,_ 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. _Berry,_ 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. _Shangold v. The Walt Disney Co.,_ No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing _Chambers v. NASCO, Inc.,_ 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." _Gleason v. Jandrucko,_ 860 F.2d 556, 559 (2d Cir.1988); _McMunn v. Mem'l Sloan-Kettering Cancer Center,_ 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn*, 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold*, 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn*, 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer*, 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn*, 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold*, 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic*, 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn*, 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

## Conclusion

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 [key] 1395(7)

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of

1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff,[FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

> FN3. The amended complaint reads as follows:
>
> That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).

> FN4. Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, also dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

> FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996.FN6 On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

> FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See,* Toliver v. County of Sullivan, 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prisoner officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g., Forster v. Bigger,* 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

**\*4** In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y.Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

**\*5** Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))



**C**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Roger SULTON, Plaintiff,
v.
Charles GREINER, Superintendent of Sing Sing Corr.
Fac., Doctor Halko & P.A. Williams of Sing Sing Corr.
Fac. Medical Department, Doctor Lofton, Defendants.
**No. 00 Civ. 0727(RWS).**

Dec. 11, 2000.

Roger Sulton, Wende Correctional Facility, Alden, NY,
Plaintiff, pro se.

Honorable Eliot Spitzer, Attorney General of the State of
New York, New York, NY, By: S. Kenneth Jones,
Assistant Attorney General, for Defendants, of counsel.

*OPINION*

SWEET, J.

**\*1** Defendants Charles Greiner ("Greiner"), past
Superintendent of Sing Sing Correctional Facility ("Sing
Sing") and Dr. Nikulas Halko, ("Halko"), P.A. Williams
("Williams"), and Dr. Lofton ("Lofton"), all of the Sing
Sing Medical Department, (collectively, the
"Defendants"), have moved to dismiss the amended
complaint of *pro se* inmate Roger Sulton ("Sulton"),
pursuant to Fed.R.Civ.P. 12(b)(6) and 12(h)(2) for failure
to exhaust administrative remedies. For the reasons set
forth below, the motion will be granted.

*Prior Proceedings*

Sulton filed the complaint in this action on February 2,
2000, asserting a claim against the Defendants under
Section 1983 for alleged violation of his constitutional
rights under the Eighth Amendment for acting with
deliberate indifference to his serious medical needs.
Sulton filed an amended complaint on May 3, 2000, to
identify additional defendants to his suit. Additionally,
Sulton alleges negligent malpractice by the Sing Sing
medical staff. Sulton seeks monetary damages. The instant
motion was filed on August 9, 2000, and was marked fully
submitted on September 6, 2000.

*Facts*

The Defendants' motion comes in the posture of a motion
to dismiss for failure to state a claim, pursuant to Federal
Rule of Civil Procedure 12(b)(6). However, both the
Defendants and Sulton have submitted materials outside
the pleadings. Where a District Court is provided with
materials outside the pleadings in the context of a 12(b)(6)
motion to dismiss, it has two options: the court may
exclude the additional materials and decide the motion on
the complaint alone or convert the motion to one for
summary judgment. *See* Fed.R.Civ.P. 12(b); *Kopec v.
Coughlin, 922 F.2d 152, 154 (2d Cir.1991); Fonte v.
Board of Managers of Continental Towers Condominium,
848 F.2d 24, 25 (2d Cir.1988).* The Court has determined
to treat the instant motion as a motion for summary
judgment. Therefore, the following facts are gleaned from
the parties' submissions, with all inferences drawn in favor
of the non-movant as required on a motion for summary
judgment. They are not findings of fact by the Court.

Sulton is a prison inmate who was incarcerated in Sing
Sing at the time of the incidents in question. Greiner was
Superintendent of Sing Sing at that time. Halko was and is
a doctor on medical staff at Sing Sing. Williams and
Lofton are alleged to be affiliated with the Sing Sing
Medical Department.

According to Sulton, on October 8, 1998, he slipped on a
flight of wet stairs, where there was no "wet floor" sign
posted, and injured his left knee. The next day his knee
was swollen and the pain "was real bad." That same day

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

Sulton went to sick call and saw P.A. Williams. Williams ordered x-rays and also ordered "no-work, feed-in cell, pain killers and a cane" for Sulton. The swelling went down, but the pain got stronger.

For four months Sulton complained to the Sing Sing medical staff about his pain. During this time his left knee would give out "at any time." Yet, "nothing was done." However, the Sing Sing Medical Department did send Sulton to the Green Haven Correctional Facility for an M.R.I. and, subsequently, knee surgery was recommended by an attending physician on April 23, 1999. A hinged knee brace was recommended for post-surgery recovery.

**\*2** At some point thereafter, Sulton wrote to Greiner concerning his medical problem and he was placed on "a call-out" to see Halko. Halko then informed Sulton that he would not be going for surgery because Correctional Physician Services [FN1] ("CPS") would not allow it. CPS wanted the inmate to undergo physical therapy before they would approve surgery. Sulton continued to be in pain and requested outside medical care from Williams. However, Williams could not do anything about Sulton's surgery until it was approved by CPS.

> FN1. CPS is the health maintenance organization which must pre-approve any outside medical service to be provided to inmates outside of the correctional facility.

In September 1999, Sulton was transferred to Wende Correctional Facility ("Wende"). The medical department there provided him with physical therapy for his left knee, which was "still in constant pain" and was prone to giving out beneath his body weight.

Sulton filed grievance # 14106-99 on November 3, 1999, and on November 24, 1999, he received a response from the Inmate Grievance Resolution Committee (the "IGRC"). Sulton contends that on that same date he indicated his desire to appeal their decision to the Superintendent. Sulton did not appeal his grievance to the highest level of administrative review, the Central Office Review Committee (the "CORC"). In a letter to Wende Superintendent Donnelly ("Donnelly") dated December

17, 2000, Sulton complained that he never received a response to his appeal of the IGRC decision. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly stated that he concurred with the IGRC's decision.

In January 2000, "plaintiff['s] legs gave out and the right leg took the weight of the body ... causing the plaintiff to suffer ... torn joints in the ankle area." Surgery was performed on the ankle and he was placed on "medical confinement status."

*Discussion*

I. *This Action Will Be Dismissed For Plaintiff's Failure To Comply With The Prison Litigation Reform Act Of 1996*

In his amended complaint, Sulton alleges that he filed a grievance and, although initially the Defendants were unable to identify the grievance, by his opposition to the instant motion Sulton has identified the process he undertook to pursue his grievance.

Section 1997e(a) of the Prison Litigation Reform Act (the "PLRA") provides that:

No action shall be brought with respect to prison conditions under ... 42 U.S.C. § 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

In enacting Section 1997e(a), Congress made exhaustion mandatory. *Salahuddin v. Mead,* 174 F.3d 271, 274-75 (2d Cir.1999). As a result, where an inmate fails to satisfy the PLRA's exhaustion requirement, the complaint must be dismissed. *See, e.g., Santiago v. Meinsen,* 89 F.Supp.2d 435, 439-40 (S.D.N.Y.2000) (citations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

In New York, the relevant administrative vehicle is the Inmate Grievance Program ("IGP"). *See* N.Y. Correct. Law § 139 (directing Commissioner of the Department of Correctional Services to establish a grievance mechanism in each correctional facility under the jurisdiction of the Department); N.Y. Comp.Codes R. & Regs., tit. 7, § 701.1 (instituting IGP). New York inmates can file internal grievances with the inmate grievance committee on practically any issue affecting their confinement. *See In re Patterson,* 53 N.Y.2d 98, 440 N.Y.S.2d 600 (N.Y.1981) (interpreting N.Y. Correct. Law § 139 broadly); N.Y. Comp.Codes R. & Regs., tit. 7, §§ 701.2(a) (inmates may file grievances about the "substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services ...") and 701.7 (procedures for filing, time limits, hearings and appeals).

**\*3** The New York State Department of Correctional Services ("DOCS") has established a grievance program with specific procedures which must be followed in order for a prisoner to exhaust his administrative remedies. *See Petit v. Bender,* No. 99 Civ. 0969. 2000 WL 303280, at *2-*3 (S.D.N.Y. March 22, 2000) (holding that prisoner failed to exhaust his administrative remedies where prisoner only partially complied with the grievance procedures established by Section 701 *et seq.*). These procedures include a requirement that an inmate appeal a Superintendent's decision to the CORC by filing an appeal with the Grievance Clerk. *See* N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7(c)(1).

There is, however, an additional issue to be addressed in this case, which is that the administrative remedies available to Sulton do not afford monetary relief. The Second Circuit has not yet ruled on whether the PLRA's exhaustion requirement applies where the available administrative remedies available do not provide the type of relief the prisoner seeks. *Snider v. Dylag,* 188 F.3d 51, 55 (2d Cir.1999) ("We note that it is far from certain that the exhaustion requirement of 42 U.S.C. § 1997e(a) applies to deliberate indifference claims ... under Section 1983, where the relief requested is monetary and where the administrative appeal, even if decided for the complainant, could not result in a monetary award.").

There is disagreement among the district courts within this circuit as to this issue, although there is "clear trend ... to find exhaustion applicable even where the requested relief, money damages, cannot be awarded by the administrative body hearing the complaint." *Santiago v. Meinsen,* 89 F.Supp.2d at 440; *see Snider v. Melindez,* 199 F.3d 108, 114 n. 2 (2d Cir.1999) (noting disagreement among courts as to applicability of exhaustion requirement where administrative remedies are unable to provide the relief that a prisoner seeks in his federal action); *but cf. Nussle v. Willette,* 224 F.3d 95, (2d Cir.2000) (holding that exhaustion not required for excessive force claim because such claim is not "prison conditions" suit and overruling district court decisions applying exhaustion requirement to excessive force claims seeking monetary relief).

Moreover, this Court has previously held that a prisoner must exhaust his administrative remedies before seeking relief in federal court in connection with a prison conditions claim even where a prisoner seeks damages not recoverable under an established grievance procedure. *Coronado v. Goord,* No. 99 Civ. 1674, 2000 WL 52488, at *2 (S.D.N.Y. Jan. 24, 2000); *Edney v. Karrigan,* No. 99 Civ. 1675, 1999 WL 958921, at *4 (S.D.N.Y. Oct. 14, 1999). This is the rule that will be applied here.

In his response to the motion to dismiss, Sulton indicates that he filed grievance # 14106-99 on November 3, 1999 and on November 24, 1999 he received a response IGRC and that on the same date Sulton indicated his desire to appeal their decision to the Superintendent. Sulton does not contend that he appealed his grievance to the highest level of administrative review, namely, the CORC. Instead, Sulton has asserted that Superintendent Donnelly never replied to the appeal of the IGRC decision and submits a letter dated December 17, 2000 in which Sulton complains that he never received a response from Donnelly. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly concurred with the decision of the IGRC denying Sulton relief. There is no evidence in the record that Sulton appealed the grievance to CORC.

**\*4** Accordingly, because Sulton failed to exhaust his administrative remedies by appealing the grievance to the CORC, his claims of medical indifference will be dismissed pursuant to 42 U.S.C. § 1997e. *See Petit,* 2000 WL 303280, at *3.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

*Conclusion*

Therefore, for the reasons set forth above, the Defendants'
motion will be granted and the amended complaint will be
dismissed without prejudice to the action being renewed
once Sulton has exhausted all administrative remedies.

It is so ordered.

S.D.N.Y.,2000.
Sulton v. Greiner
Not Reported in F.Supp.2d, 2000 WL 1809284
(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.